# 23-7407

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

GOLDEN UNICORN ENTERPRISES, INC., ON BEHALF OF THEMSELVES
AND ALL THOSE SIMILARLY SITUATED, BIG DOG BOOKS, LLC,
ON BEHALF OF THEMSELVES AND ALL THOSE SIMILARLY SITUATED,

—against—

*Plaintiffs-Appellants,*

AUDIBLE, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS
## [REDACTED]

CHRISTOPHER R. BAGLEY
LAW OFFICES OF
  JAMES SCOTT FARRIN
555 South Mangum Street, Suite 800
Durham, North Carolina 27701
(919) 688-4991

MITCHELL M. BREIT
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
405 East 50th Street
New York, New York 10022
(347) 668-8445

*Attorneys for Plaintiffs-Appellants*

## DISCLOSURE STATEMENT

Appellants GUE and BDB are owned solely by Jan Bonthu and Elizabeth

Noble, i.e., no public companies have membership interests.

# TABLE OF CONTENTS

PAGE

DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ..................................................... iv

I.   INTRODUCTION ........................................................ 1

II.  JURISDICTIONAL STATEMENT ...................................... 4

III. ISSUES PRESENTED .................................................. 5

IV. STATEMENT OF THE CASE ............................................ 5

V.  FACTS AND PROCEDURAL BACKGROUND ......................... 8

    A. The ACX Contracts ................................................ 8

    B. Industry Standards and Audible's Great Listen Guarantee ........... 9

    C. The October 2020 Glitch and Response ............................ 11

VI. ARGUMENT ............................................................ 16

    A. Standards of Review .............................................. 16

    B. The District Court Erred in Dismissing Plaintiffs' Claim for
       Breach of Contract ................................................ 17

       1. The term "returns" is ambiguous ............................... 17

       2. The term "returns" in Authors' contracts excludes
          exchanges .................................................... 24

    C. The District Court Erred in Dismissing Plaintiffs' Claim for
       Breach of the Implied Covenant of Good Faith and Fair
       Dealing .......................................................... 29

       1. Audible breached the implied covenant of good faith and
          fair dealing by concealing true numbers of sales, returns,
          and exchanges ................................................ 31

ii

PAGE

    2. Audible breached the implied covenant of good faith and fair dealing with both Plaintiffs by encouraging its customers to return Audiobooks ................................... 33

  D. The District Court's Exclusion of Expert Analysis of Audible's Reduction of Royalties Was Manifestly Erroneous ...... 36

    1. Egan's Methodologies Align With Plaintiffs' Theory of Liability, Even Though the Proposed Calculations Cannot Yet Be Conducted ................................................. 39

    2. Egan's Proposed Methodologies Are Not Too "Simple" to Assist the Fact-Finder ............................................. 43

    3. Lack of Analytical Complexity Is Not a Proper Basis for Exclusion ...................................................... 46

VII. CONCLUSION ......................................................... 48

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ................................................. 38

*Arnold v. Ambulance Serv., Inc.*,
    No. 2:06-CV-105, 2007 WL 5117409
    (E.D. Tenn. Aug. 21, 2007) ................................................ 45

*United States ex rel. Banigan v. Organon USA Inc.*,
    No. CV 07-12153-RWZ, 2016 WL 6571269
    (D. Mass. Jan. 20, 2016) ................................................... 47

*Bar-Tur v. Arience Cap. Mgmt., L.P.*,
    490 F. App'x 392 (2d Cir. 2012) ......................................... 24

*Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co.*,
    10 N.Y.3d 187, 856 N.Y.S.2d 505, 886 N.E.2d 127 (2008) ............. 33

*Bloom v. Hearst Ent., Inc.*,
    33 F.3d 518 (5th Cir. 1994) ............................................... 18

*Colon de Mejias v. Lamont*,
    963 F.3d 196 (2d Cir. 2020) ............................................... 16

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) ................. 17

*Cox v. Spirit Airlines, Inc.*,
    341 F.R.D. 349 (E.D.N.Y. 2022) ..................................... 21, 22

*Cox v. Spirit Airlines, Inc.*,
    786 F. App'x 283 (2d Cir. 2019) ..................................... 18, 21

*Dalton v. Educ. Testing Serv.*,
    87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) ............. 30

*Dart Mech. Corp. v. Johnson Controls, Inc.*,
    No. 13-CV-2941(JS)(AYS), 2015 WL 9050384
    (E.D.N.Y. Dec. 15, 2015) ................................................. 36

*Ezrasons, Inc. v. Travelers Indem. Co.*,
    89 F.4th 388 (2d Cir. 2023) ............................................... 19

iv

PAGE(S)

*Fox Film Corp. v. Springer*,
   273 N.Y. 434, 8 N.E.2d 23 (1937) ............................................ 2

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ................................................. 44

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*,
   317 F.R.D. 374 (S.D.N.Y. 2016) ............................................. 41

*Great Minds v. Fedex Off. & Print Servs., Inc.*,
   886 F.3d 91 (2d Cir. 2018) ................................................. 18

*In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*,
   1 F. Supp. 3d 34 (E.D.N.Y.) ................................................. 30

*L. Debenture Tr. Co. v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010) ..................................... 2, 3, 18, 25

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ............................................... 42

*Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*,
   441 F. Supp. 3d 745 (S.D. Iowa 2019) ...................................... 47

*Marx & Co. v. Diners' Club, Inc.*,
   550 F.2d 505 (2d Cir. 1977), *cert. denied*, 434 U.S. 861,
   98 S.Ct. 188 (1977) ........................................................ 40

*Mint Solar, LLC v. Sam's W., Inc.*,
   No. 5:19-CV-05167, 2021 WL 1776144
   (W.D. Ark. May 4, 2021) .................................................... 47

*Najjar Grp., LLC v. W. 56th Hotel LLC*,
   850 F. App'x 69 (2d Cir. 2021) ............................................. 31

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016) ................................................ 16

*Roberts v. Cap. One, N.A.*,
   719 F. App'x 33 (2d Cir. 2017) ......................................... 19, 23

*S. Coal Corp. v. Drummond Coal Sales, Inc.*,
   28 F.4th 1334 (11th Cir. 2022) ............................................. 18

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015) ............................................. 42

v

PAGE(S)

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*,
    769 F.3d 807 (2d Cir. 2014) ............................................... 16

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
    959 F.2d 425 (2d Cir. 1992) .......................................... 24, 25

*Slatt v. Slatt*,
    64 N.Y.2d 966, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985) ............ 25

*Tesser v. Bd. of Educ. of City Sch. Dist. of City of New York*,
    370 F.3d 314 (2d Cir. 2004) ................................................ 38

*In re The City of New York*,
    607 F.3d 923 (2d Cir. 2010) ................................................ 17

*Thomas v. Jordan*,
    66 Misc. 3d 54, 116 N.Y.S.3d 486 (N.Y. App. Term. 2020) ............ 24

*Topps Co. v. Cadbury Stani S.A.I.C.*,
    526 F.3d 63 (2d Cir. 2008) ................................................. 17

*Total Control, Inc. v. Danaher Corp.*,
    338 F. Supp. 2d 566 (E.D. Pa. 2004) ...................................... 47

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007) ....................................... 34, 35, 36

*United States v. Dwyer*,
    539 F.2d 924 (2d Cir. 1976) ................................................ 39

*United States v. Onumonu*,
    967 F.2d 782 (2d Cir. 1992) ........................................... 39, 48

*WWP, Inc. v. Wounded Warriors Fam. Support, Inc.*,
    628 F.3d 1032 (8th Cir. 2011) .............................................. 47

## Statutes

28 U.S.C. § 1291 ............................................................. 4

28 U.S.C. § 1332(d) .......................................................... 4

## Rules

Fed. R. Evid. 702 ........................................................ 37, 47

vi

PAGE(S)

Fed. R. Evid. 702(a) ........................................................ 47

N.Y. C.P.L.R. 213 ........................................................... 8

NY Rules of Prof. Cond. 1.1(a) ............................................ 44

NY Rules of Prof. Cond. 1.3(a) ............................................ 44

**Other Authorities**

*About Our Returns Policies,* AMAZON,
   https://www.amazon.com/gp/help/customer/display.html?nodeId
   =GKM69DUUYKQWKWX7 ................................................. 27

Alliance of Independent Authors, Orna Ross, ed., Self-Publishing
   Glossary, August 2020,
   https://www.allianceindependentauthors.org/wp-
   content/uploads/2020/08/Self-Publishing-Glossary-Print.pdf ........... 20

MERRIAM-WEBSTER ONLINE, "RETURN," NOUN, DEF. 5.B.,
   https://www.merriam-webster.com/dictionary/return (viewed
   Mar. 7, 2024) ............................................................ 20

Oxford English Dictionary ................................................ 19

Restatement (Second) of Contracts § 206 (1981) ........................... 24

Restatement (Second) of Contracts § 208, cmt. a ......................... 24

Webster's New International Dictionary ................................... 19

I.   **INTRODUCTION**

Defendant/Appellee Audible is a seller and distributor of audio versions of books ("Audiobooks"). Audible implemented a marketing campaign that it called the "Great Listen Guarantee," which allowed its subscribers to obtain an Audiobook with cash or credit and then return or exchange that book up to 365 days later, for any reason, even if it had been entirely consumed. When the Audiobooks were returned or exchanged after use, Audible profited from these transactions, because its revenue comes primarily through subscriptions.[1] Yet the return or exchange was accompanied by a nefarious practice: when Audiobooks were returned or exchanged for *any* reason (even fully consumed works returned under the Great Listen Guarantee), Audible clawed back all royalties earned by and paid to the authors of those Audiobooks.

Plaintiffs/Appellants are business entities owned by self-published authors who rely on Defendant Audible to distribute and sell audio versions of their works. They brought this case on behalf of other authors, or their respective business entities

---

[1] Evidence in this case shows that roughly ███████ of ACX Authors' Audiobooks are accessed via subscription plans, with the balance being single "à la carte" sales. *See* ECF No. 263-9, at Audible_00000550 (table in e-mail from ████████████ ████████████████████████████, to colleagues at Audible and Amazon, Aug. 10, 2020). In ████████████, ████████ of were obtained with credits by subscribers: ████████ were obtained by Audible members using subscription credits ("AL"), compared to ████████ à la carte purchases by Audible members ("ALOP") and non-members ("ALC"). *Id.*

1

(collectively, the "Authors"), who like Plaintiffs were deprived of royalties for Audiobooks that they wrote and that Audible sold. Plaintiffs' evidence shows that the Authors, pursuant to industry standard, reasonably understood that their contract with Audible provided for them to be compensated for Audiobooks that Audible sold, and that royalties withheld for "returns" would be limited to malfunctions, mis-selections, and other technical issues. In order to justify clawing back royalties even when consumers used the Audiobooks and Audible profited, Audible construed "returns" in the Authors' contract in a manner that rendered the term meaningless by giving Audible unfettered discretion to withhold royalties.

The District Court accepted Audible's interpretation of the contract, ruling that the term "return" in the contract was unambiguous as a matter of law. That holding is not supported by the applicable New York authorities. In evaluating ambiguity of a contract term, a court must consider whether the term "could suggest more than one meaning when viewed objectively by a reasonably intelligent person . . . who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *L. Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (citation omitted); *see also, e.g.*, *Fox Film Corp. v. Springer*, 273 N.Y. 434, 437, 8 N.E.2d 23, 24 (1937)). In considering possible ambiguity, a court "must be informed of the meaning of the language as generally understood in that business, in the light of the customs and practices of the business."

2

*L. Debenture Tr. Co.*, 595 F.3d at 466 (quoting *Springer*, 273 N.Y. at 437, 8 N.E.2d at 24). The District Court's disregard of this rule resulted in several errors:

- The contract term providing for royalties to be calculated on a count of gross sales "less any . . . returns" was interpreted entirely out of step with the trade to reverse royalty payments even for Audiobooks that customers accessed, consumed fully, and then exchanged.

- Under the circumstances here, the proper test is whether a reasonable author would have read the contract and concluded that she would lose her royalties when an Audible listener returned or exchanged an Audiobook after keeping it for up to 365 days and completely consuming it, even though Audible itself did not typically return cash revenue to its customer.

- The contract is one of adhesion, and there was no negotiation of the terms of the contract between Audible and the Authors, which should have counseled in favor of application of the *Law Debenture Trust* rule.

In effect, Audible demanded, and the District Court allowed, that Authors be limited to an illogical general-use dictionary definition of "returns," untethered from the realities of the publishing industry. The District Court's ruling contravened the well-established principles that ambiguity must be assessed in the eyes of the non-drafting party.

The District Court compounded this error with a constrained view of the covenant of good faith inherent in the contract, holding that Audible did not breach this covenant despite (1) concealing from Authors the numbers of Audiobooks that customers returned and exchanged, and (2) actively inviting customers to exchange pursuant to the self-serving Great Listening Guarantee, to the Authors' detriment.

The District Court also improperly excluded expert testimony propounded by Plaintiffs to forecast their ability to prove damages.

The District Court's rulings were erroneous. Plaintiffs request reversal and remand for further proceedings.

## II.    JURISDICTIONAL STATEMENT

The United States District Court for the Southern District of New York ("District Court") had subject-matter jurisdiction over this case under 28 U.S.C. § 1332(d), because this is a class action with diversity between at least one class member and Audible, and because aggregate damages exceed $5,000,000. The District Court entered final judgment on September 21, 2023.[2] Plaintiffs timely filed a notice of appeal on October 16, 2023. This Court has jurisdiction under 28 U.S.C. § 1291.

---

[2] Plaintiffs' Complaint in this action also raised a claim for unjust enrichment, which the District Court dismissed on December 8, 2021. Plaintiffs do not appeal that dismissal.

## III.   ISSUES PRESENTED

**A.** Whether the District Court erred in holding, as a matter of law, that the term "returns" in the parties' contract encompassed all instances where an Audible customer returned, exchanged, or otherwise gave up access to an Audiobook, and that the "less any . . . returns" term allowed Audible to deduct all such instances from Authors' royalty calculations.

**B.** Whether the District Court erred in holding that Audible could not have breached the contract's implied covenant of fair dealing by concealing the numbers of Audiobooks that its customers were returning and exchanging.

**C.** Whether the District Court erred in holding that Plaintiffs' evidence could not have shown that Audible breached the contract's implied covenant of fair dealing by encouraging its customers to exchange Plaintiffs' Audiobooks.

**D.** Whether the District Court erred in excluding Plaintiffs' damages expert, Joseph Egan.

## IV.   STATEMENT OF THE CASE

Plaintiffs Golden Unicorn Enterprises, Inc. ("GUE") and Big Dog Books, LLC ("BDB") filed suit against Audible on August 20, 2021, raising contract-based claims related to Audible's clawback of royalty payments for Audiobooks that were returned or exchanged. Plaintiffs first discovered these claims Audible inadvertently disclosed its clawback policy through a computer glitch.

The District Court (Furman, J.) granted summary judgment on Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing. ECF No. 280 & 294. The court concluded that the term "returns" in the contracts between Authors and Audible was unambiguous, that the contract allowed royalties to be calculated net of "returns," and that Plaintiffs did not isolate specific instances of impermissible "returns" or where Audiobooks had been exchanged at Audible's encouragement. ECF Nos. 280 & 294. The court also granted Audible's motion to exclude the testimony of Joseph Egan, the expert retained by Plaintiffs to explain and calculate the damages to Authors. ECF No. 280.

The District Court denied as moot Plaintiffs' class-certification motion and Audible's motion to exclude Thad McIlroy, an industry expert retained to explain the understanding of contract terms in the relevant market, and entered final judgment on September 21, 2023.

Plaintiff GUE is a Colorado corporation whose sole shareholder is Jan Bonthu, who writes romance novels primarily under the pen name "J.S. Scott." Plaintiff GUE and Ms. Bonthu began using the Audio Creation Exchange ("ACX"), Audible's online portal for self-publishing Authors, and licensing their audio rights to Audible in 2014. Unbeknownst to Plaintiff GUE until discovery in this lawsuit, Audible deducted $38,701 from GUE's royalties between August 20, 2015, and December 31, 2021. ECF No. 261-5 (Decl. of Jan Bonthu); ECF No. 222-1 (Expert Rep't of

Joseph Egan) ¶ 42; *see also* ECF No. 132-30 (Account Manager Statement of Golden Unicorn Enters.).

Plaintiff BDB is a North Carolina LLC whose sole member is the novelist Elizabeth Noble, who writes under the name "Sawyer Bennett." Both BDB and Noble licensed audio rights in their self-published works to Audible and began using ACX in 2015. Unbeknownst to Plaintiff BDB until discovery in this lawsuit, Audible deducted $43,929 from BDB's royalties between August 20, 2015, and December 31, 2021. ECF No. 261-7; ECF No. 222-1 ¶ 42; *see also* ECF No. 132-14 (excerpts of BDB account-manager statement). Separately, as discussed more fully in section VI.B.2, *infra*, BDB and Ms. Noble licensed audio rights to a series of her novels to Audible in a non-ACX contract.

Members of the putative class are similarly situated self-published Authors, or their business entities, who licensed audio rights in their works to Audible.

Defendant Audible is a Delaware corporation headquartered in Newark, New Jersey, and distributes Audiobooks both pursuant to subscription plans and through non-subscription "à la carte" sales. ECF No. 299-2 ¶¶ 1–4. Self-published Authors use ACX to upload audio versions of their works, track sales, enter into contracts, and in some instances, to create the Audiobooks. ECF No. 299-2 ¶¶ 2–4. Audible

sold and otherwise distributed ███████ Audiobooks from those self-published Authors between August 20, 2015, and December 31, 2021.[3]

## V.     FACTS AND PROCEDURAL BACKGROUND

### A. The ACX Contracts

Audible launched the Audio Creation Exchange for self-publishing Authors in 2011. ECF No. 299-2 ¶ 2. ACX.com was an online portal where self-published Authors entered into a form contract for the distribution of their works. ECF No. 299-2 ¶ 2–4. While some Authors produced their own Audiobooks before uploading them to ACX for distribution, ACX also allowed Authors to identify and contract with narrators and producers to create Audiobooks via the portal. ECF No. 299-2 ¶¶ 3–4. Throughout the class period until March 2021, an Author could view her month-to-date "total sales units" for each title and for all titles on her sales "dashboard" at ACX.com. ECF Nos. 261-27 & 261-29. Except for a critical three-week period in fall 2020, this number reflected numbers ***net*** of returns and exchanges, *i.e.*, without indicating that Audible was clawing back royalties. *See* ECF No. 261-27 (showing dashboard format before early 2021); ECF No. 249-28 (e-mail from Rich Bernardo, Audible Product Lead for Creator and Content Products, March 18, 2021, explaining subsequent changes); ECF No. 261-32 (Audible/ACX e-mail

---

[3] Plaintiffs' proposed class period begins on August 20, 2015, exactly six years before the filing of their Complaint. *See* N.Y. C.P.L.R. 213 (McKinney). Documents produced by Audible in discovery show data for the class period through December 31, 2021.

to Author, Oct. 26, 2020), at Audible_00001654. The Author was not able to see gross numbers of sales or gross numbers of returns and exchanges. ECF No. 261-27. Audible provided month-end totals to Authors in monthly royalty statements. *See, e.g.*, ECF No. 249-6 (April 2017 Royalty Statement of Golden Unicorn Enterprises).

While Plaintiffs and other class members entered into various licensing agreements with Audible, the provisions at issue in this lawsuit do not vary. Each agreement provided for Authors to be paid royalties calculated as fixed percentages of gross sales "***less any*** cash incentives, promotional discounts, sales or use taxes, excise taxes, value-added taxes, duties, and ***returns***." ECF Nos. 261-18 & 261-19 (emphasis added). The agreements do not define the word "returns" or the circumstances under which Audible accepts returns. This language was uniform among all the contracts, drafted by Audible and presented to Authors without any opportunity for negotiation ECF No. 299-2 ¶ 8; ECF No. 299-1, 30:20–21 (Dep. of Diana Dapito, Aug. 16, 2022).

### B. Industry Standards and Audible's Great Listen Guarantee

Because a book, beyond its physical form, embodies intellectual property that can be fully consumed in a relatively short time, retailers who sell traditional hard-copy books allow customers to return them only under narrow circumstances. ECF No. 261-8 (Expert Rep't of Thad McIlroy), at 14–19. Industry standards for "returns" of digital books and Audiobooks, which consist purely of intellectual property, are

even stricter. ECF No. 261-8, at 15–19. A significant proportion of retailers flatly consider audiobooks to be unreturnable, reflecting the reality that an audiobook, once listened to, is fully consumed and cannot be truly returned. ECF No. 261-8, at 14–19. (*E.g.*, "As it is not possible to 'return' an ebook in the same way that books can be returned in print form, we are not able to accept returns."). For this reason, retailers who do issue refunds for purchased audiobooks typically limit them to instances of technical flaws and payment errors. *Id.* The allowed window to request a refund is seven days. *Id.* Notably, the purchase of digital books distributed through and read on the Kindle platform of Audible's parent company, Amazon, may be refunded only within seven days and only if less than 10% of the book has been consumed. ECF No. 261-8, at 15–17. Returns are consequently few. ECF No. 261-8, at 13–14. Because of the nature of intellectual property, an author whose Audiobook is made available on Audible or another retailer does not reasonably expect royalty income to be reduced when Audible or another retailer issues a refund for a reason other than technical flaws and payment errors or outside the narrow windows described above. ECF No. 261-8, at 18–20.

In 2011, under its Great Listen Guarantee, Audible began accepting returns and exchanges, for any reason, up to 365 days after purchase or distribution. ECF No. 299-2 ¶ 25–27; ECF No. 299-3, Audible_00001595–96 (e-mail from Audible ███████████████████████████ to Audible author liaison ████████, Feb. 13,

2020). Audible described such a transaction most often as an "exchange" or "swap." *See* ECF No. 299-2 ¶ 30 (citing ECF No. 216-14 (2017 Audible e-mail to Jan Bonthu), ECF No. 216-15 (2019 Audible e-mail to Elizabeth Noble)).

Audible distributed ███████████ Audiobooks from self-published Authors between August 20, 2015, and December 31, 2021, and realized sales of ███████ on them before netting out returns and exchanges. ECF Nos. 132-21 & 132-22.[4] Audible listeners returned and exchanged ███████████████ Audiobooks during this period, representing ███████████ in lost revenue for the proposed class of Authors through 2021. ECF Nos. 132-21 & 132-22.[5]

## C. The October 2020 Glitch and Response

In late 2020, an anomaly in Audible's accounting software suddenly altered the sales and royalty data that Authors were able to see in their online ACX dashboards. From September 25 through October 18, 2020, the dashboards inadvertently revealed gross sales numbers. On October 19, 2020, those numbers were reduced to net out three weeks of returns and exchanges. ECF No. 1, ¶ 71; ECF

---

[4] These numbers are calculated from numbers in the "purchase" columns of two spreadsheets that Audible produced in discovery. One spreadsheet, filed as ECF No. 132-21, shows the "sum of royalty amount" calculated on self-published Authors' Audiobooks that Audible sold or otherwise distributed in the calendar years 2015–21. The other, ECF No. 132-22, shows corresponding figures for only the portion of 2015 that falls within Plaintiffs' proposed class period.

[5] These numbers are calculated from numbers in the "refund" columns of the same spreadsheets. Plaintiffs do not claim this entire amount as damages, but only the amounts corresponding to the revenue lost as a result of returns and exchanges outside of industry practices. *See infra* § VI.B.2.

No. 37, ¶ 71; ECF No. 261-32, at Audible_00001654.[6] Because of this glitch in the reporting system, the impact of Audible's unreasonable interpretation of "returns" on Author's royalties was evident for the first time.

This glitch and the previously hidden losses that it suggested prompted Authors to investigate and learn that Audible had been encouraging its customers to exchange Audiobooks and then clawing back royalties. ECF No. 299-2 ¶ 43; *see, e.g.*, ECF No. 261-32 (Author Complaint), at Audible_00001657–58. The extent to which Authors could have been aware of the effect upon their royalties before October 2020 is a disputed issue of fact. ECF No. 299-2 ¶ 30 (citing ECF No. 216-14 (2017 Audible e-mail to Jan Bonthu); ECF No. 216-15 (2019 Audible e-mail to Elizabeth Noble). Regardless, Audible did not ***tell*** Plaintiffs how the unrestricted guarantee would impact their royalty incomes. Nor were the GLG's terms referenced anywhere in the ACX contracts of adhesion. *See, e.g.*, ECF No. 1-1; ECF No. 261-5 ¶ 3; ECF No. 261-7 (decl. of Elizabeth Noble) ¶ 3; ECF No. 261-18; ECF No. 261-19. Indeed, Audible represented to Authors that it "can and does limit returns," but, when asked, a Senior Director of Customer Experience was unable to identify ***any*** such limit. ECF No. 299-2 ¶¶ 125–26; ECF No. 261-23 (Compilation of Audible statements to Authors); ECF No. 261-21, at 41:7–47:9.

---

[6] Some Audible documents show that the calculation of the numbers reverted to its prior method one day later, on October 20, 2020. *E.g.,* ECF No. 261-32, at Audible_00001647.

The record demonstrates that, prior to October 2020, Authors believed that their sales numbers and royalty incomes were not reduced for the vast numbers of returns and exchanges that Audible was allowing: when the glitch adjusted the numbers reported to Authors to net out returns and exchanges during twenty-one days at once, wide outrage immediately ensued. ECF No. 299-2 ¶¶ 143, 145–46; 148–152. Authors contacted Audible directly to complain, many asserting that they had been duped. ECF No. 299-2 ¶ 43; ECF No. 261-32. An open letter from the Authors' Guild, a trade organization, called on Audible to reform its "unparalleled" return and royalty-payment practices. ECF No. 299-2 ¶¶ 148–150; ECF No. 261-36. An associated petition directed at Authors drew 13,175 signatures within a month. ECF No. 299-2 ¶ 150; ECF No. 261-37 (Dec. 4, 2020, e-mail from Audible marketing director ███████ ), at Audible_00006675. For months, Audible tracked Authors' sentiment on social media as Authors discussed the impact of the previously concealed royalties information. ECF No. 299-2 ¶ 151; ECF No. 261-38 (Jan. 15, 2021, e-mail from Audible marketing director ███████ ).

The outcry prompted Audible to reform its payment practices in early 2021 to align more closely with the industry standard and with Authors' reasonable expectation of the meaning of "returns." Audible began paying royalties where Audiobooks were returned more than seven days after being released to the consumer. ECF No. 299-2 ¶¶ 153–55; ECF No. 261-37, at Audible_00006675.

Audible set this seven-day limit based on ████████████████████████████

████████████████████. ECF No. 261-17 (Dapito Dep.), at 109:19–110:5.

Audible then deleted the term "Easy Exchanges," language that does not correspond

to the use of "returns" in the contract with Authors, from its website and marketing

materials, ECF No. 299-2 ¶ 158, ECF No. 249-41. Audible also began reporting, and

not concealing, numbers of books returned or exchanged within seven days

("qualified returns"), which it still deducts from Authors' sales and royalties. ECF

No. 299-2 ¶ 156; ECF No. 261-17, at 107:5–110:5; ECF No. 249-40, at

Audible_00001233. Partial dashboard views before and after this change are below.



ECF No. 261-27, at Audible_00000460 (Fig. 1) (showing no returned, refunded, or

exchanged Audiobooks).



ECF No. 261-28, at Audible_00000463 (Fig. 2) (showing, with added highlight, "qualified return units" that are refunded, returned, or exchanged within seven days, resulting in royalty deductions).

　　All in all, the class lost as much as ▮▮▮▮▮ from ▮▮▮▮▮ returned and exchanged Audiobooks, as measured through the end of 2021. ECF Nos. 132-21 & 132-22. Plaintiffs assert that the proper measure of damages for breach of contract is this number less those instances where an Audible customer returned an Audiobook that had a technical defect or had been purchased by mistake, *i.e.*, reasonable returns. In other words, Plaintiffs ask that their royalties income and other

Authors' royalties income reflect "less any . . . returns" as that word is understood in the world of digital publishing. Plaintiffs' damages expert, Joseph Egan, has demonstrated that he will be able to calculate such damages, as discussed more fully in § VI.D, *infra*. Audible's reform of its payment practices reduced Authors' losses by approximately ████████ beginning in 2021. ECF No. 261-17, at 198:12–199:12. This lawsuit followed to recoup the improperly withheld royalties primarily from before the change.

## VI.    ARGUMENT

### A. Standards of Review

On appeal, a district court's grant of summary judgment is reviewed de novo. *See Colon de Mejias v. Lamont*, 963 F.3d 196, 202 (2d Cir. 2020). Contract interpretation as a question of law is reviewed de novo on appeal. *See id.* Such interpretation includes "questions as to the plain meaning or ambiguity of the language of a contract." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 815 (2d Cir. 2014) (quoting *Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88, 90 (2d Cir. 2010)).

A district court's exclusion of expert testimony is reviewed for abuse of discretion. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016). While a district court's discretion "is considerable, it is not unfettered." *Id.* (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)). Specifically, "[a] district court

'abuses' its discretion if it (1) bases its ruling on an 'erroneous view of the law,' (2) makes a 'clearly erroneous assessment of the evidence,' or (3) renders 'a decision that cannot be located within the range of permissible decisions.'" *In re The City of New York*, 607 F.3d 923, 943 (2d Cir. 2010) (quoting *Sims v. Blot*, 534 F.3d 117, 132 (2d Cir.2008)); *see also Cooter & Gell v. Hartmarx Corp*., 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law[.]").

## B. The District Court Erred in Dismissing Plaintiffs' Claim for Breach of Contract.

### 1. The term "returns" is ambiguous.

The District Court held that the word "returns" unambiguously includes exchanges of Audiobooks in situations that are extremely unusual in the world of digital self-publishing, and on that basis held that Audible's contracts with Authors allowed it to reduce royalties corresponding to those exchanges. ECF No. 280, at 7–9. In adopting Audible's preferred construction of the term "returns," the District Court relied on definitions from two general-usage dictionaries without analysis of the terms or reference to usage in the relevant industry. *Id.* This was reversible error.

A court may decide a contract claim on summary judgment "only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). Under New York law, which applies to this

standard form contract, *e.g.*, ECF No. 1-1 ¶ 17, "an ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and ***who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business***.'" *L. Debenture Tr. Co.*, 595 F.3d at 466 (citation omitted; emphasis added). "Ordinarily, courts are bound to the four corners of the contract in interpreting it, but there is an exception for evidence of industry usage or custom, and this evidence may be considered in determining whether a contract is ambiguous." *S. Coal Corp. v. Drummond Coal Sales, Inc.*, 28 F.4th 1334, 1342 (11th Cir. 2022) (interpreting New York law and citing *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617–18 (2d Cir. 2001)); *see also Bloom v. Hearst Ent., Inc.*, 33 F.3d 518, 522 (5th Cir. 1994) ("[I]ndustry custom and usage is a determinative factor in discovering whether a contract term is ambiguous.") (applying New York law). "If 'specific [contract] language is susceptible of two reasonable interpretations,' the contract is ambiguous as a matter of law." *Great Minds v. Fedex Off. & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018) (quoting *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244, 997 N.Y.S.2d 339, 342, 21 N.E.3d 1000, 1003 (2014)); *see also Cox v. Spirit Airlines, Inc.*, 786 F. App'x 283, 286 (2d Cir. 2019) (determining "price" to be ambiguous because it did not specify which service).

Assessment of ambiguity in a form adhesion contract focuses on the "reasonable expectations" of the average nondrafting party who enters into the contract with the drafter. *Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 395 (2d Cir. 2023) (quoting *Mostow v. State Farm Ins. Cos.,* 88 N.Y.2d 321, 326–27, 645 N.Y.S.2d 421, 424, 668 N.E.2d 392, 395 (1996). The inquiry furthermore focuses on "common speech" as used by those nondrafting parties. *Id.* A court must give meaning to the ***entire phrase*** in which a contested term appears. *Roberts v. Cap. One, N.A.*, 719 F. App'x 33, 36 (2d Cir. 2017) ("The district court repeatedly emphasized the word 'pay' without explaining what significance, if any, it attributed to the transitive verb 'elect to' in each clause using that formulation.").

The District Court relied on definitions of "return" found in two general-usage dictionaries: Webster's New International Dictionary ("to bring, send or put back to or in a former position" and "to restore for a former . . . state") (sic) and the Oxford English Dictionary ("[t]he act of sending . . . a thing back to the . . . owner"). ECF No. 280, at 7–8. Such definitions may apply to traditional sales of physical goods, but they are inapposite in the context of both digital products—whose electronic code is not delivered back to the seller—and consumable items like Audiobooks—whose value is imparted at the moment of consumption and cannot thereafter be truly "returned."

Even general-usage dictionaries vary in their definitions of the word "return." Merriam-Webster's sole definition **as used in publishing** provides that returns are "**unsold** publications returned to the publisher for cash or credit." MERRIAM-WEBSTER ONLINE, "RETURN," NOUN, DEF. 5.B., https://www.merriam-webster.com/dictionary/return (viewed Mar. 7, 2024) (emphasis added). A self-publishing trade organization's definition of the word is nearly identical: "[b]ooks returned from book retailers to the publisher and refunded after failing to sell." Alliance of Independent Authors, Orna Ross, ed., Self-Publishing Glossary, August 2020, https://www.allianceindependentauthors.org/wp-content/uploads/2020/08/Self-Publishing-Glossary-Print.pdf, at 98. The distinction is important: under the interpretation of "returns" advanced by Audible and accepted by the District Court, a customer forfeits the use and benefit of the physical good when she returns it for cash or credit. But a purchaser of an Audiobook—through its nature both as a digital product, and as consumable intellectual property—forfeits nothing where she has listened to some, most, or all of an Audiobook before exchanging it for another, effectively consuming it for free. The evidence in this case, including Audible's internal research, shows that such circumstances were pervasive. *See, e.g.,* ECF No. 249-24, at Audible_00001429 (Audible internal research showing that more than 20 percent of subscribers who "returned" Audiobooks did so on at least some occasions because they had "already listened."

20

In *Cox*, this Court reversed dismissal of class plaintiffs' state-law contract claims on a federal preemption defense and held that "'price' is an ambiguous term" with respect to an airline ticket. 786 F. App'x at 286. Specifically, a stated "price" did not necessarily include or exclude passage of carry-on luggage along with the transportation of the passengers themselves:

> Whether, in light of state-law principles of contract interpretation, the carriage of Plaintiffs' carry-on items was in fact within the scope of Spirit's obligations, is a question for the district court to consider in the first instance. We conclude only that, in light of what appear to be ambiguities in the contract that Plaintiffs allege Spirit to have breached, and our conclusion that ADA preemption does not apply, Plaintiffs' breach of contract claim was not dismissible on the pleadings.[7] . . . [W]e hold that "price" is an ambiguous term.

*Id.* 285–86. In denying the defendant airline's motion for summary judgment after remand, the district court noted that, even if it were not bound by Second Circuit's holding of ambiguity, it would still find the term ambiguous. *See Cox v. Spirit Airlines, Inc.*, 341 F.R.D. 349, 356 (E.D.N.Y. 2022).

As this Court and the Eastern District of New York implicitly asked with respect to "price" in Cox, the question in the ACX contract is: "Returns of what, precisely?" The contract does not specify whether this includes "all returns," "returns and exchanges," or "returns of Audiobooks that customers read but didn't

---

[7] While the Second Circuit overruled dismissal on the pleadings in *Cox*, its finding of ambiguity is applicable here, too, because summary judgment in this case was based on the District Court's holding that contract was unambiguous irrespective of evidence adduced in discovery.

love and exchanged pursuant to the Great Listen Guarantee," or anything of the sort. *See* ECF No. 299-2 ¶¶ 119–21; ECF No. 261-18; ECF No. 261-19. Nor is it clear whether the modifier "any" applies only to the immediately following phrase "cash discounts," or to "returns" and the other subsequent items. *See* ECF No. 261-18; ECF No. 261-19.

The District Court distinguished *Cox v. Spirit Airlines*, holding that Audible's contracts at issue were

> clear with respect to "returns of what?" The answer is returns of audiobooks. In other words, *Spirit Airlines* involved ambiguity as to what the "price" term encompassed. Here, by contrast, there is no ambiguity as to what the "returns" term encompasses; merely a dispute over Audible's business decision to allow a generous return policy.

*See* ECF No. 280, at 10. But this logic does not address the core question: "which Audiobooks?" Audiobooks whose purchases were refunded for industry-standard reasons such as technical flaws or mistaken purchases? Or *all* Audiobooks? The District Court's answer is based on its erroneous determination that "returns" unambiguously includes even "exchanges" and "swaps"—*i.e.*, reading one Audiobook and then "returning" it to receive another—in the context of Audiobook publishing. *See* ECF No. 280, at 7–8 ("At a minimum, [Plaintiffs] assert, returns should not include 'exchanges' or 'swaps.' But this reading finds no support whatsoever in the contract itself or in the plain and ordinary meaning of the term 'returns.'" (citation omitted)). Nor is there any evidence that Audible attempted to

make Authors aware, or that Authors otherwise had reason to know, of this contextually unusual interpretation.

Also instructive is the Second Circuit's decision in *Roberts v. Capital One*, which involved a plaintiff who was charged overdraft fees when her bank account had insufficient funds to cover a charge at the moment the transaction was settled. *See* 719 F. App'x 33. The relevant contract defined "overdraft" merely by putting the term in a parenthetical following a long and grammatically complex phrase: "We may in our sole discretion, and without obligation, elect to pay checks and other items drawn on your deposit account or to permit automatic bill payments and withdrawals against your account for an amount in excess of your available balance (an 'Overdraft')." The district court adopted the defendant bank's emphasis on "pay" and its argument that the overdraft occurred at the time the bank settled the transaction with the merchant. *See Roberts*, 719 F. App'x at 34–36. On appeal, the plaintiff argued that the insufficiency should instead be determined at the time the bank elects to pay the charge, *i.e.*, when the card is swiped and the merchant authorizes the transaction, typically a day or more before the transaction is settled. The Second Circuit agreed, holding that "the district court repeatedly emphasized the word 'pay' without explaining what significance, if any, it attributed to the transitive verb 'elect to' in each clause using that formulation."

2.   The term "returns" in Authors' contracts excludes exchanges.

Because the District Court erroneously held that the term "returns" was unambiguous, it also failed to consider evidence that supports Plaintiffs' and Authors' understanding of that ambiguous term.

"In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (citing *Slatt v. Slatt*, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985)). "Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words becomes an issue of fact and summary judgment is inappropriate." *Bar-Tur v. Arience Cap. Mgmt., L.P.*, 490 F. App'x 392, 395 (2d Cir. 2012) (quoting *Seiden Assocs.*, 959 F.2d at 428).

"In cases of ambiguity, a contract must be construed most strongly against the party that prepared it, and favorably to a party that had no voice in the selection of its language." *Thomas v. Jordan*, 66 Misc. 3d 54, 56, 116 N.Y.S.3d 486 (N.Y. App. Term. 2020); *see* Restatement (Second) of Contracts § 206 (1981). This principle is particularly important in construing ambiguity in a standardized adhesion contract, drafted by one party and offered to the other on a take-it-or-leave-it basis. *See* Restatement (Second) of Contracts § 208, cmt. a.

Viewing the ACX contract as a whole, its intent was mutually beneficial profit to both parties—to Audible through sale and distribution of Audiobooks, and to Authors through payment of royalties associated with the sale and distribution. That intent was disregarded when Authors were denied royalties on Audiobooks accessed by customers, particularly when those transactions provided value to Audible's customers and, ultimately, to Audible. *See L. Debenture Tr. Co.*, 595 F.3d at 466; *Seiden*, 959 F.2d at 428 (2d Cir. 1992); *Slatt*, 64 N.Y.2d at 967, 488 N.Y.S.2d at 646, 477 N.E.2d at 1100; ECF No. 299-2 ¶ 118; ECF No. 263-9, at Audible_00000550.[8]

Because the District Court considered the contract language unambiguous, it engaged in limited discussion of the ample evidence supporting Plaintiffs' construction of the terms. ECF No. 280, at 10–11 ("But all of this is extrinsic evidence that the Court may not consider because, as discussed above, the relevant term in the Agreement is unambiguous.") (citing *Universal Instruments Corp. v.*

---

[8] Of the Audiobooks by ACX authors accessed by listeners in ████████████ percent were obtained with credits by subscribers: ███████ were obtained by Audible members using subscription credits ("AL"), compared to ██████ à la carte purchases by Audible members ("ALOP") and non-members ("ALC"). Audible_00000550 (table in e-mail from ████████████ to colleagues at Audible and Amazon, Aug. 10, 2020). The terms "AL," "ALOP," and "ALC" were defined by Audible in its Rule 30(b)(6) deposition. ECF No. 261-17, at 10:20–11:11, 200:6–201:1. Given that only subscribers may take full advantage of the Great Listen Guarantee, ECF No. 299-2 ¶ 9, it follows that ████████████ returns and exchanges involved Audiobooks obtained through subscription plans.

District Court did not address, precludes summary judgment that the ACX contract's term "returns" includes exchanges or other instances where the Audiobook was at least partially consumed or held for any significant time. It also precludes a holding that, as a matter of law, the term "less any . . . returns" allows Audible to reduce Authors' royalties when an Audiobook is returned or exchanged for reasons other than a technical defect or a mistaken purchase, or more than seven days after purchase.

As shown by Plaintiffs' industry expert Thad McIlroy, refunds and exchanges in other contexts are simply outside industry norms, and it is unheard of to reduce the earnings of self-published authors when digital media purchases are refunded for reasons other than these. ECF No. 299-2 ¶ 161; ECF No. 261-8, at 15–18[9]; *see also* ECF No. 261-36, at 2–3 (Authors Guild asserting that "it is not fair to deduct the author's royalty for [Audio]books that have been or could have been listened to. This practice is unparalleled in digital media retail"). The industry standard under which digital media is considered returnable is extremely tight, with few retailers allowing returns for ***any*** reason after seven days. ECF No. 299-2 ¶ 161; ECF No. 261-8, at

---

[9] The District Court denied Audible's motion to exclude Mr. McIlroy as moot, but upon remand Plaintiffs intend to use his opinions to support their arguments that industry standards require royalties to be paid in most instances where Audible improperly deducted for what it calls "returns."

15–18.[10] The District Court viewed retailers' policies as "scattered and inconsistent," ECF No. 280, at 9, even though they typically provide a seven-day window for returns and exchanges and typically bar "returns" in instances where a product has been consumed in any substantial part. ECF No. 299-2 ¶ 160; ECF No. 261-8, at 14–15. Based on those standards and Mr. McIlroy's own experience, "it would be unreasonable to expect that an author would understand that their royalties would be net of these returns" in the circumstances allowed and encouraged by Audible. ECF No. 299-2 ¶ 163; ECF No. 261-8, at 19. Nor would a reasonable Author be expected knowingly to enter a contract with a retailer whose habit of encouraging consumers to seek refunds or exchanges of their fully consumed intellectual property could be "catastrophic" to the Author's earnings. ECF No. 299-2 ¶ 164; ECF No. 261-8, at 14.

Audible's separate contracts with Ms. Noble (of Plaintiff Big Dog Books) and other prominent self-published authors show that Audible itself perceived a difference between "returns" and "exchanges." While those authors were able to negotiate royalty rates and advance amounts in these separate contracts, other contractual language was offered to them on a take-it-or-leave-it basis. ECF No. 299-

---

[10] Among the retailers cited by McIlroy is Amazon, Audible's parent company. *See id.*; *About Our Returns Policies,* AMAZON, https://www.amazon.com/gp/help/customer/display.html?nodeId=GKM69DUUYKQWK WX7 (click on bookmark for "Digital Products" or scroll down to "Digital Products").

2 ¶ 75; ECF No. 261-11, at GUE_00000395–396, License and Distribution Agreement for Sex and Sweet Tea, October 16, 2018. These provided for Ms. Noble's royalties to be calculated on Audible's sales "less any cash incentives, promotional discounts, sales or use taxes, excise taxes, value-added taxes, duties, ***exchanges*** and returns." ECF No. 299-2 ¶ 75; ECF No. 261-11, at GUE_00000395–396 (emphasis added). Audible's use of the word "exchanges" in such non-ACX contracts shows that it recognizes exchanges, where a customer obtains a second Audiobook after giving up access to the first, as an independent concept.

The gap between Audible's understanding and Authors' understanding of the word "returns" was displayed in the outcry that followed Audible's inadvertent disclosure of its actual royalty payment practices in late 2020. Prior to the glitch, Audible's external communications did not alert Authors about how it calculated royalties. For years, Audible encouraged listeners to "swap" books and frequently referred to its "Great Listen Guarantee" as "Easy Exchanges." *See, e.g.*, ECF No. 216-12, at 89. Following the glitch in late 2020, Audible deleted this language from its website and marketing materials. *See* ECF No. 299-2 ¶ 158, ECF No. 249-41. Meanwhile, Authors complained both directly to Audible, ECF No. 299-2 ¶ 43; ECF No. 261-32, and in public forums, ECF No. 299-2 ¶¶ 148–150; ECF No. 261-36; ECF No. 299-2 ¶ 150, ECF No. 261-37, at Audible_00006675. Audible responded by reforming its payment practices and reporting raw numbers of books returned or

exchanged within seven days, which it still deducts from Authors' sales and royalties. ECF No. 299-2 ¶¶ 153–56; ECF No. 261-17, at 107:5–110:5; ECF No. 261-37, at Audible_00006675; ECF No. 249-40, at Audible_00001233. Audible set this seven-day limit based on ███████████████████████████████████ ████████████████████████████. ECF No. 261-17, at 109:19–110:5. This reform strongly suggests that Audible aimed at conforming, belatedly, to Authors' reasonable expectations of which returns could be accepted such that they would trigger deductions in Authors' royalty payments.[11]

If applied to the ambiguous term "less any . . . returns" in the contract, this evidence (at a minimum) supports a reading that the contract did not allow Audible to reduce Authors' royalties for books mostly consumed and then swapped well outside the industry standard window for returns.

### C. The District Court Erred in Dismissing Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

Plaintiffs raise their implied-covenant claim based on two sets of facts. First, Audible concealed the numbers of returns and exchanges from Plaintiffs and other Authors, thus preventing them from understanding the clawback policy's impact on their royalty incomes. Second, Audible actively encouraged many of its customers

---

[11] The District Court discounted these reforms and in fact held them against Plaintiffs, reasoning that Audible's definition of "returns" did not change when the policy changed. ECF No. 280, at 11 n.4. More likely is that Audible's decision not to change its contractual language simply reflects an awareness that additional changes could become evidence in anticipated litigation. *See* ECF No. 299-2 ¶ 158, ECF No. 249-41.

to exchange Audiobooks that had been partially and sometimes even entirely consumed. The District Court rejected the first theory of liability based on its conclusion that the Authors' contract expressly allowed Audible to omit those numbers from royalty reports. ECF No. 280, at 19–20. The District Court rejected that second based on its conclusion that Plaintiffs could not forecast evidence of damages.

Every contract implicitly includes "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) (internal quotes omitted). These promises include a "pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (internal quotes omitted). "Ordinarily, the covenant of good faith and fair dealing is breached where a party has complied with the literal terms of the contract, but has done so in a way that undermines the purpose of the contract and deprives the other party of the benefit of the bargain." *In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 51 (E.D.N.Y.) (quoting *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co.*, 10 N.Y.3d 187, 198, 856 N.Y.S.2d 505, 886 N.E.2d 127 (2008)). Where a contract contemplates the exercise of discretion, "this pledge includes a promise not to act

arbitrarily or irrationally in exercising that discretion." *Najjar Grp., LLC v. W. 56th Hotel LLC*, 850 F. App'x 69, 72 (2d Cir. 2021) (quoting *Dalton*, 87 N.Y.2d at 389).

Audible's breaches occurred in the context of divergent revenue models. Of the Audiobooks by ACX Authors, ██████████ are distributed under subscription plans, which means that Audible loses no revenue when they are returned or exchanged. ECF No. 299-2 ¶ 118; ECF No. 263-9, at Audible_00000550. Authors, by contrast, were paid based only on what Audible counted as "net sales," and the counts turned out to be arbitrary and self-serving. Until Audible reformed its scheme, Authors lost 100% of their income associated with a return or exchange. ECF No. 299-2 ¶ 157; ECF No. 261-17, at 198:12–199:12.

1. Audible breached the implied covenant of good faith and fair dealing by concealing true numbers of sales, returns, and exchanges.

The evidence shows that Audible concealed from Authors its actual method of calculating the sales numbers on which their royalties were based. It did this by providing only net sales numbers, which masked the much larger volume of actual returns and exchanges. *See* ECF No. 299-2 ¶ 131. Yet it reported these numbers to Authors on their ACX dashboards as "total sales." ECF No. 261-27, at Audible_00000460. Shortly after the revelations of October 2020, Audible assured authors that it "can and does limit" returns, but an Audible senior customer-service

manager was unable to identify *any* such limits. ECF No. 299-2 ¶¶ 125–26; ECF No. 261-21, at 41:7–47:9), ECF No. 261-23.

Audible could not have used its methods of royalty calculations—that is, its preferred interpretations of "returns" and "less any . . . returns"—for years if it had not concealed those methods from Authors, because the discrepancy between its calculations and the contractually required calculations were massive. Discovery in this case revealed that rates of returns and exchanges were as high as ▇▇ in some months, causing authors to lose, unknowingly, more than ▇▇▇▇▇▇ in reversed royalties in the class period through 2021. ECF No. 299-2 ¶¶ 128–29; ECF No. 249-16, at Audible_00000628 (E-mail from ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, to Audible Colleagues, Feb. 25, 2020); ECF No. 132-21; ECF No. 132-22.

The District Court rejected the concealment argument, holding that the contract "expressly permitted Audible to report net sales information, rather than gross sales, on authors' royalty statements." ECF No. 280, at 19–20 (citing *Clalit Health Servs. v. Israel Humanitarian Found.*, 395 F. Supp. 2d 21, 23 (S.D.N.Y. 2005), and *Gaia House Mezz LLC v. State St. Bank & Tr. Co*, 720 F.3d 84, 93 (2d Cir. 2013)). It is not clear what express permission the District Court was referencing. The contract at issue requires Audible to provide the contracting Author with a "statement of royalties" but does not specify what figures must be included

in the statement or what calculations Audible was required or permitted to provide to support any such figures. *See* ECF No. 1-1, at 7–8. Moreover, this analysis is predicated on the error that the District Court made in construing the term "returns" in the contract. Plaintiffs had no reason to suspect that Audible was deducting "exchanges" and "swaps." Nowhere does the contract specify that such deductions are reflected in the "net sales" calculation. *See* ECF No. 1-1, at 7–8; ECF No. 261-18; ECF No. 261-19. Thus, even if Audible complied with the contract's express terms, its concealment of the true numbers of returns, refunds, and exchanges "undermine[d] the purpose of the contract and deprive[d] the other party of the benefit of the bargain." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co.*, 10 N.Y.3d at 198, 856 N.Y.S.2d at 512, 886 N.E.2d 134. Authors' forceful and widespread outcry in October 2020, upon learning of Audible's method of calculation, shows that Authors considered the calculations relevant to their decisions to enter the ACX contract.

2. <u>Audible breached the implied covenant of good faith and fair dealing with both Plaintiffs by encouraging its customers to return Audiobooks.</u>

The evidence shows that Audible actively encouraged returns and exchanges via the Great Listen Guarantee and via private messages to customers that Authors rarely if ever saw (and that, in any event, diverged from the "returns" language it used in its contract with them). Audible encouraged listeners to "exchange" Audiobooks they did not like. ECF No. 299-2 ¶¶ 30, 123. For example, unbeknownst

to Plaintiffs, Audible encouraged listeners to exchange Audiobooks in instances where a listener had rated the Audiobook as a 1/5 or 2/5 on a scale of five "stars" on Audible's website. ECF No. 299-3, at Audible_00001594-95 (e-mail from Audible's author liaison ███████ to Audible ██████████████████, Feb. 13, 2020); ECF No. 299-4 (Dep. of Ryan Eland, Oct. 28, 2022) 194:5–195:9.

Audible customer-service representatives regularly allowed subscribers to return and/or exchange numerous Audiobooks in a single encounter, sometimes even when it was obvious that the subscriber had consumed all of them and simply wanted more. *See* ECF No. 261-22 (Compilation of Customer Interactions). For instance, an agent allowed a listener to return nine titles after the customer admitted, "I[']m done with them." *See id.* at Audible_00019789.

The evidence would demonstrate to the trier of fact with reasonable certainty that Audible's campaign of promoting returns harmed Plaintiffs financially. A party suing for breach of contract, which under New York law includes breach of the implied covenant, must have sustained damages that are "not merely speculative, possible, and imaginary, but they must be ***reasonably*** certain and such only as actually follow or may follow from the breach of the contract." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 4 N.E. 264, 266 (1886))

34

(emphasis added). Uncertainty in the amount of damages does not eliminate entitlement to those damages:

> [W]hen it is certain that damages have been caused by a breach of contract, ***and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach***. A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain.

*Id.* (quoting *Wakeman*, 101 N.Y. 205, 4 N.E. at 266) (emphasis added). "[T]he burden of uncertainty as to the amount of damage is upon the wrongdoer." *Tractebel*, 487 F.3d at 110 (2d Cir. 2007) (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir.1977) (applying New York law)).

Audible's internal research reveals the company's overall acceptance of returns and exchanges through Audible's website without involvement of customer-service personnel. In May 2021, Audible internal research found that ███████ ██████ subscribers who "returned" Audiobooks did so on at least some occasions because █████████████████ ECF No. 249-24, at Audible_00001429. ████ ██████ the percentages of subscribers "returning" Audiobooks simply because ██████████████████████████ *Id.* The same internal research found that ████████████ such subscribers had returned Audiobooks because ██████████████, while ██████ had returned Audiobooks because ██████████████ *Id.* Both of these reasons reflect at least partial consumption.

35

In granting summary judgment on this theory of liability, the District Court misread *Tractebel* as requiring that Plaintiffs' damages be absolutely certain. But this is not so. Plaintiffs' damages are not "speculative," as the District Court termed them. Given the percentages discussed above, and the thousands of Plaintiffs' Audiobooks that were returned, Plaintiffs' damages are certain in all but amount.

To withstand summary judgment, Plaintiffs should not have been required to demonstrate the amount of damages they have sustained, only that their damages caused by the breach are not speculative. *See Tractebel*, 487 F.3d at 110; *Dart Mech. Corp. v. Johnson Controls, Inc.*, No. 13-CV-2941(JS)(AYS), 2015 WL 9050384, at *6 (E.D.N.Y. Dec. 15, 2015) (citing *Tractebel*, 487 F.3d at 110–11, and denying summary judgment because "if a plaintiff can prove the existence of damages, the plaintiff is entitled to some leeway in proving the precise amount of damages at trial". The record in this case plainly establishes damages: when Audible stopped clawing back royalties on titles returned more than seven days after purchase, and stopped encouraging readers to "swap" their purchases, Authors' royalties increased. ECF No. 261-17, at 198:12–199:12.

### D. The District Court's Exclusion of Expert Analysis of Audible's Reduction of Royalties Was Manifestly Erroneous.

Joseph Egan—an economist and forensic accountant with more than thirty-five years of relevant experience and whose expert testimony has been admitted in more than sixty prior cases—offered testimony in this case regarding methodologies

for calculating classwide damages. ECF No. 222-1, ¶¶ 1–3, 6. For the first time ever, however, his testimony was excluded. ECF No. 246-2 (Egan Dep., Jan. 24, 2023), at 182:1–12.

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if four conditions are met: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

The District Court precluded Egan's testimony primarily for being too straightforward—*i.e.*, for "involv[ing] relatively simple arithmetic, not expert analysis," ECF No. 280, at 13, imposing an incorrect minimum level of analytic complexity as a prerequisite for expert testimony and demonstrating fundamental errors in the court's understanding of Egan's proffered testimony. The District Court (a) faulted Egan for not yet performing an analysis that is necessarily only a proposal at this stage because the class parameters (which are not within Egan's realm of expertise) have not yet been established, and (b) disregarded the complexities of applying the methodologies that Egan proposes for calculating damages.

Separately, the court condemns "Egan's damages calculations, such as they are, [for] not correspond[ing] to Plaintiffs' sole remaining claim." ECF No. 280, at 15. This reasoning holds against Egan a failure to account for reasonable returns—a determination that is not within his purview. Egan acknowledged that he would be performing his analysis only with respect to those returns "at issue"—unreasonable returns. ECF No. 222-1 (Egan Rep't) ¶ 36, "Step 1". At no point did Plaintiffs contend or Egan indicate that making or implementing such a distinction would be his responsibility.

Accordingly, neither of the trial court's bases for excluding Egan is justified, and both constitute an abuse of discretion because they impose substantive requirements inconsistent with his designated expertise. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264–65 (2d Cir. 2002) ("We review a district court's determination to admit or exclude expert testimony under Daubert for abuse of discretion.") (citations omitted). Nor was this abuse harmless; exclusion of Egan's testimony was an explicit basis for the court's ultimate decision to grant summary judgment.[12] *See Tesser v. Bd. of Educ. of City Sch. Dist. of City of New York*, 370 F.3d 314, 319 (2d Cir. 2004) ("An erroneous evidentiary ruling that does not affect

---

[12] Nevertheless, the District Court's grant of summary judgment can and should be reversed even if this Court determines that exclusion of Egan's testimony was not an abuse of discretion or was ultimately harmless. Plaintiffs proffered Egan's testimony to *assist* the fact-finder in computing damages—not to prove those damages.

a party's 'substantial right' is thus harmless . . . . Whether an evidentiary error implicates a substantial right depends on 'the likelihood that the error affected the outcome of the case.'") (quoting *Malek v. Fed. Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993); ECF No. 280, at 20–21 ("Plaintiffs rely on Egan's expert report [] and the Court has now excluded it . . . . [L]ess clear is whether, in the absence of Egan's testimony, Plaintiffs can point to any theory of damages."); *cf. United States v. Onumonu*, 967 F.2d 782, 789 (2d Cir. 1992) (finding abuse of discretion and reversing conviction where exclusion of expert testimony was not harmless); *United States v. Dwyer*, 539 F.2d 924, 928 (2d Cir. 1976) ("[Despite] great discretion in the trial judge, discretion does not mean immunity from accountability."). The bases for reversal are set forth in more detail herein.

1. Egan's Methodologies Align With Plaintiffs' Theory of Liability, Even Though the Proposed Calculations Cannot Yet Be Conducted.

The court mistakenly focused on the calculations that Egan had already performed—only for the named plaintiffs and only on the basis of limited data—without appreciating or acknowledging that Egan proposed ***methodologies***, not final determinations. ECF No. 280, at 15 ("Egan did not attempt to calculate [class-wide damages] . . . . [B]ecause Egan does not calculate class-wide damages, or provide any indication why doing so would be more complicated than his 'calculation' of the individual Plaintiffs' damages, that is not a basis to admit his testimony"); *compare* ECF No. 222-1 ¶ 6 (Egan stating that he was retained at this stage to

propose methodologies and provide examples). Indeed, Egan had not yet attempted to perform the calculations that he proposes on a classwide basis for two fundamental reasons: (1) a determination of which returns are "at issue" (*see* ECF No. 222-1 ¶ 36, "Step 1") remains to be made by the fact-finder, after which Egan's analysis will incorporate only those returns deemed unreasonable, that is, outside of the terms of the contract; and (2) Audible has not yet provided data necessary to isolate those returns which are "at issue."

The court implicitly, and incorrectly, required that Egan himself opine on and incorporate a distinction in the data that is beyond both Egan's expertise and his assignment: namely, which returns were reasonable under the contract. *See* ECF No. 222-1 ¶ 2 ("I have over 35 years of experience performing financial and economic damages analyses"); ¶ 6 ("retained [] to determine if there are acceptable method(s) available to calculate [] classwide aggregate damages [and if so,] to provide an example."); *see also Marx & Co. v. Diners' Club, Inc*., 550 F.2d 505, 509–10 (2d Cir. 1977) (excluding proffered expert testimony exceeding topics "on which [he] was qualified as an expert, [and which] were rather legal opinions as to the meaning of the contract terms at issue"), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188 (1977). Egan, aware of the bounds of his expertise and assignment, did not claim in his report that he would make such a determination, and during his deposition, he refused to be goaded into opining on which "returns" were "at issue" for purposes of his

analysis, instead relying on the fact-finder to make that determination.[13] Egan has, nevertheless, testified that he *can* eliminate non-recoverable entries from his damages analysis (*e.g.*, non-U.S. authors, *see* ECF No. 222-1 ¶¶ 53–57), indicating that he can do the same with respect to contractually allowed returns once that term is properly construed.

In other words, Egan can perform his analysis on those returns that are at issue once the fact-finder has determined which returns of the Authors' books were allowed under the ambiguous contract (whether because, *e.g.*, the consumer identified some technical deficiency with the Audiobook at the time of the return, or only a limited amount of the Audiobook had been consumed, or a limited number of days had passed before the return), and which are not. To the extent there are limitations imposed on the class due to statutes of limitation, or geographical constraints, or otherwise, these also will be incorporated into the data. *See, e.g.*, *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 317 F.R.D. 374, 393 (S.D.N.Y. 2016) ("*Comcast* requires only that courts should examine the proposed damages ***methodology*** at the certification stage to ensure that it is consistent with the class-wide theory of liability and ***capable*** of measurement on a class-wide basis.") (citations, quotation marks, and textual edits omitted; emphasis supplied);

---

[13] Egan responded ***sixteen*** times at deposition that he had "no opinion" on the definition of "return." *See* ECF No. 246-2, at 69:6–7, 74:4–9, 22–23, 76:3–7, 16–17, 77:8–10, 78:7–9, 79:6–9, 12–15, 82:25–83:10, 84:3–6, 13–21, 87:24–25, 88:1–15.

*In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 414 (S.D.N.Y. 2015) ("[N]othing in *Comcast* requires an expert to **perform** his analyses at the class certification stage.") (emphasis in original) (*citing Brown v. Hain Celestial Grp.*, No. C 11-03082 LB, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014) ("The point . . . is to determine whether there is an acceptable class-wide [damages] approach, not to actually calculate under that approach before liability is established.")); *see also Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (approving calculation of class member damages "once the common liability questions are adjudicated").

Most importantly, Audible has not produced class-wide data from which these considerations can be assessed. To be sure, Plaintiffs requested such information— *see* Pls.' Interrogs. Nos. 9–12 (seeking information regarding the value of the net sales of, as well as the amount of time possessed and proportion which was consumed, of the Audiobooks at issue in this case)[14]—but Audible's objections that

---

[14]    Specifically, Interrogatories 9 and 10 together seek information regarding the net value of Audiobooks which were ultimately "returned or exchanged or to which customers . . . otherwise gave up access"—No. 9 seeks "the initial gross sales figure" while No. 10 seeks "the total amount deducted from the initial gross sales figure"—in order to calculate royalties. Interrogatory 11 requests "the length of time that each exchanged Audiobook had been in the possession or control of a customer . . . before return or exchange, and the date on which it was returned or exchanged." Interrogatory 12 requests "the percentage of each Audiobook that had been played by the customer" prior to "the date on which [it] was relinquished," *e.g.*, "(1) 2% or less, (2) more than 2% but not more than 5%, (3) more than 5% but not more than 20%, (4) more than 20% but not more than 50%, (5) more than 50% but not more than 90%, (6) more than 90% but not more than 95%, (7) more than 95% but not more than 99%, (8) more than 99%, and (9) unknown."

they are "overly broad and unduly burdensome, not proportional [and] not relevant" are likely to remain until a class is certified. This is emblematic of the of the court's premature ruling excluding Egan's testimony: it finds fatal fault with Egan's failure to perform a calculation that necessarily requires data that has not yet been produced, and fact determinations that have not yet been made, pursuant to the scheduling order entered by the court. *See* ECF No. 109 (setting deadlines for expert reports, and scheduling briefing on class certification and summary judgment). According to the trial court's deadlines, Egan provided his report by December 15, 2022, but class certification briefing did not conclude until February 9, 2023 (indeed, did not even begin until December 21, 2022) and overlapped entirely with summary judgment briefing. Thus, the court did not allow any time for an actual damages calculation— time during which Audible would produce returns data for the actual class of certified Authors, upon which data Egan would perform one of his methodologies— but nevertheless faulted him for not yet having done so by the time he submitted his report.

### 2. Egan's Proposed Methodologies Are Not Too "Simple" to Assist the Fact-Finder.

The District Court also criticized Egan for his process of calculating the value of each returned commission both because it is too easy ("he merely multiplies the price of each returned audiobook by the royalty rate Plaintiffs received") and because Audible calculates the royalty amount for each purchased Audiobook in its

regular course of business ("Egan simply replicated calculations that Audible had already done"). ECF No. 280, at 13. But simplicity in performing a single calculation does not mean that "it is simple addition," *id.*, for a class-wide calculation, particularly where (a) the ultimate calculation will require exclusion of certain data related to returns reasonably contemplated under the Agreement, and other class limitations (*e.g.*, geographical), and (b) when it is critical that the calculation be performed precisely and with sufficient oversight and confirmation of results. *See* ECF No. 246-2 (Egan Dep.) 135:22–137:18 (describing process of extracting data, preparing spreadsheets, summing and double-checking results).

Further, it is reasonable, appropriate, and perhaps even mandatory that an expert (or party) independently perform calculations that a defendant has performed, when it is the value of those calculations that is the subject of the disputed damages; indeed, a failure at least to double-check to those calculations might be dereliction of Plaintiffs' duties to the class. *See, e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 814 (3d Cir. 1995) (reversing class settlement approval order where, *inter alia*, "nothing in the record demonstrates that [class counsel] had conducted significant independent discovery or investigations [or] retained their own experts"); *see also* NY Rules of Prof. Cond. 1.1(a) (noting that competent representation requires thoroughness), 1.3(a) ("A lawyer shall act with reasonable diligence"). At the very least, a methodology that double-checks the

defendant's calculations should not be precluded on the basis that the fact-finder could delve into the defendant's documents and try to reach the same conclusions.

The methodologies that Egan proposes involve multi-step processes for calculating damages for thousands of Authors—indeed, one of Egan's methodologies proposes calculating damages on an individual basis for each of the ████████████ challenged "returns." *See, e.g.*, ECF No. 222-1 ¶ 36 ("Step 1: For *each audiobook at issue*…, Step 4: *Repeat Steps 1 to 3 for each Author* in the class…") (emphasis supplied); *see also* ECF No. 132-29, at 6 (at Audible_00001360 (scripted messaging for responding to complaints from ████████████ Authors in the putative class)).The District Court provided no basis for summarily rejecting the idea that an increase in the numbers of Authors for whom the calculation must be performed would make the exercise more difficult. *See* ECF No. 280, at 15. ("The fact that there may be thousands of class members does not make the arithmetic more complicated or 'unwieldy.'") To the contrary, simply managing large amounts of data introduces possibilities for errors, and performing calculations on that data (even if only multiplication of royalty-rates and summation of the results) increases the risk of mistake. *See, e.g.*, *Arnold v. Ambulance Serv., Inc.*, No. 2:06-CV-105, 2007 WL 5117409, at * 1 (E.D. Tenn. Aug. 21, 2007) ("[W]hat is a simple mathematical computation to one person may be mind-numbingly complicated to another."). And because the class period extends over several years,

to the extent the royalty rates for each author have changed, or even the underlying data itself is inconsistent, the difficulty of ensuring an accurate result increases.

Thus, the calculation that Egan proposes is by no means "simple," and certainly is not as rudimentary as the "simple arithmetic" at issue in the opinions on which the trial court relied. *See* ECF No. 280, at 13 (citing *FPP, LLC v. Xaxis US, LLC*, No. 14-CV-6172 (LTS), 2017 WL 11456572, at *1-2 (S.D.N.Y. Feb. 13, 2017) (finding fault with "simple arithmetic" involving only "subtract[ion of] two numbers."); *Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242 (VEC), 2020 WL 1503452, at *6 (S.D.N.Y. Mar. 30, 2020) (excluding testimony because, among many other reasons, it involved only averaging of two numbers; "The Court finds several flaws in Anderson's methodology . . . . First, [] Anderson does not explain how stock photos [] are, in any way, comparable to the misappropriated images of Plaintiffs."); *Luck v. McMahon*, No. 20-CV-00516, 2022 WL 5500934, at *7–8 (D. Conn. Feb. 11, 2022) (excluding testimony consisting of subtracting two numbers and counting days between two dates)). None of the reports at issue in those cases is analogous to Egan's proposed methodologies, or the final calculations to be made, in this case.

### 3. Lack of Analytical Complexity Is Not a Proper Basis for Exclusion.

Even if Egan's proposed methodologies for calculating damages are not exceedingly complex, they should be permitted, because they "will help the trier of

fact to understand the evidence." Fed. R. Evid. 702(a); *see also Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*, 441 F. Supp. 3d 745, 753 (S.D. Iowa 2019) ("[T]he key inquiry here is not whether the expert analyzed a sufficiently large amount of data but rather whether the expert's analysis is helpful to a jury"); *Total Control, Inc. v. Danaher Corp.*, 338 F. Supp. 2d 566, 569 (E.D. Pa. 2004) ("[A]n expert can be employed if his testimony will be helpful to the trier of fact in understanding evidence that is simply difficult, [though] not beyond ordinary understanding.").

"There is not, as [appellant] suggests, an implicit requirement in Fed. R. Evid. 702 for the proffered expert to make complicated mathematical calculations." *WWP, Inc. v. Wounded Warriors Fam. Support, Inc.*, 628 F.3d 1032, 1039–40 (8th Cir. 2011) (citing *In re Prempro Prods. Liab. Litig.*, 514 F.3d 825, 831 (8th Cir.2008)). "[C]ourts have taken a liberal approach to the admissibility of expert testimony in instances when a party offers expert guidance to the finder of fact respecting factual issues that arguably fall within the competence of lay people." *Total Control*, 338 F. Supp. 2d at 569–70; *see also Mint Solar, LLC v. Sam's W., Inc.*, No. 5:19-CV-05167, 2021 WL 1776144, at *1–2 (W.D. Ark. May 4, 2021) ("[T]he mere fact that [the proposed expert's] contribution is to organize and add up the numbers provided to him by [a party] does not require the Court to exclude his opinion"); *United States ex rel. Banigan v. Organon USA Inc.*, No. CV 07-12153-RWZ, 2016 WL 6571269, at *3 (D. Mass. Jan. 20, 2016) (rejecting argument that expert's "method of

calculating damages directly attributable to it—*i.e.*, adding—requires so little technical skill that it relies on no 'specialized knowledge'").

Thus, even if the analysis and calculations proposed by Egan's methodologies were objectionably "simple," ECF No. 280, at 13—as set forth *supra*, they really are not—that would not be a proper cause for exclusion. If a fact-finder can do a superior job calculating damages for hundreds of thousands of returns across thousands of class members over several years, the fact-finder certainly is empowered to do so. But if those calculations might be helped by a professional qualified to perform them, who undertakes a reliable methodology based on Audible's own data (none of which the trial court refutes), Plaintiffs should be permitted to provide such assistance. *See, e.g.*, *U.S. v. Onumonu*, 967 F.2d 782, 787 (2d Cir. 1992). In *Onumonu*, this Court found an abuse of discretion, reversed the trial court, and overturned the jury's conviction, where the trial court had excluded expert testimony for being irrelevant and not helpful to the jury. The Court found that the plaintiff's proffered expert testimony—essentially that diamonds are small and valuable—was relevant and would have assisted the fact-finder, despite arguments that it was "well known to the average juror." *Id.* at 786–88.

## VII. CONCLUSION

For the reasons discussed above, Plaintiffs ask that the Court recognize the ambiguity of the undefined term "returns" in the ACX contract between Audible and

Authors, reverse the District Court's grant of summary judgment to Audible on Plaintiffs' breach-of-contract claim and remand this action to the District Court to evaluate the ambiguity in light of the ample evidence supporting Plaintiffs' interpretation. Plaintiffs further ask the Court to reverse the District Court's grant of summary judgment on both prongs of their implied-covenant claim. Finally, Plaintiffs ask the Court to reverse the District Court's exclusion of Plaintiffs' expert witness for damages, Joseph Egan.

Respectfully submitted, this 14th day of March 2024.

**LAW OFFICES OF JAMES SCOTT FARRIN**

By: _____

Christopher R. Bagley
555 S. Mangum Street, Suite 800
Durham, North Carolina 27701
Telephone: (919) 287-5037
Facsimile: (984) 227-6962
cbagley@farrin.com

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

By: _____

Mitchell Breit
405 East 50th Street
New York, New York 10022
Telephone: (212) 594-5300
mbreit@milberg.com

49

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 11,866 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated: March 14, 2024

_____

Christopher R. Bagley

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Memorandum Opinion and Order of the Honorable Jesse M. Furman,
dated December 8, 2021...........................................  SPA-1

Memorandum Opinion and Order of the Honorable Jesse M. Furman,
dated October 6, 2022...........................................  SPA-3

Order of the Honorable Jesse M. Furman to File Opinion and Order
Under Seal, dated July 17, 2023 .................................  SPA-5

Opinion and Order of the Honorable Jesse M. Furman on Motion to
Exclude Egan and Audible's Motion for Summary Judgment,
dated July 17, 2023 ............................................  SPA-6

Opinion and Order of the Honorable Jesse M. Furman re Motion for
Summary Judgment, dated September 20, 2023.................  SPA-29

Judgment of the Honorable Ruby J. Krajick,
dated September 21, 2023 ......................................  SPA-41

# SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                :

GOLDEN UNICORN ENTERPRISES, INC., *on behalf*    :
*of themselves and all those similarly situated*, et al.,  :

                    :          21-CV-7059 (JMF)
             Plaintiffs,      :

                    :
           -v-            :        MEMORANDUM OPINION
                    :          AND ORDER
AUDIBLE, INC.,                :

              Defendant.      :

                    :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In this case, familiarity with which is assumed, Plaintiffs Golden Unicorn Enterprises, Inc.,

and Big Dog Books, LLC sue Defendant Audible, Inc. for breach of contract, breach of the implied

covenant of good faith and fair dealing, and unjust enrichment.  *See* ECF No. 1 ("Compl.").

Audible moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for dismissal of

Plaintiffs' implied covenant and unjust enrichment claims.  *See* ECF Nos. 16-17.

      Upon review of the parties' motion papers, the Court denies Audible's motion to dismiss the

implied covenant claim.  It is true that "New York law does not recognize a separate cause of action

for breach of the implied covenant of good faith and fair dealing when a breach of contract claim,

based upon the same facts, is also pled."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir.

2013) (cleaned up).  Thus, "when a complaint alleges both a breach of contract and a breach of the

implied covenant of good faith and fair dealing based on the same facts, the latter claim should be

dismissed as redundant."  *Id.*  Here, however, Plaintiffs' implied covenant claim is *not* based on the

"same facts."  Instead, the gravamen of the claim is that Audible encouraged and induced

subscribers and customers to exchange unlimited numbers of audiobooks and that, by doing so,

Audible deprived Plaintiffs of the fruits of the contract even if such exchanges qualified as "returns"

within the meaning of the contract.  *See* Compl. ¶¶ 67-69, 101, 107.  It follows that the claim is not redundant and, thus, survives.

By contrast, Plaintiffs' unjust enrichment claim must be and is dismissed as duplicative of their contract claim.  Under New York law, "a party can pursue alternative claims for unjust enrichment . . . and breach of contract . . . *only* where there is a bona fide dispute as to whether an express contract governs the subject matter of the disagreement."  *Philip Morris Cap. Corp. v. Nat'l R.R. Passenger Corp.*, No. 19-CV-10378 (JMF), 2021 WL 797671, at *7 (S.D.N.Y. Feb. 26, 2021) (cleaned up).  But here there is no such dispute.  *See* ECF No. 32, at 1 (confirming that "neither party disputes the validity and enforceability" of the operative agreements); *id.* at 7 n.3 ("Neither Plaintiffs nor Audible dispute [sic] the existence of valid and enforceable contracts.").  Accordingly, dismissal of the unjust enrichment claim is appropriate.  *See, e.g.*, *INTL FCStone Markets, LLC v. Agro Santino OOD*, No. 20-CV-2658 (JMF), 2021 WL 2354567, at *1 (S.D.N.Y. June 9, 2021); *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 430 (S.D.N.Y. 2021) (citing cases); *Philip Morris Cap. Corp.*, 2021 WL 797671, at *8 (same).

For the foregoing reasons, Audible's motion to dismiss is GRANTED as to the unjust enrichment claim and DENIED as to the implied covenant claim.  Moreover, because the problem with Plaintiffs' unjust enrichment claim is substantive, and Plaintiffs neither request leave to amend nor suggest that they are in possession of facts that could cure the problems, the Court denies Plaintiffs leave to amend.  *See, e.g.*, *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014); *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53-54 (2d Cir. 1999).

The Clerk of Court is directed to terminate ECF No. 16.

SO ORDERED.

Dated: December 8, 2021
      New York, New York                    _____
                                            JESSE M. FURMAN
                                            United States District Judge

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                :
GOLDEN UNICORN ENTERPRISES, INC., *on behalf*  :
*of themselves and all those similarly situated*, et al.,  :
                :        21-CV-7059 (JMF)
           Plaintiffs,   :
                :
      -v-           :    MEMORANDUM OPINION
                :      AND ORDER
AUDIBLE, INC.,        :
                :
           Defendant.   :
                :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In this case, familiarity with which is assumed, Plaintiffs Golden Unicorn Enterprises,

Inc., and Big Dog Books, LLC sue Defendant Audible, Inc. ("Audible") for breach of contract

and breach of the implied covenant of good faith. *See* ECF No. 1 ("Compl."). In a

Memorandum Opinion and Order entered on December 8, 2021, the Court denied Audible's

motion to dismiss the implied covenant claim as duplicative, on the ground that it was "not based

on the same facts" as the contract claim. ECF No. 33, at 1 (emphasis omitted). Audible now

moves to dismiss the claim again, this time by way of a motion for partial judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. *See* ECF No. 72.

Audible argues that dismissal is required in light of the Second Circuit's decision in *JN*

*Contemporary Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118 (2d Cir. 2022), which,

according to Audible, resolved a split among district courts and "confirmed that duplicative

damages alone are a sufficient basis to dismiss an implied covenant claim." ECF No. 76, at 1.

      Audible's motion is denied. For starters, there is reason to hesitate before adopting

Audible's reading of *JN Contemporary*, which rests on a single sentence: "Even accepting JN's

arguments that it set out a different factual basis for this claim than the factual basis set out in its

breach of contract claim, the damages sought for both claims would be the same: compensation

for the lost sale." *JN Contemp.*, 29 F.4th at 128.  Put simply, assuming for the sake of argument

that Audible is correct and there is a split among district courts on when a plaintiff can plead

both a contract claim and an implied covenant claim, the Court doubts that the Second Circuit

intended to resolve that split in a throwaway sentence that does not acknowledge the issue, let

alone engage in any analysis.  (If Audible is wrong and there is no such split, there is all the more

reason to doubt that the Second Circuit would have adopted a dramatic shift in the law without

acknowledgment or analysis.)  Be that as it may, the Court concludes that, even if Audible's

reading of *JN Contemporary* is correct, further factual development is required to determine if

Plaintiffs' two claims actually seek the same damages.  Accordingly, Audible's motion for

judgment on the pleadings is DENIED without prejudice to renewal of the argument on summary

judgment.  The Clerk of Court is directed to terminate ECF No. 72.

      SO ORDERED.

Dated:  October 6, 2022
      New York, New York
                                   JESSE M. FURMAN
                           United States District Judge

# SPA-5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                :

GOLDEN UNICORN ENTERPRISES, INC. and BIG   :
DOG BOOKS, LLC, *on behalf of themselves and all*  :
*others similarly situated*,                       :

                 :        21-CV-7059 (JMF)
                Plaintiffs,    :

                 :        <u>ORDER</u>
       -v-               :

AUDIBLE, INC.,                :

                Defendant.    :

                 :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

On July 14, 2023, the Court issued an Opinion and Order granting in part Defendant's

motion for summary judgment.  ECF No. 278.  Defendant alerted the Court to the fact that the

Opinion and Order inadvertently referenced information currently under seal.  Accordingly, the

Court placed the Opinion and Order under seal, viewable only to the Court and case participants.

The Court will file a redacted version of its Opinion and Order publicly and will direct the

parties to address the propriety of the redaction when addressing the various motions to seal.

SO ORDERED.

Dated: July 17, 2023
     New York, New York                        _____
                                        JESSE M. FURMAN
                                 United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                                                      :
GOLDEN UNICORN ENTERPRISES, INC. et al., *on*                         :
*behalf of themselves and all those similarly situated*               :
                                                                      :
                                        Plaintiffs,                   :          21-CV-7059 (JMF)
                                                                      :
                  -v-                                                 :          OPINION AND ORDER
                                                                      :
AUDIBLE, INC.,                                                        :
                                                                      :
                                        Defendant.                    :
                                                                      :
----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Plaintiffs Golden Unicorn Enterprises, Inc. and Big Dog Books, LLC (together,

"Plaintiffs") are run by independent, self-published authors — Jan Bonthu and Elizabeth Noble,

respectively.  Both companies contracted with Defendant Audible, Inc. ("Audible"), a leading

provider of audiobooks, to license and distribute audiobooks.  In October 2020, Plaintiffs (and

other self-publishing authors) discovered that Audible was deducting from their royalties

audiobooks that customers had returned, including, in some instances, audiobooks returned long

after they had been purchased and listened to in full.  This lawsuit followed.  Discovery is now

closed.  Two claims remain: a claim for breach of contract and a claim for breach of the implied

covenant of good faith and fair dealing.[1]  Now pending before the Court are a slew of motions.

Audible moves for summary judgement with respect to both of Plaintiffs' claims and three of its

affirmative defenses.  ECF Nos. 189, 214.  Both sides move to preclude the other's expert

_____

[1]       Plaintiffs also brought an unjust enrichment claim, which the Court previously dismissed.
*See* ECF No. 33, at 2.

witnesses.  ECF Nos. 194, 197, 201, 203, 218, 221.  Audible moves for spoliation sanctions.

ECF Nos. 199, 224.  And finally, Plaintiffs move for class certification.  ECF No. 130.

As discussed below, the Court concludes the Audible is entitled to summary judgment

with respect to both Plaintiffs' contract claim (because the parties' contract unambiguously

provides that Plaintiffs were due royalties net of all "returns") and at least one of Plaintiffs' two

theories of liability for breach of the implied covenant (namely, their theory that Audible

"surreptitiously" deducted royalties).  The Court also grants Audible's motion to preclude the

testimony of Plaintiffs' damages expert, which moots Plaintiffs' motion to preclude the

testimony of Audible's rebuttal expert.  For reasons the Court will explain, however, the Court

reserves judgment on the remainder of the parties' motions pending supplemental briefing on

whether Plaintiffs' have a viable theory of damages attributable to Audible's alleged breach of

the implied covenant by encouraging customers to return their audiobooks.

## BACKGROUND

The following facts, taken from admissible materials submitted in connection with the

pending motions, are either undisputed or viewed in the light most favorable to the non-moving

parties.  *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

Audible is a leading provider of audiobook content and offers a program called ACX,

which allows independent authors to produce and publish audiobooks.  ECF No. 263 ("Def.'s

SOF"), ¶¶ 1-2.  Jan Bonthu and Elizabeth Noble are authors who, through their companies,

Golden Unicorn Enterprises and Big Dog Books, LLC, respectively, publish audiobooks on

Audible.  *Id.* ¶¶ 43-44, 65-66.  Both Bonthu and Noble use ACX to produce their titles as

audiobooks, *id.* ¶¶ 44, 66, and both have earned hundreds of thousands of dollars in royalties

through their audiobooks published on ACX, *id.* ¶ 47, 68.

2

Every time Plaintiffs, and other independent authors, publish a title through ACX, they agree to the ACX Audiobook License and Distribution Agreement (the "Agreement"). *Id.* ¶ 7. At issue in this case is the provision of the Agreement concerning royalties. Specifically, the Agreement provides that authors receive royalties on their "net sales," which are defined as sales net of, most notably, "returns." *Id.* ¶ 8; *see also id.* ¶¶ 10-11 (representatives of both Plaintiffs testified that they understood Plaintiffs should not be paid royalties on returns); ECF No. 267 ("Pls.' Counter SOF"), ¶¶ 119-20; ECF No. 1-1 ("Agreement"), at 6-8. The Agreement further states that Audible would provide authors with a statement of royalties every month on a "net 30 day basis." Agreement 7, 8. That is, authors' royalty statements reflected monthly sales net of returns, Def.'s SOF ¶ 21, although, prior to March 2021, the statements referred to the net sales as "total sales units," Pls.' Counter SOF ¶ 131; ECF No. 263-17.

Beginning in 2012, Audible permitted its customers to return audiobooks within 365 days of purchase, regardless of whether the customer had completed the book. Def.'s SOF ¶¶ 25, 27. Pursuant to this policy, which was known as both "A Great Listen Every Time" or the "Great Listen Guarantee," a customer could send his or her title back to Audible in exchange for either money or "subscriber credits," whichever the customer had used to purchase the title. *Id.* ¶¶ 26, 98. Plaintiffs dispute that they were aware of Audible's return policy, but they do not dispute that Audible advertised on its website and in emails to members, including both Bonthu and Noble, that customers could "exchange any book" and that the company offered "easy exchanges." *Id.* ¶¶ 29-30; *see also* ECF Nos. 216-12, 216-14.

In addition, if a customer completed a title and rated it one or two stars, Audible would notify him or her of the option to exchange the title for a different one. ECF No. 263-11, at 3; Pls.' Counter SOF ¶ 123. Customers were permitted to return multiple titles at once. Pls.'

Counter SOF ¶ 124; ECF No. 263-13, at 6; *see also* ECF No. 263-12 ("Eland Tr."), at 43-45

(Audible employee testifying that customers would be prevented from exchanging titles only if

they had hit a certain threshold number of returns).  Audible promoted its return policy using the

words "exchanges" and "swaps," in addition to "return."  Pls.' Counter SOF ¶ 122; ECF No.

216-12, at 3, 6, 10, 14, 51; *see also* ECF No. 263-11, at 3 (internal Audible email from February

2020 noting that Audible wanted "customers to 'exchange' one book for another instead of

returning").  Between 2015 and 2021, Audible refunded over ▮▮▮▮▮▮▮ for ACX titles that

were returned — over ▮▮ of the gross revenue from sales of ACX titles.  ECF No. 263-16.

The impetus for this lawsuit arose in October 2020 when, due to a technical glitch,

authors' accounts on Audible showed *gross* sales rather than *net* sales.  ECF No. 247 ("Pls.' MSJ

Opp'n"), at 1.  Plaintiffs contend that, as a result, they and other authors realized for the first time

that Audible deducted a substantial number of returns from their royalties.  Pls.' Counter SOF

¶¶ 135, 138, 143.  Following this glitch, authors and authors' trade guilds contacted Audible

expressing their anger and concern over its policy of deducting all returns from authors'

royalties.  *See* Pls.' Counter SOF ¶¶ 143, 145-47; ECF Nos. 263-20, 263-21, 263-22.[2]  The

director of the ACX program understood that authors were upset because customers could listen

to an entire book and then return it.  ECF No. 263-25.  Responding to the outrage from authors,

Audible changed its policy for calculating royalties: Beginning November 24, 2020, Audible

stopped clawing back royalties on titles that were returned more than seven days after purchase.

Pls.' Counter SOF ¶ 155.  Audible also changed the marketing to customers of its return benefit,

---

[2]     Audible disputes these statements insofar as Plaintiffs did not authenticate the cited
documents or verify their contents.  Pls.' Counter SOF ¶¶ 143, 145-47.  The cited materials
include emails to and from Audible employees, and presumably Plaintiffs would be able to
authenticate them at trial using Audible witnesses.  But the Court need not decide whether it can
rely on them here because the cited documents do not bear on the Court's analysis.

no longer describing it as a "swap." *See* ECF No. 263-28 (Audible employee requesting that an advertisement stating that customers could swap one title for another be removed as part of the "global sweep"). As a result of the change in policy, ACX authors' royalties increased. ECF No. 263-10 ("Dapito Tr."), at 199.

### DISCUSSION

As noted, Audible moves for summary judgement with respect to both of Plaintiffs' claims and three of its affirmative defenses, both sides move to preclude the other's expert witnesses, Audible moves for spoliation sanctions, and Plaintiffs move for class certification. For reasons that will become clear, the Court will not take the motions in order. Instead, the Court will address Audible's motion for summary judgment with respect to Plaintiffs' contract claim first, then turn to each side's motions to exclude the other's damages expert, before turning back to the remainder of Audible's motion for summary judgment and the other motions.

**A. Plaintiffs' Breach of Contract Claim**

The Court begins with Audible's motion for summary judgment with respect to Plaintiffs' contract claim. Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). Such a dispute qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden

will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).  Critically, however, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

To make out a claim for breach of contract under New York law — which applies to the Agreement, *see* ECF No. 1 ("Compl."), ¶ 8; Agreement 6 — a plaintiff must show "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach." *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021).  Significantly, a court may grant summary judgment "only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *accord Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005).  If the contract is unambiguous, then the Court "should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence and it may then award summary judgment." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (cleaned up).  A contract is ambiguous "where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Tr.*

6

*Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted). Conversely, "a contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). "Whether contract language is ambiguous is a question of law that is resolved by reference to the contract alone." *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 58-59 (2d Cir. 1994) (internal quotation marks omitted).

Applying these standards, the Court concludes that the Agreement is unambiguous and that Plaintiffs' breach of contract claim fails as a matter of law. The parties' dispute turns on the meaning of the term "returns" in the Agreement. *See* Pls.' MSJ Opp'n 4-8; ECF No. 215 ("Def.'s MSJ Mem."), at 9-11. The Agreement does not explicitly define the term. But the plain and ordinary meaning of the term is, as Audible maintains, "to give back a product in exchange for what one used to acquire it." Def.'s MSJ Mem. 9; *see also Return*, Webster's Third New Int'l Dictionary (2002) (defining "return" as "to bring, send or put back to or in a former position" and "to restore for a former . . . state"); *Return*, Oxford English Dictionary, https://www.oed.com/view/Entry/164595?rskey=VQshdK&result=1&isAdvanced=false#eid (defining "return" as "[t]he act of sending . . . a thing back to the . . . owner"). Notably, that definition is embraced *by Plaintiffs' own industry expert*, Thad McIlroy, who explains that "a digital product return is the process of a customer returning previously purchased digital content back to the retailer, and in turn receiving a refund in the original form of payment, exchange for another item, or a store credit." ECF No. 263-4 ("McIlroy Report"), at 9. Thus, every time an Audible customer gives back an audiobook in exchange for money or store credit, that customer completes a "return" within the meaning of the Agreement, even if she immediately purchases a

new title with the money or store credit.  *See* Def.'s MSJ Mem. 9-10 & n.2.  It follows that

Audible, which was entitled to deduct all "returns" from Plaintiffs' royalties, did not breach the

Agreement.

In arguing otherwise, Plaintiffs contend that "returns" should include only those instances

in which a customer returns a book "for a technical defect" or because they purchased the title by

mistake.  Pls.' MSJ Opp'n 8.  At a minimum, they assert, returns should not include "exchanges"

or "swaps."  *Id.* at 5-6.  But this reading finds no support whatsoever in the Agreement itself or

in the plain and ordinary meaning of the term "returns."  Thus, Plaintiffs "seek[] to rewrite the

contract to say something other than what it says.  Far from compelling that outcome, New York

law expressly prohibits it.  That is, this Court may not 'by construction add or excise terms, nor

distort the meaning of those used and thereby make a new contract for the parties under the guise

of interpreting the writing.'"  *Wilmington Sav. Fund Soc'y, FSB v. Cash Am. Int'l, Inc.*, No. 15-

CV-5027 (JMF), 2016 WL 5092594, at *5 (S.D.N.Y. Sept. 19, 2016) (quoting *Riverside S.

Planning Corp. v. CRP/Extell Riverside, L.P.*, 892 N.Y.S.2d 303, 307 (N.Y. 2009); *see also

Grant & Eisenhofer, P.A. v. Bernstein Liebhard, LLP*, No. 14-CV-9839 (JMF), 2016 WL

4098616, at *4 (S.D.N.Y. July 28, 2016) ("[T]he Court's 'fundamental objective is to determine

the intent of the contracting parties *as derived from the language employed in the contract*.'"

(quoting *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 527 (2d Cir. 2005)).

As if to confirm the point, Plaintiffs rely not on the language of the Agreement, but on

their expert's report (which may or may not be admissible), which purportedly shows that

Audible's practice of allowing returns for any reason up to 365 days after purchase is out of step

with industry practice.  Pls.' MSJ Opp'n at 8-9; *see also* McIlroy Report 15-18 (identifying other

companies' return policies for digital goods).  But putting aside the fact that the Court may not

look to extrinsic sources unless the contract is ambiguous, this argument confuses Audible's

return *policy* with the *interpretation* of the contract term "returns."  *See* ECF No. 266 ("Def.'s

Reply"), at 3.  Put simply, the fact that Audible's return policy may be outside the industry norm

does not render ambiguous the Agreement's use of the term "returns."  To be sure, the Court

must interpret the contract from the perspective of ACX authors who are "cognizant of the

customs and terminology as generally understood in the" digital audiobook industry.  *Great*

*Minds v. FedEx Off. & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018) (cleaned up); *see also*

*Roberts v. Cap. One, N.A.*, 719 F. App'x 33, 37 (2d Cir. 2017) (summary order) (holding that to

determine whether a contract provision is ambiguous, the court must consider the defendant's

proposed interpretation from the perspective of the "reasonable consumer").  But Plaintiffs

provide no basis to believe that a reasonable author would understand "returns" to mean anything

other than giving back a product in exchange for the money or credit used to purchase it.  Nor,

for that matter, have they provided any support for reading the scattered and inconsistent return

policies of *other* companies into the Agreement.  *Cf. Glob. Reinsurance Corp. of Am. v. Century*

*Indem. Co.*, 22 F.4th 83, 94 (2d Cir. 2021) ("[P]roof of custom and usage consists of proof that

the language in question is fixed and invariable in the industry in question.").  At bottom,

Plaintiffs seek to limit the definition of "returns" as a matter of policy, not as a matter of contract

interpretation.  But the Court is "not free to alter the contract to reflect its personal notions of

fairness and equity."  *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 467 (cleaned up).

      *Cox v. Spirit Airlines, Inc.*, 341 F.R.D. 349, 356 (E.D.N.Y. 2022), upon which Plaintiffs

place heavy reliance, Pls.' MSJ Opp'n 5-6, does not call for a different conclusion.  In *Cox*, the

plaintiffs purchased tickets on Spirit Airlines.  341 F.R.D. at 354.  When they purchased the

tickets, however, the plaintiffs were not informed that Spirit Airlines charged an additional fee

for carry-on items.  *Id.* at 353-54.  The plaintiffs sued Spirit Airlines for breaching their contract — the airline ticket.  Considering a prior motion, the Second Circuit determined that the contract was ambiguous because it did not make clear what was included in the "price" term.  *Cox v. Spirit Airlines, Inc.* 786 F. App'x 283, 286 (2d Cir. 2019) (summary order).  A reasonable consumer, the Court held, would not necessarily understand the "price" to include the price of only the airline ticket, and not the additional carry-on fee.  *See Cox v. Spirit Airlines, Inc.*, 17-CV-5172 (EK), 2023 WL 1994201, at *7 (E.D.N.Y. Feb. 14, 2023) (amending, in part, the prior summary judgment opinion on reconsideration).  Here, however, the Agreement is clear with respect to "[r]eturns of *what*."  Pls.' MSJ Opp'n 5.  The answer is returns of *audiobooks*.  Def.'s Reply 4.  In other words, *Spirit Airlines* involved ambiguity as to what the "price" term encompassed.  Here, by contrast, there is no ambiguity as to what the "returns" term encompasses; merely a dispute over Audible's business decision to allow a generous return policy.

Plaintiffs' remaining arguments are similarly unavailing.  First, Plaintiffs point to a non-standard ACX contract between Audible and Noble, which specified that Audible would pay royalties on sales "less any . . . *exchanges* and returns."  Pls.' MSJ Opp'n 5-6; Pls.' Counter SOF ¶ 75; ECF No. 261-11, at 4.  Thus, they argue, Audible knew how to use the word "exchanges" when it wanted to deduct those types of transactions, in addition to returns, from an author's net sales.  Pls.' MSJ Opp'n 6.  Second, Plaintiffs point to ACX authors' reactions after allegedly realizing that Audible had been deducting all returns from their royalties, arguing that their shock and outrage demonstrates that they did not understand "net sales," as defined in the Agreement,

to include all returns.  *Id.*[3]  And finally, they point to Audible's change in policy after October

2020 as support for their interpretation of the term "returns."  *Id.* at 6-7.  But all of this is

extrinsic evidence that the Court may not consider because, as discussed above, the relevant term

in the Agreement is unambiguous.  *See Universal Instruments Corp. v. Micro Sys. Eng'g Inc.*,

924 F.3d 32, 41 (2d Cir. 2019) ("The existence of an ambiguity, if any, is to be ascertained from

the face of an agreement without regard to extrinsic evidence." (cleaned up)); *Law Debenture Tr.*

*Co. of N.Y.*, 595 F.3d at 466 ("[E]xtrinsic evidence of the parties' intent may be considered only

if the agreement is ambiguous." (internal quotation marks omitted)).[4]

　　　　In the final analysis, independent authors may well view Audible's return policy as

unfair.  They may not have fully understood the policy or the way it affected their royalties.  But

that does not cast doubt on the meaning of "return" in the Agreement.  And because the contract

makes clear that authors would not earn royalties on returned audiobooks, *see* Def.'s Reply 3,

---

[3]　　In the same breath, however, Plaintiffs themselves argue that authors' subjective understandings of the Agreement are irrelevant because what matters is the reasonable, objective interpretation of the Agreement.  Pls.' MSJ Opp'n 7-8.  This is, of course, the correct articulation of the law — a party's personal, subjective intent is not relevant to the interpretation of a contract.  *See Hotchkiss v. Nat'l City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y. 1911) (Hand, J.) ("A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties."), *aff'd sub nom. Ernst v. Mechanics' & Metals Nat. Bank of City of N.Y.*, 201 F. 664 (2d Cir. 1912), *aff'd*, 231 U.S. 50 (1913).

[4]　　In any event, Audible's policy change in November 2020 undermines, rather than supports, Plaintiff's arguments.  Audible changed an aspect of its return policy, beginning to compensate authors for titles returned more than seven days after purchase.  ECF No. 263-23; Pls.' Counter SOF ¶ 154.  Audible did not change the definition of returns or change the default rule that returns were deducted from an author's net sales; instead, it imposed an external limit on how many returns would be deducted from an author's royalties.  In other words, the definition of "returns" has remained consistent — anytime a customer gives back a title in exchange for money or store credit.  Thus, the change is consistent with Audible's argument that its *policy* on returns does not affect the *definition* of returns in Agreement.

Plaintiffs cannot show that Audible breached the Agreement.  Accordingly, Audible's motion for summary judgment with respect to the contract claim must be and is granted.

**B.  The Parties' Damages Experts**

Next, the Court turns to each side's motion to preclude the other side's damages expert: Audible's motion to preclude Joseph Egan, *see* ECF No. 222 ("Def.'s Egan Mem."), who provides two sets of damages calculations for the individual Plaintiffs and opines that damages are calculable on a class-wide basis, *see* ECF No. 223-1 ("Egan Report"), at 7, 11-17; and Plaintiffs' motion to preclude Audible's rebuttal expert, Juli Saitz, *see* ECF No. 213 ("Pls.' Saitz Mem.").

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

 (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

 (b) the testimony is based on sufficient facts or data;

 (c) the testimony is the product of reliable principles and methods; and

 (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597; *see also Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case.").  A court should not "admit opinion

evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Nor should an expert be permitted to "supplant the role of counsel in making argument at trial," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004), or be permitted to merely "construct[] a factual narrative based upon record evidence," *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227 (PAC), 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018).

Measured against these standards, Egan's proposed testimony plainly falls short.  First, Egan's calculation of the individual Plaintiffs' damages involves relatively simple arithmetic, not expert analysis.  To start, he merely multiplies the price of each returned audiobook by the royalty rate Plaintiffs received to determine the royalty amount deduced from Plaintiffs' earnings for each title returned.  *See* Egan Report 11 (describing his process), *id.* at 12; Def.'s Egan Mem. 8-9; ECF No. 222-2 ("Egan Tr."), at 124.  That does not involve expertise.  But making matters worse, the calculations appear in the Audible document upon which Egan relied.  Egan Tr. 124-25.  That is, Egan simply replicated calculations that Audible had already done.  After that, Egan used the "sum" function on Microsoft Excel to add up the total amount of royalties deducted between 2015 and 2021.  *Id.* at 135-36; Def.'s Egan Mem. 9; Egan Report 13.  That too involves no expertise; it is simple addition.  Courts regularly exclude expert testimony where the expert "engages in arithmetic, not expert analysis." *FPP, LLC v. Xaxis US, LLC*, No. 14-CV-6172 (LTS), 2017 WL 11456572, at *1-2 (S.D.N.Y. Feb. 13, 2017) (excluding expert testimony where the expert calculated damages by taking three figures and conducted "simple arithmetic"); *see also Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242 (VEC), 2020 WL 1503452, at *6 (S.D.N.Y. Mar. 30, 2020) (rejecting the damages' expert testimony because, in part, it was based on "a basic mathematical calculation taught in grade school," namely averaging two numbers);

*Luck v. McMahon*, No. 20-CV-00516, 2022 WL 5500934, at *7 (D. Conn. Feb. 11, 2022)

(excluding an expert report that simply conducted "straightforward mathematical calculations of

[the plaintiff's] lost compensation").  The same result is warranted here.

   *Hamza v. Saks Fifth Ave., Inc.*, No. 07-CV-5974 (FPS), 2011 WL 6187078, at *2

(S.D.N.Y. Dec. 5, 2011), upon which Plaintiffs rely, ECF No. 246 ("Pls.' *Daubert* Opp'n), at 24-

25, is inapposite.  There, the damages expert's calculations of future earnings loss "was based

upon a calculation not only of [the plaintiff's] earnings over the three years leading up to her

termination, her statistical work life expectancy, the fringe benefits to which she was entitled at

Saks, and her mitigation earnings . . . ; but also the average earnings growth rate in the United

States labor market, the probability of unemployment, based upon New York area

unemployment statistics, as well as job maintenance expenses for both her job at Saks and her

post-termination employment."  *Hamza*, 2011 6187078, at *2.  That is a far cry from the

relatively simple calculations Egan conducted.  *See* ECF No. 268 ("Def.'s *Daubert* Reply"), at

11.  Similarly, Plaintiffs' argument that the jury cannot be expected to determine damages from

Audible's raw data is misplaced.  To the extent that Plaintiffs' damages calculations are

admissible, Plaintiffs' counsel could create summary charts to present them to the jury.  *See* Fed.

R. Evid. 1006.[5]  And even if Plaintiffs were to introduce evidence of class-wide damages —

---

[5]      Plaintiffs' argument that Egan's testimony could itself come in through Rule 1006, Pls.'
*Daubert* Opp'n 26 n.9, is borderline frivolous.  Rule 1006 permits parties to use summaries,
charts, or calculations to present voluminous records to a factfinder.  It is not a backdoor for
expert testimony, and Plaintiffs provide no case to the contrary.  *See United States v. Lebedev*,
932 F.3d 40, 50 (2d Cir. 2019) (contrasting Rule 702, which permits expert testimony, with Rule
1006), *abrogated on other grounds by Ciminelli v. United States*, 143 S. Ct. 1121 (2023); *see
also United States v. Jennings*, 724 F.2d 436, 443 (5th Cir. 1984) (rejecting argument that an
expert was necessary to introduce summary charges, and noting that "when a chart does not
contain complicated calculations requiring the need of an expert for accuracy, no special
expertise is required in presenting the chart").

which, notably, Egan did not attempt to calculate, Def.'s Egan Mem. 9 — they could use Excel

or another tool to do so.  The fact that there may be thousands of class members does not make

the arithmetic more complicated or "unwieldy."  *Cf.* Pls.' *Daubert* Opp'n 24.  And in any event,

because Egan does not calculate class-wide damages, or provide any indication why doing so

would be more complicated than his "calculation" of the individual Plaintiffs' damages, that is

not a basis to admit his testimony.

      This would be enough to exclude Egan's testimony.  But there is more.  Egan's damages

calculations, such as they are, do not correspond to Plaintiffs' sole remaining claim (breach of

the implied covenant of good faith and fair dealing) and, thus, are irrelevant, unreliable, and will

not assist the trier of fact.  *See* Def.'s Egan Mem. 11; *cf. In re Pfizer Inc. Sec. Litig.*, 819 F.3d

642, 660-61 (2d Cir. 2016) (reversing the district court's decision to preclude the plaintiff's

damages expert, concluding that the expert's model fit the plaintiff's theory of liability).

Plaintiffs' theory of damages for their implied covenant claim is based on the number of

"exchanges" of Plaintiffs' audiobooks "pursuant to Audible's 'Great Listen Guarantee.'"  Def.'s

SOF ¶ 104.  That is, Plaintiffs distinguish between exchanges (i.e., when a title is returned and

the customers uses the refund to purchase another title) and returns due to a technical defect or

mistaken purchase.  *See* Pls.' MSJ Opp'n 8.  Egan, however, tallies up the royalties for *all*

returns, regardless of whether the customer "exchanged" the title or returned it due to a technical

defect.  *See* Def.'s Egan Mem. 11-13; Egan Report 11; *cf.* Pl.'s *Daubert* Opp'n 27 (conceding

that Egan did not excluding any returns from his calculations).  It follows that Egan's

calculations do not measure the damages, if any, attributable to Audible's breach of the implied

covenant and must be excluded on that basis.  *See, e.g., In re Payment Card Interchange Fee &*

*Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2022 WL 14863110, at *23 (E.D.N.Y.

Oct. 26, 2022) ("Plaintiffs' experts' damages opinions must correspond to Plaintiffs' theory of

liability."); *cf. Comcast Corp. v. Behrend*, 569 U.S. 27, 35-36 (2013) (decertifying a class in an

antitrust suit because the petitioners' damages model did not "measure damages resulting from

the particular antitrust injury on which petitioners' liability . . . is premised").

   *In re Payment Card Fee and Merchant Discount* provides a helpful contrast.  There, the

court denied the defendants' motion to preclude the plaintiffs' damages experts.  The damages

experts calculated the costs to the plaintiffs from the defendants' alleged anticompetitive conduct

and then deducted the discounts that the plaintiffs had received that were specifically tied to the

anticompetitive conduct.  2022 WL 14863110, at *22.  The defendants argued that these

calculations were unreliable because they did not account for other incentives the defendants

provided.  *Id.*  The court concluded, however, that the damages calculations were, more likely

than not, "the product of reliable principles and methods and [would] be helpful to the jury"

because the calculations deducted the incentives directly tied to the anticompetitive conduct, and

the defendants could cross-examine the experts regarding other potential deductions at trial.  *Id.*

at *25.  Here, by contrast, Egan did not deduct anything from his calculation of royalties

attributable to returns — despite Plaintiffs' express acknowledgment that deductions of returns

due to technical defects or mistaken purchase would be appropriate.  Egan's calculations are

therefore based on assumptions that are contrary to Plaintiffs' theory of liability.

   Plaintiffs argue that it is up to Audible to prove which returns were validly deducted from

their earnings.  Pls.' *Daubert* Opp'n 27.  But this misstates the relevant burdens of proof.  As the

proponent of Egan's testimony, Plaintiffs have "the burden of establishing by a preponderance of

the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v.*

*Jones*, 965 F.3d 149, 161 (2d Cir. 2020).  Additionally, Plaintiffs' argument ignores the plain

language of the Agreement, which expressly defines "net sales" to exclude "returns."  Indeed,

Egan's calculations would render the term "returns" in the Agreement superfluous.  And

Plaintiffs appear to recognize this.  They repeatedly define "returns" as titles given back due to

technical defects, mistaken purchases, or other reasons shortly after the time of

purchase.  *See* Pls.' MSJ Opp'n 8; *see also* ECF No. 148 ("Pls.' Class Cert. Mem."), at

5.  Plaintiffs cannot now say that, in their eyes, every return is illegitimate unless and until

Audible, the party that does not bear the burden of proof, proves otherwise.  This dooms Egan's

theory.  And even if it did not, Egan fails to indicate how he would incorporate validly deducted

returns into his calculations.  Plaintiffs assume that he can do so, Pls.' *Daubert* Opp'n 27, but

provide no basis for that assumption.  Accordingly, Plaintiffs have not established that Egan's

calculations *could* comport with their theory of damages, let alone that they do so now.  Simply

stating that Egan could calculate damages once liability is established is insufficient to show that

Egan's methodology is reliable.

 Accordingly, Audible's motion to preclude Egan's testimony is granted.  Audible

retained Juli Saitz to rebut Egan's damages analysis and opinions.  *See* ECF No. 213-1 ("Saitz

Report"), ¶ 1.  In light of the Court's preclusion of Egan's testimony, therefore, Saitz's testimony

must also be excluded as irrelevant.  *See Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für

Chemische Industrie*, No. 11-CV-681 (KBF), 2015 WL 5459662, at *9 (S.D.N.Y. Sept. 16,

2015) (precluding rebuttal experts where the court had already precluded the principal expert).  It

follows that Plaintiffs' motion to preclude Saitz's testimony is moot.

**C. The Parties' Remaining Motions**

 As noted, Audible also moves for summary judgment with respect to Plaintiffs' claim for

breach of the implied covenant of good faith and fair dealing.  The covenant of good faith and

fair dealing, which is implied in all contracts, requires that "neither party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (cleaned up); *see also Cordero v. Transamerica Annuity Serv. Corp.*, — N.E.3d —, 2023 WL 3061503, at *5 (N.Y. Apr. 25, 2023). More specifically, it encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Manhattan Motorcars, Inc. v. Automobili Lamborghini,* 244 F.R.D. 204, 214 (S.D.N.Y. 2007) (internal quotation marks omitted). Thus, "conduct that while technically not constituting a breach of contract, nevertheless deprives the plaintiff of the benefit of its bargain" can constitute a breach of the implied covenant. *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16-CV-6392 (JPO), 2017 WL 3600427, at *4 (S.D.N.Y. Aug. 18, 2017) (internal quotation marks omitted).

Under New York law, "[p]roof of damages is an essential element of a claim for" breach of the implied covenant of good faith and faith dealing. *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016); *Sec. Plans, Inc. v. Cuna Mut. Ins. Soc'y*, 726 F. App'x 17, 20 n.2 (2d Cir. 2018) (summary order) (citing *RXR WWP Owner LLP v. WWP Sponsor, LLC*, 132 A.D.3d 467, 468 (1st Dep't 2015)). Moreover, damages "must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach . . . ." *Tractebel Energy Mktg. Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (internal quotation marks and emphasis omitted); *accord Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 448 (S.D.N.Y. 2018) (noting that parties bringing a breach of implied covenant claim "must show that the breach . . . proximately caused their damages" (cleaned up)); *Accent Delight Int'l Ltd. v. Sotheby's*, No. 18-CV-9011 (JMF), 2021

WL 2418225, at *3 (S.D.N.Y. June 14, 2021) (similar, for breach of contract claim).  Where the amount of damages is uncertain, it is the "wrongdoer" who bears "the burden of uncertainty." *Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977); *see also Regan v. Conway*, No. 07-CV-3207 (ADS), 2010 WL 11629513, at *13 (E.D.N.Y. May 10, 2010) (explaining the wrongdoer rule in the context of a breach of implied covenant claim).  But this rule applies only "when it is certain that damages have been caused by [the] breach" in the first place.  *Tractebel Energy Mktg.*, 487 F.3d at 110 (internal quotation marks omitted).  The burden is on the plaintiff to establish its entitlement to damages for breach of the implied covenant, and a defendant is entitled to summary judgment if it "point[s] to a lack of evidence to go to the trier of fact" as to damages.  *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009); *see also Vaughn v. Consumer Home Mortg. Co.*, 297 F. App'x 23, 27 (2d Cir. 2008) (summary order) ("A defendant does not have to introduce evidence that would negate the possibility of damages in order to move for summary judgment.").

Plaintiffs allege that Audible breached the implied covenant of good faith and fair dealing in two ways: first, by actively encouraging customers to return titles using its Great Listen Guarantee; and second, by "surreptitiously" deducting royalties from Plaintiffs and other authors.  Pls.' MSJ Opp'n 13.  The latter theory is easily rejected.  A breach of implied covenant claim cannot be based on conduct permitted under the contract.  *Clalit Health Servs. v. Israel Humanitarian Found.*, 395 F. Supp. 2d 21, 23 (S.D.N.Y. 2005) (Chin, J.); *see also Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (holding that the defendant did not breach the implied covenant of good faith and fair dealing because, among other things, it "acted consistently with the contract"); *Najjar Grp., LLC v. W. 56th Hotel LLC*, 850 F. App'x 69, 72 (2d Cir. 2021) (summary order) (affirming the district court's conclusion that the

19

defendant had not breach the implied covenant because it "merely did what the operating

agreement required it to do" (internal quotation marks omitted)). And as Audible points out,

Def.'s MSJ Mem. 15-16, the Agreement expressly permitted Audible to report net sales

information, rather than gross sales, on authors' royalty statements. *See* Contract 7, 8. Plaintiffs

contend that, by reporting only net sales, rather than gross sale, Audible masked the large volume

of returns that it was deducting from their royalties. Pls.' MSJ Opp'n 14. That may be so. But

Audible was permitted to do so under the express terms of the parties' contract.[6]

The Court could probably grant summary judgment to Audible with respect to Plaintiffs'

other theory — that the company breached the implied covenant by actively encouraging

customers to return titles using its Great Listen Guarantee — as well, but it will reserve judgment

pending supplemental briefing. Audible argues that Plaintiffs have not provided a competent or

viable theory of damages for that species of alleged breach. Def.'s MSJ Mem. 24-25.[7] There is

much force to that argument. For starters, Plaintiffs rely on Egan's expert report, *see* ECF No.

223-1 ("Egan Report"), ¶¶ 36, 51, and the Court has now excluded it. But even if the Court had

not done so, Egan's calculations, as discussed above, do not fit Plaintiffs' theory of liability, as

he calculates the total royalties for *all* returns, not only those returns attributable to breach of the

implied covenant through the Great Listen Guarantee. What is less clear is whether, in the

---

[6]    Plaintiffs also note in their statement of material facts — although, conspicuously, not in their memorandum of law — that the dashboard for ACX authors purported to display "total sales" numbers, even though it actually showed net sales numbers. Pls. Counter SOF ¶ 131; ECF No. 263-17. But that does not salvage their claim; Plaintiffs point to no evidence that, by reporting net sales numbers under the heading total sales, Audible somehow deprived them of the benefits of the Agreement.

[7]    Audible also argues that Plaintiffs' damages evidence must be stricken because Plaintiffs failed to comply with their Rule 26 initial disclosure obligations. Def.'s MSJ Mem. 20-24. The Court rejects this argument, substantially for the reasons it articulated in *New York City Transit Authority v. Express Scripts, Inc.*, 588 F. Supp. 3d 424, 440 (S.D.N.Y. 2022).

# SPA-26

absence of Egan's testimony, Plaintiffs can point to *any* theory of damages that is "not merely speculative, possible, and imaginary." *Tractebel Energy Mktg.*, 487 F.3d at 110.  Because the parties' briefs addressed *both* Plaintiffs' contract claim and their implied covenant claim, Plaintiffs did not focus on that question.  The Court could hold that failure against Plaintiffs; it is, after all, their burden to prove reasonably certain damages attributable to the breach.  But mindful that the Court's ruling with respect to Plaintiffs' contract claim materially alters the landscape of the case, and that there may be evidence in the record that would support a viable theory of damages with respect to Plaintiffs' remaining implied covenant claim, the Court concludes that the fairer course is to give Plaintiffs an opportunity to marshal the evidence, to the extent it exists, showing that they have a viable theory of damages.[8]

The Court also reserves judgment on the parties' other motions: Audible's motion for summary judgment with respect to three of its affirmative defenses; Audible's motion to preclude Thad McIlroy; Audible's motion for spoliation sanctions; Plaintiffs' motion to preclude John Rodzvilla; and Plaintiffs' motion for class certification.  In the case of Plaintiffs' motion for class certification, one of Audible's counterarguments pertains also to proof of damages — namely, that Plaintiffs do not satisfy the predominance requirement of Rule 23(b)(3) of the Federal Rules of Civil Procedure because, among other things, Plaintiffs fail to provide a competent model of class-wide damages.  ECF No. 164 ("Def.'s Class Cert. Opp'n"), at 23-24 (citing *Comcast Corp.*, 569 U.S. at 35).  If it does not moot the class certification motion altogether, the supplemental briefing may well be relevant to that counterargument.  Relatedly,

---

[8]     If it does not moot the issue altogether, that supplemental briefing may also be relevant to Audible's alternative argument for summary judgment on the ground that Plaintiffs' implied covenant claim is duplicative of their contract claim.  *See* Def.'s MSJ Mem. 12-13 (arguing that the implied covenant claim is duplicative because Plaintiffs seek the "same damages").  Accordingly, the Court reserves judgment on that argument too.

the parties should address in their supplemental submissions whether Plaintiffs have standing (specifically, whether they can prove injury in fact traceable to Audible's alleged breach of the implied covenant) and what the common issues are, pursuant to Rule 23(a), specific to the breach of implied covenant claim. The parties' other motions are less likely to be affected by supplemental briefing on damages. But it makes sense to await the supplemental briefing, if only to conserve the Court's resources and avoid opining on potentially unnecessary issues of law, some of which are matters of state law.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Audible's motion for summary judgment with respect to Plaintiffs' breach of contract claim and with respect to Plaintiffs' implied covenant claim to the extent it is based on the allegation that Audible "surreptitiously" deducted Plaintiffs' royalties. In addition, the Court GRANTS Audible's motion to preclude Joseph Egan's testimony and DENIES Plaintiffs' motion to preclude Juli Saitz's testimony as moot. The Court otherwise reserves judgment on Plaintiffs' motions pending supplemental briefing.

In particular, the parties shall submit supplemental briefing on the following issues:

(1) Whether Plaintiffs have a non-speculative basis for calculating damages caused by Audible's alleged breach of the implied covenant by encouraging customers to return titles using its Great Listen Guarantee; and

(2) Whether Plaintiffs can satisfy the predominance requirement of Rule 23(b)(3), the commonality requirement of Rule 23(a), and Article III standing with respect to class certification for their remaining implied covenant claim.

Plaintiffs shall submit their brief, **not to exceed 15 pages, within three weeks of the date of this Opinion and Order**. Audible shall submit its brief in response, **not to exceed 15 pages, two weeks thereafter.** For avoidance of doubt: The summary judgment record is closed; the parties should therefore, as appropriate, cite to evidence in the existing record. If either side believes oral argument would be helpful, it should indicate that in its brief.

# SPA-28

The Court will address the parties' many motions to seal when it rules on the outstanding

motions. The Clerk of Court is directed to terminate ECF Nos. 197, 203, and 221.

    SO ORDERED.

Dated: July 14, 2023
      New York, New York

                                     JESSE M. FURMAN
                              United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                                   :
GOLDEN UNICORN ENTERPRISES, INC. et al., *on*                      :
*behalf of themselves and all those similarly situated,*           :
                                                                   :
                                        Plaintiffs,                :          21-CV-7059 (JMF)
                                                                   :
                        -v-                                        :          OPINION AND ORDER
                                                                   :
AUDIBLE, INC.,                                                     :
                                                                   :
                                        Defendant.                 :
                                                                   :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Plaintiffs Golden Unicorn Enterprises, Inc. and Big Dog Books, LLC (together,

"Plaintiffs") are run by independent, self-published authors. Both companies contracted with

Defendant Audible, Inc. ("Audible"), a leading provider of audiobooks, to license and distribute

audiobooks. In October 2020, Plaintiffs (and other self-publishing authors) discovered that

Audible was deducting from their royalties audiobooks that customers had returned, including, in

some instances, audiobooks returned long after they had been purchased and listened to in full.

This lawsuit followed. Following the completion of discovery, the parties filed a slew of

motions, including a motion by Audible for summary judgment on Plaintiffs' two remaining

claims, a claim for breach of contract and a claim for breach of the implied covenant of good

faith and fair dealing. In an Opinion and Order dated July 14, 2023, familiarity with which is

presumed, the Court granted summary judgement to Audible on Plaintiffs' breach-of-contract

claim and on one of Plaintiffs' two theories of liability for breach of the implied covenant

(namely, their theory that Audible had "surreptitiously" deducted royalties). *See Golden*

*Unicorn Enterprises, Inc. v. Audible, Inc.*, — F. Supp. 3d —, No. 21-CV-7059 (JMF), 2023 WL

4561718 (S.D.N.Y. July 17, 2023) (ECF No. 280).  The Court also granted Audible's motion to

preclude the testimony of Plaintiffs' damages expert.  *See id.* at *6-8.  The Court reserved

judgment on the remainder of the parties' motions, however, pending supplemental briefing on

whether Plaintiffs' have a viable theory of damages attributable to Audible's alleged breach of

the implied covenant by encouraging customers to return their audiobooks.  *See id.* at *9-10.

Having reviewed the parties' supplemental briefing, the Court concludes that Audible is

entitled to summary judgment on Plaintiffs' remaining theory of breach as well.  In brief,

Plaintiffs fail to identify any means, let alone evidence, to identify "legitimate" returns from

returns that Audible "encouraged" in breach of the implied covenant.  In other words, Plaintiffs

cannot prove two essential elements of their remaining claim: causation and damages.

Accordingly, and for the reasons stated below, Audible's motion for summary judgment is

granted in its entirety.  The parties' other substantive motions are therefore denied as moot.

## BACKGROUND

The Court presumes familiarity with its prior Opinion and Order and, thus, provides only

a brief background here.  Audible, a leading provider of audiobook content, offers a program

called ACX, which allows independent authors to produce and publish audiobooks.  ECF No.

263 ("Def.'s SOF"), ¶¶ 1-2.  Jan Bonthu and Elizabeth Noble are authors who, through their

companies — Plaintiffs Golden Unicorn Enterprises and Big Dog Books, respectively — used

ACX to produce and publish audiobooks on Audible.  *Id.* ¶¶ 43-44, 65-66.

Every time Plaintiffs and other independent authors publish a title through ACX, they

agree to the ACX Audiobook License and Distribution Agreement (the "Agreement").  *Id.* ¶ 7.

As relevant here, the Agreement provides that authors receive royalties on their "net sales,"

which are defined as sales net of, most notably, "returns."  *Id.* ¶ 8; ECF No. 267 ("Pls.' Counter

SOF"), ¶¶ 119-20; ECF No. 1-1 ("Agreement"), at 6-8.  Beginning in 2012, Audible permitted

its customers to return audiobooks within 365 days of purchase, regardless of whether the

customer had completed the book.  Def.'s SOF ¶¶ 25, 27.  Pursuant to this policy, which was

known as both "A Great Listen Every Time" or the "Great Listen Guarantee," a customer could

send a title back to Audible in exchange for either money or "subscriber credits," whichever the

customer had used to purchase the title.  *Id.* ¶¶ 26, 98.  In addition, if a customer completed a

title and rated it one or two stars, Audible would notify the customer of the option to exchange

the title for a different one.  ECF No. 263-11, at 3; Pls.' Counter SOF ¶ 123.

　　In October 2020, a technical glitch permitted ACX authors to see on their account

statements *gross* sales rather than *net* sales.  ECF No. 247 ("Pls.' MSJ Opp'n"), at 1.  Plaintiffs

contend that, as a result, they and other authors realized for the first time that Audible deducted a

substantial number of returns from their royalties.  Pls.' Counter SOF ¶¶ 135, 138, 143.

Responding to authors' complaints, Audible then changed its policy for calculating royalties.  On

November 24, 2020, Audible announced that, effective January 2021, it would stop clawing back

royalties on titles that were returned more than seven days after purchase.  Pls.' Counter SOF

¶ 155; ECF No. 191-45.  Audible also changed the marketing to customers of its return benefit,

no longer describing it as a "swap."  *See* ECF No. 263-28 (Audible employee requesting that an

advertisement stating that customers could swap one title for another be removed as part of the

"global sweep").  As a result of the change in policy, ACX authors' royalties increased.  ECF

No. 263-10 ("Dapito Tr."), at 199.

　　In August 2021, Plaintiffs filed this lawsuit on behalf of a putative class of ACX authors.

*See* ECF No. 1 ("Compl.").  Following discovery, two claims remained: a claim for breach of

contract and a claim for breach of the implied covenant of good faith and fair dealing.  With

respect to the latter, Plaintiffs proffered two theories of breach: first, that Audible breached the

implied covenant of good faith and fair dealing by actively encouraging customers to return titles

using its Great Listen Guarantee; and second, that Audible breached by "surreptitiously"

deducting royalties from Plaintiffs and other authors through reporting net, rather than gross,

sales on authors' statements.  Pls.' MSJ Opp'n 13.  In its July 14, 2023 Opinion and Order, the

Court granted summary judgment to Audible with respect to Plaintiffs' contract claim and with

respect to the second of their two implied covenant theories.  With respect to the contract claim,

the Court concluded that the Agreement unambiguously allowed Audible to do what it had been

doing — namely, deducting from authors' royalties all "returns," defined as audiobooks that a

customer gave back "in exchange for money or store credit, . . . even if [the customer]

immediately purchase[d] a new title with the money or store credit."  2023 WL 4561718, at *4.

It followed as well that Plaintiffs' second theory for breach of the implied covenant failed.  As

the Court explained, the Agreement "expressly permitted Audible to report net sales information,

rather than gross sales, on authors' royalty statements."  *Id.* at *9.  And "[a] breach of implied

covenant claim cannot be based on conduct permitted under the contract."  *Id.* (citing cases).

Significantly, the Court also granted Audible's motion to preclude the testimony of

Plaintiffs' expert, Joseph Egan, who provided damages calculations for Plaintiffs and opined that

damages were calculable on a class-wide basis.  *See id.* at *6-8.  The Court did so on two

grounds.  First, the Court reasoned that Egan's calculation of Plaintiffs' damages involved

"relatively simple arithmetic, not expert analysis" — namely, multiplication of "the price of each

returned audiobook by the royalty rate Plaintiffs received."  *Id.* at *6.  "[M]aking matters worse,"

Egan's calculations appeared in an Audible document upon which he had relied; that is, he

"simply replicated calculations that Audible had already done."  *Id.*  Second, and more

fundamentally, the Court found that "Egan's damages calculations, such as they [we]re, [did] not correspond to Plaintiffs' sole remaining claim . . . and, thus, [were] irrelevant, unreliable, and [would] not assist the trier of fact." *Id.* at *7. Plaintiffs' theory of damages for their remaining implied covenant claim, the Court explained, was based on the number of "exchanges" of Plaintiffs' audiobooks pursuant to Audible's "Great Listen Guarantee." In other words, "Plaintiffs distinguish[ed] between exchanges (i.e., when a title is returned and the customers uses the refund to purchase another title) and returns due to a technical defect or mistaken purchase." *Id.* But "Egan . . . tallie[d] up the royalties for *all* returns, regardless of whether the customer 'exchanged' the title or returned it due to a technical defect." *Id.*

Having excluded Egan's testimony, the Court noted that it "could probably" grant Audible's motion for summary judgment with respect to Plaintiff's other implied covenant theory — that the company breached by actively encouraging customers to return titles using its Great Listen Guarantee — on the ground that Plaintiffs had failed to provide "a competent or viable theory of damages for that species of alleged breach." *Id.* at *9. But instead the Court reserved judgment pending supplemental briefing. The Court explained as follows:

> Audible argues that Plaintiffs have not provided a competent or viable theory of damages for that species of alleged breach. There is much force to that argument. For starters, Plaintiffs rely on Egan's expert report, and the Court has now excluded it. But even if the Court had not done so, Egan's calculations, as discussed above, do not fit Plaintiffs' theory of liability, as he calculates the total royalties for *all* returns, not only those returns attributable to breach of the implied covenant through the Great Listen Guarantee. What is less clear is whether, in the absence of Egan's testimony, Plaintiffs can point to *any* theory of damages that is not merely speculative, possible, and imaginary. Because the parties' briefs addressed *both* Plaintiffs' contract claim and their implied covenant claim, Plaintiffs did not focus on that question. The Court could hold that failure against Plaintiffs; it is, after all, their burden to prove reasonably certain damages attributable to the breach. But mindful that the Court's ruling with respect to Plaintiffs' contract claim materially alters the landscape of the case, and that there may be evidence in the record that would support a viable theory of damages with respect to Plaintiffs' remaining implied covenant claim, the Court concludes that

> the fairer course is to give Plaintiffs an opportunity to marshal the evidence, to the
> extent it exists, showing that they have a viable theory of damages.

*Id.* (cleaned up).  Accordingly, the Court ordered supplemental briefing on "[w]hether Plaintiffs

have a non-speculative basis for calculating damages caused by Audible's alleged breach of the

implied covenant by encouraging customers to return titles using its Great Listen Guarantee."  *Id.*

at 10.[1]  "For avoidance of doubt," the Court noted that the parties should limit themselves to

evidence "in the existing record" because the summary judgment record was "closed."  *Id.*

### MOTION FOR SUMMARY JUDGMENT

The Court begins with the Audible's motion for summary judgment with respect to

Plaintiffs' remaining implied covenant theory.  Summary judgment is appropriate where the

admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v.*

*Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  Such a dispute qualifies as genuine "if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542

F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the

absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986).  "In moving for summary judgment against a party who will bear the ultimate burden of

proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to

support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes*

---

[1]     The Court also directed the parties to brief "[w]hether Plaintiffs can satisfy the
predominance requirement of Rule 23(b)(3), the commonality requirement of Rule 23(a), and
Article III standing with respect to class certification for their remaining implied covenant
claim."  *Id.*  The Court need not and does not address these issues here.

# SPA-35

*Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

Under New York law, one "essential element" of a claim for breach of the implied covenant is "[p]roof of damages." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016); *Sec. Plans, Inc. v. Cuna Mut. Ins. Soc'y*, 726 F. App'x 17, 20 n.2 (2d Cir. 2018) (summary order) (citing *RXR WWP Owner LLP v. WWP Sponsor, LLC*, 132 A.D.3d 467, 468 (1st Dep't 2015)). Moreover, damages "must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach." *Tractebel Energy Mktg. Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (internal quotation marks and emphasis omitted); *accord Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 448 (S.D.N.Y. 2018) (noting that parties bringing a breach of implied covenant claim "must show that the breach . . . proximately caused their damages" (cleaned up)). When the amount of damages is uncertain, it is the "wrongdoer" who bears "the burden of uncertainty." *Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977); *see also Regan v. Conway*, No. 07-CV-3207 (ADS), 2010 WL 11629513, at *13 (E.D.N.Y. May 10, 2010) (explaining the wrongdoer rule in the context of a breach of implied covenant claim). Significantly, however, this rule applies only "when it is certain that damages have been caused by [the] breach" in the first place. *Tractebel Energy Mktg.*, 487 F.3d at 110 (internal quotation marks omitted). The burden is on the plaintiff to establish its entitlement to damages for breach of the implied covenant, and a defendant is entitled to summary judgment if it "point[s] to a lack of evidence to go to the trier of fact" as to either causation or damages. *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

In light of these principles, Audible is entitled to summary judgment on Plaintiffs'

remaining implied covenant theory.  Put simply, Plaintiffs fail to provide a coherent theory, let

alone evidence, of the damages attributable to Audible's alleged breach.  At best, Plaintiffs point

to the fact that Golden Unicorn "lost $38,701 in royalty review due to all returns" and Big Dog

Books "lost $43,929."  ECF No. 284 ("Pls.' Supp. Mem."), at 4 (citing ECF No. 249, ¶ 112).

But, as the Court held in its earlier Opinion and Order, Audible was contractually entitled to

deduct royalties for "returns."  2023 WL 4561718, at *4.  The gravamen of Plaintiffs' remaining

implied covenant claim is that Audible deprived them of the fruits of the contract by "actively

encouraging customers to return titles using its Great Listen Guarantee."  2023 WL 4561718, at

*9; *see* Pls.' Supp. Mem. 11 (describing the issue as "whether Audible *encouraged* readers to act

in such a way that would further Audible's benefit under the contract while depriving authors of

their full benefit"); *id.* at 6 ("Plaintiffs assert that they were damaged when Audible, in

frustration of the contract's intended benefit to authors, *encouraged* readers to return books and

then deducted the associated royalties on those books from class members' accounts.").  As

Plaintiffs themselves concede, *see* Pls.' Supp. Mem. 3 n.1, to prevail on that claim they therefore

have to provide a means to distinguish between returns "actively encouraged" by Audible and

other returns.  Yet Plaintiffs fail to do so.  Indeed, like Egan, they cite no evidence proving that

Audible's purported "encouragement" led to the return of even a single audiobook.

In arguing that "the record does include evidence of damages" pursuant to their

remaining theory of breach, Plaintiffs point to two facts in the record.  Pls.' Supp. Mem. 3.[2]

---

[2]     Plaintiffs assert that, at trial, they would rely on other, unidentified "categories of
information" to prove causation and damages, but explain they are "not available to attach"
because the Court "requested citation only to the existing summary judgment record."  Pls.'
Supp. Mem. 7-8.  To avoid summary judgment, however, Plaintiffs "'may not rely on mere
conclusory allegations nor speculation, but instead must offer some hard evidence showing that

First, they cite the fact that "when Audible stopped clawing back royalties on titles returned more than seven days after purchase, and stopped encouraging readers to 'swap' their purchases, authors' royalties increased." *Id.* (emphasis omitted). And second, they note that "Audible's own research" indicates that a percentage of customers "returned books for some reason other than technical defect or mistaken purchase." *Id.* at 7; *see also id.* at 3-4. But these facts prove neither causation nor damages. For one thing, Plaintiffs proffer no evidence that *they* themselves had an increase in royalties after Audible changed the seven-day policy and no evidence that any title of *theirs* was returned for a reason other than technical defect or mistaken purchase. That alone is fatal to Plaintiffs' claim. On top of that, however, these calculations of damages are as mismatched with Plaintiffs' theory of breach as Egan's calculations were. At bottom, Plaintiffs' arguments rest on the assumption that returns made more than seven days after purchase and returns made for reasons other than technical defect and mistaken purchase were attributable to Audible's encouragement. But that assumption finds no support in the record. As Audible points out, there are "countless reasons that a customer might return a title more than a week after purchase, without encouragement by anyone." ECF No. 290, at 8. And Plaintiffs themselves acknowledge that "returns" can properly include titles given back because the product was defective *and* titles given back because "the buyer was otherwise dissatisfied." Compl. ¶ 44; *see also* ECF No. 261, ¶ 100 (acknowledging the Egan had opined that "any returns because the audiobook was 'defective,' *or because the listener was 'otherwise dissatisfied,'* would be properly deducted from net sales and would not earn a royalty" (emphasis added)).

---

its version of the events is not wholly fanciful.'" *Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 200 (2d Cir. 2004) (quoting *Damico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998)). The fact that the Court generously invited Plaintiffs to submit a supplemental brief, rather than reopening the record altogether, does not relieve Plaintiffs of this burden.

Perhaps recognizing the frailty of their record evidence, Plaintiffs lean heavily on the rule that, where "the amount of damages is uncertain, then it is wrongdoer who bears the burden of uncertainty." Pls.' Supp. Mem. 8 (cleaned up).  As noted above, however, this rule applies only "when it is certain that damages have been caused by [the] breach" in the first place. *Tractebel Energy Mktg.*, 487 F.3d at 110 (internal quotation marks omitted).  And here, there is no such certainty, as Plaintiffs marshal no evidence from which a jury could find that even a single one of their audiobooks was returned as a result of Audible's "encouragement."  Additionally, it is well established that damages may not be "merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach." *Id.* (internal quotation marks and emphasis omitted).  Put differently, a plaintiff must at least provide a "stable foundation for a reasonable estimate" of damages. *Id.* at 110-11 (citation omitted). And here, Plaintiffs fail to do so.  Indeed, they fail to proffer *any* evidence of damages attributable to Audible's "encouragement" — i.e., to the alleged breach of the implied covenant of good faith and fair dealing. *See* ECF No. 246 ("Pls.' Daubert Opp'n"), at 22 (conceding that "proof" of damages "has not yet been submitted").  It follows that Audible is entitled to summary judgment on Plaintiffs' remaining implied covenant theory as well.

## OTHER MOTIONS

In light of the foregoing, the parties' other substantive motions — Audible's motion for summary judgment with respect to three of its affirmative defenses; Audible's motion to preclude Plaintiff's other expert; Audible's motion for spoliation sanctions; Plaintiffs' motion to preclude an Audible expert; and Plaintiffs' motion for class certification — are moot.

That leaves only a slew of letter-motions to seal portions of their motion papers and supporting exhibits. *See, e.g.*, ECF Nos. 144, 163, 167, 175, 178, 188, 193, 207, 208, 229, 235,

238, 244, 256, 265, 281, 285, 289.  The Court granted these letter-motions temporarily, pending

its decision on the underlying motions.  *See, e.g.*, ECF Nos. 150, 166, 172, 177, 179, 192, 196,

209, 227, 232, 237, 240, 251, 259, 269, 282, 288, 291.  Although a district court must generally

consider sealing requests on a document-by-document basis, *see Brown v. Maxwell*, 929 F.3d 41,

48 (2d Cir. 2019), the Court reviewed a random selection of the parties' requests given the

number and nature of documents at issue.  With two exceptions, the Court concludes that the

parties' requests are narrowly tailored to "preserve higher values," *Lugosch v. Pyramid Co. of

Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) (internal quotation marks omitted) — namely

privacy interests and confidential business or client information — and thus approves them.

The first exception is ECF No. 148-1 (Exhibit K to Plaintiffs' Motion for Class

Certification), 62:19-21.  Audible seeks to redact these three lines because they relate to internal

strategy discussions.  *See* ECF No. 144, at 3.  Although much of the surrounding discussion does

relate to internal strategy discussions, and therefore can properly be maintained in redacted form,

these three lines are too vague to constitute confidential strategy information.  The second

exception are Paragraphs 123 and 125 in ECF No. 263 (Plaintiff's Counter Statement of

Undisputed Material Facts).  Audible seeks to keep this material redacted because it references

confidential internal business practices.  ECF No. 256, at 2.  The redacted sentences do relate to

Audible's business practices, but they are highly relevant to the Court's ruling on the breach of

implied covenant claim.  Moreover, Paragraph 123 reflects a customer-facing policy, meaning

that the information contained in the paragraph is at a minimum quasi-public.  Paragraph 125

does not reflect a policy of Audible; instead, it conveys an Audible employee's deposition

testimony regarding his own understanding of how Audible's policy was implemented.  Thus,

any value in protecting confidential business information is outweighed by the public's right of

access.  This reasoning applies equally to the documents these paragraphs cite, namely ECF No.

263-11 (excluding the personal identifying information) and ECF No. 263-12, at 195:3-8.

Accordingly, **within two weeks of the date of this Opinion and Order,** Audible shall

show cause in writing why ECF Nos. 148-1, 263, 263-11, and 263-12 should not be re-filed with

the contents discussed above unredacted.  If Audible fails to show cause by that date, it shall file

the documents with the contents discussed above unredacted.  Otherwise, the parties' requests to

maintain the documents referenced in their various letter-motions to seal in sealed or redacted

form are GRANTED without prejudice to any future application — by a party or any third party

— for reconsideration as to a particular document or documents.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the rest of Audible's motion for summary

judgment.  The parties' other pending substantive motions are denied as moot.

The Clerk of Court is directed to terminate all open motions, to enter judgment for

Audible in accordance with this Opinion and Order as well as the Court's Opinions and Orders

of December 8, 2021, and July 14, 2023, *see* ECF Nos. 33, 280, and to close the case.


SO ORDERED.

Dated:  September 20, 2023
        New York, New York                              _____
                                                        JESSE M. FURMAN
                                                        United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
GOLDEN UNICORN ENTERPRISES, INC. et al., *on*
 *behalf of themselves and all those similarly situated,*

                              Plaintiffs,            21 **CIVIL** 7059 (JMF)

              -against-                              **JUDGMENT**

AUDIBLE, INC.,

                              Defendant.
-------------------------------------------------------------------X

              It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated September 20, 2023, the Court GRANTS the rest

of Audible's motion for summary judgment. The parties' other pending substantive motions are

denied as moot. Judgment is entered for Audible in accordance with this Opinion and Order as

well as the Court's Opinions and Orders of December 8, 2021, and July 14, 2023, see ECF Nos.

33, 280; accordingly, the case is closed.


**Dated:**  New York, New York
          September 21, 2023


                                             **RUBY J. KRAJICK**
                                             **Clerk of Court**

                         **BY:**  _____
                                             **Deputy Clerk**