# 23-7407

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

GOLDEN UNICORN ENTERPRISES, INC., ON BEHALF OF THEMSELVES
AND ALL THOSE SIMILARLY SITUATED, BIG DOG BOOKS, LLC, ON
BEHALF OF THEMSELVES AND ALL THOSE SIMILARLY SITUATED,

*Plaintiffs-Appellants,*

v.

AUDIBLE, INC.,

*Defendant-Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
Hon. Jesse M. Furman
Case No. 1:21-cv-07059**

**PAGE PROOF BRIEF FOR DEFENDANT-APPELLEE**

Kathryn J. Fritz
Jedediah Wakefield
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

Brian D. Buckley
Deena J.G. Feit
FENWICK & WEST LLP
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone: 206.389.4510

Attorneys for Defendant-Appellee AUDIBLE, INC.

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee

Audible, Inc. states that it is a wholly owned subsidiary of Amazon.com, Inc.


Dated:  June 11, 2024                    FENWICK & WEST LLP


By:  */s/ Brian D. Buckley*
          Brian D. Buckley

Attorneys for Defendant-Appellee
AUDIBLE, INC.

## TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ..............................................................i

INTRODUCTION ...........................................................................1

STATEMENT OF THE ISSUES............................................................4

STATEMENT OF THE CASE ..............................................................5

    I.       STATEMENT OF FACTS.....................................................5

          A.     The ACX Service and Agreement ...............................5

          B.     Audible's Return Policy............................................8

          C.     Plaintiffs Golden Unicorn and Big Dog Books .........11

    II.      PROCEDURAL HISTORY ..................................................14

          A.     Plaintiffs' Repeated Opportunities To Make Their Case...................................................................14

          B.     Plaintiffs' Putative Damages Expert.........................17

          C.     The District Court's Grant Of Summary Judgment For Audible And Exclusion Of Egan........................19

SUMMARY OF THE ARGUMENT ......................................................21

STANDARD OF REVIEW .................................................................23

ARGUMENT .................................................................................24

    I.       THE DISTRICT COURT PROPERLY GRANTED AUDIBLE SUMMARY JUDGMENT ON PLAINTIFFS' BREACH OF CONTRACT CLAIM....................................24

          A.     The Agreement Is Unambiguous. .............................24

          B.     Plaintiffs Fail To Show That "Returns" Is Ambiguous.............................................................29

## TABLE OF CONTENTS
### (Continued)

Page

    C.    Plaintiffs' Extrinsic "Evidence" Does Not Change The Meaning Of "Returns." ..........................................33

II.    THE DISTRICT COURT PROPERLY GRANTED AUDIBLE SUMMARY JUDGMENT ON PLAINTIFFS' IMPLIED COVENANT CLAIM. ..........................................36

    A.    Audible's Royalties Reporting Complied With The Agreement. ..........................................37

    B.    Plaintiffs Cannot Prove Damages Under Their "Encouragement" Theory. ..........................................41

    C.    Alternative Bases Exist To Affirm The District Court's Grant of Summary Judgment. ..........................................44

        1.    Plaintiffs' Implied Covenant Claim Is Duplicative Of Its Breach Of Contract Claim. ..........................................45

        2.    "Encouraging" Returns Does Not Violate The Implied Covenant. ..........................................47

III.    THE DISTRICT COURT PROPERLY EXCLUDED EGAN'S TESTIMONY. ..........................................48

    A.    Egan's Opinions Do Not Fit Plaintiffs' Liability Theory. ..........................................48

    B.    Plaintiffs Cannot Excuse Egan's Failures. ..........................................50

    C.    Egan's Opinions Require No Specialized Expertise And Are Unfairly Prejudicial. ..........................................55

IV.    CONCLUSION ..........................................61

CERTIFICATE OF COMPLIANCE ..........................................62

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*,
634 F.3d 112 (2d Cir. 2011) ...........................................................58

*Abrahams v. MTA Long Island Bus*,
644 F.3d 110 (2d Cir. 2011) .............................................................58

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) .............................................................24

*Andrews v. Metro N. Commuter R.R. Co.*,
882 F.2d 705 (2d Cir. 1989) .............................................................55

*Belasco Theatre Corp. v. Jelin Prods., Inc.*,
270 A.D. 202 (N.Y. 1st Dep't 1945) ...........................................26, 27

*Bostany v. Trump Org. LLC*,
73 A.D.3d 479 (N.Y. 1st Dep't 2010) ...............................................45

*Canstar v. J.A. Jones Constr. Co.*,
212 A.D.2d 452, 453 (N.Y. 1st Dep't 1995) ......................................45

*Clark v. Takata Corp.*,
192 F.3d 750 (7th Cir. 1999) ...........................................................60

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)......................................................................49, 50

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)...........................................................20, 48, 49

*Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC*,
631 F.3d 42 (2d Cir. 2011) ...............................................................51

*Dish Network Corp. v. Ace Am. Ins.*,
21 F.4th 207 (2d Cir. 2021) .............................................................26

*Fed. Ins. v. Am. Home Assurance Co.*,
639 F.3d 557 (2d Cir. 2011) .............................................................26

iv

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Fischer & Mandell, LLP v. Citibank, N.A.*,
  632 F.3d 793 (2d Cir. 2011) ..........................................................24, 31

*FPP, LLC v. Xaxis US, LLC*,
  No. 14 CV 6172-LTS-AJP, 2017 WL 11456572
  (S.D.N.Y. Feb. 13, 2017) ......................................................................56

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
  720 F.3d 84 (2d Cir. 2013) ............................................................38, 47

*Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*,
  22 F.4th 83 (2d Cir. 2021) ..............................................................24, 25

*Greenfield v. Philles Recs., Inc.*,
  98 N.Y.2d 562, 780 N.E.2d 166 (2002)..................................................28

*Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*,
  819 F.3d 42 (2d Cir. 2016) ...................................................................23

*In re Lehman Bros.*,
  No. 17 CIV. 6246 (AT), 2018 WL 10454936 (S.D.N.Y. Sept. 26, 2018),
  *aff'd sub nom. In re Lehman Bros. Holdings Inc.*,
  792 F. App'x 16 (2d Cir. 2019) ............................................................35

*JA Apparel Corp. v. Abboud*,
  568 F.3d 390 (2d Cir. 2009) .................................................................36

*JN Contemp. Art LLC v. Phillips Auctioneers LLC*,
  29 F.4th 118 (2d Cir. 2022) ...........................................................*passim*

*Keiler v. Harlequin Enters. Ltd.*,
  751 F.3d 64 (2d Cir. 2014) .............................................................24, 25

*Kern v. City of Rochester*,
  93 F.3d 38 (2d Cir. 1996) .....................................................................42

*L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*,
  595 F.3d 458 (2d Cir. 2010) .......................................................26, 28, 33

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ................................................................52

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Loc. 377, RWDSU, UFCW v. 1864 Tenants Ass'n,*
   533 F.3d 98 (2d Cir. 2008) ...............................................................39, 40

*Lockheed Martin Corp. v. Retail Holdings, N.V.,*
   639 F.3d 63 (2d Cir. 2011) ......................................................................35

*Luck v. McMahon,*
   No. 3:20-CV-00516 (VAB), 2022 WL 5500934 (D. Conn. Feb. 11, 2022) ......56

*M/A–COM Sec. Corp. v. Galesi,*
   904 F.2d 134 (2d Cir.1990) ....................................................................47

*McCutcheon v. Colgate-Palmolive Co.,*
   62 F.4th 674 (2d Cir. 2023) ...............................................................23, 24

*McElwee v. Cnty. of Orange,*
   700 F.3d 635 (2d Cir. 2012) ....................................................................44

*Minasian v. Standard Chartered Bank, PLC,*
   109 F.3d 1212 (7th Cir. 1997) .................................................................60

*Mint Solar, LLC v. Sam's W., Inc.,*
   No. 5:19-CV-05167, 2021 WL 1776144 (W.D. Ark. May 4, 2021)................57

*Nimely v. City of New York,*
   414 F.3d 381 (2d Cir. 2005) ....................................................................58

*Olin Corp. v. Ins. Co. of N. Am.,*
   221 F.3d 307 (2d Cir. 2000) ....................................................................34

*Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins.,*
   472 F.3d 33 (2d Cir. 2006) ......................................................................28

*Richards v. Direct Energy Servs., LLC,*
   915 F.3d 88 (2d Cir. 2019) ......................................................................37

*Schweizer v. Sikorsky Aircraft Corp.,*
   634 F. App'x 827 (2d Cir. 2015) ..............................................................48

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y,*
   726 F. App'x 17 (2d Cir. 2018) ................................................................41

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*,
769 F.3d 807 (2d Cir. 2014) .........................................................37, 48

*SEC v. Terraform Labs Pte. Ltd.*,
No. 23-CV-1346 (JSR), 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023)..............59

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
959 F.2d 425 (2d Cir. 1992) ................................................................25

*Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc.*,
575 F.3d 199 (2d Cir. 2009) ................................................................41

*Spinelli v. Nat'l Football League*,
903 F.3d 185 (2d Cir. 2018) .........................................................37, 46

*Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*,
993 F. Supp. 2d 379 (S.D.N.Y. 2014)*, aff'd sub nom. APEX Emp.*
*Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc.*,
725 F. App'x 4 (2d Cir. 2018) ............................................................34

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015) .................................................................52

*Tchatat v. City of New York*,
315 F.R.D. 441 (S.D.N.Y. 2016) ....................................................58, 60

*Thyroff v. Nationwide Mut. Ins.*,
460 F.3d 400 (2d Cir. 2006) ...............................................................47

*Total Control, Inc. v. Danaher Corp.*,
338 F. Supp. 2d 566 (E.D. Pa. 2004)......................................................57

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
487 F.3d 89 (2d Cir. 2007) .......................................................41, 42, 43

*United States ex rel. Banigan v. Organon USA Inc.*,
No. CV 07-12153-RWZ, 2016 WL 6571269 (D. Mass. Jan. 20, 2016) ............57

*United States v. Castillo*,
924 F.2d 1227 (2d Cir. 1991) .........................................................55 57

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*United States v. Onumonu*,
  967 F.2d 782 (2d Cir. 1992) ..............................................................57

*United States v. Tuzman*,
  No. 15 CR. 536 (PGG), 2017 WL 6527261 (S.D.N.Y. Dec. 18, 2017)............58

*Wakeman v. Wheeler & Wilson Mfg. Co.*,
  4 N.E. 264 (N.Y. 1886).................................................................41, 43

*Warth v. Seldin*,
  422 U.S. 490 (1975)..........................................................................42

*Wills v. Amerada Hess Corp.*,
  379 F.3d 32 (2d Cir. 2004) ...........................................................24, 48

*WWP, Inc. v. Wounded Warriors Fam. Support, Inc.*,
  628 F.3d 1032 (8th Cir. 2011) .............................................................56

**STATUTES AND RULES**

Fed. R. Civ. P. 26 .........................................................................45, 51

Fed. R. Civ. P. 56 ..............................................................................24

Fed. R. Evid. 403 .....................................................................58, 59, 60

Fed. R. Evid. 702 ...........................................................20, 48, 55, 59

Fed. R. Evid. 1006 ....................................................................59, 60

**OTHER AUTHORITIES**

23 Williston on Contracts § 63:22 (4th ed. May 2024 update) .............................38

## INTRODUCTION

This is a contract dispute related to royalties for audiobooks. Plaintiffs-Appellants are independent authors who published audiobooks through Audible's Audiobook Creation Exchange program ("ACX"). ACX allows authors to create audio versions of their books easily and inexpensively, and to distribute them to listeners through Audible, Amazon, and iTunes. ACX is an innovative way for new or less-established authors to reach a vast audience of audiobook consumers. As Plaintiffs' own industry expert put it, "ACX was a breakthrough in audiobook publishing."

Each time an author seeks to publish a distinct title through ACX, she must agree to Audible's Audiobook License and Distribution Agreement (the "Agreement"). The Agreement expressly provides that Audible will deduct returns from authors' sales figures when calculating their royalties. Plaintiffs admit that they were aware of that contract provision and always understood they would not earn royalties on returned audiobooks. With that knowledge, they executed the Agreement repeatedly over many years and profitably published scores of audiobooks through ACX.

Like many successful businesses, Audible has a customer-centric "satisfaction guaranteed" policy that allows customers to return audiobooks for any reason for up to a year. That policy allows listeners to try new authors or books, knowing they

can return a title if they are dissatisfied. That policy, in turn, helps authors, particularly independent authors trying to build an audience. As Plaintiffs' industry expert acknowledged, generous return policies tend to increase sales more than returns. And that was borne out in this case: during the relevant period—when Audible marketed its satisfaction-guaranteed return policy—ACX authors' net sales and royalties increased.

In October 2020, a software error in the ACX dashboard—an online tool that allows authors to track their sales—caused the dashboard temporarily to reflect gross sales, rather than net sales (minus returns). Plaintiffs claim that this "glitch" exposed Audible's "secret" policy of "surreptitiously" deducting returns from authors' sales. It did no such thing. There is no dispute that the Agreement always provided that authors would not earn a royalty on returned audiobooks. Authors' royalty statements always reflected that arrangement, and the ACX author community openly discussed Audible's policies for years before the "glitch." The error merely drew the attention of certain ACX authors who claimed (incorrectly) that Audible's return policy was too generous and hurt independent authors.

In August 2021, Plaintiffs sued Audible seeking royalties for titles that listeners had returned. After Audible's initial pleading motion, Plaintiffs pursued claims for breach of contract and breach of the implied covenant of good faith and fair dealing. For 12 months, the parties engaged in extensive discovery, including

expert discovery.  In two separate orders, in July and August 2023, the district court (Furman, J.) granted summary judgment for Audible on Plaintiffs' remaining claims. After reviewing the full factual record, the court rejected Plaintiffs' breach of contract claim because the conduct Plaintiffs challenge—i.e., Audible deducting returns from authors' sales figures when calculating royalties—is precisely what the Agreement said Audible would do.

The district court also rejected both of Plaintiffs' implied covenant theories. The court first "easily rejected" Plaintiffs' theory that Audible was "secretly" deducting returns, explaining that "the Agreement expressly permitted Audible to report net sales information, rather than gross sales, on authors' royalty statements." And the court dismissed Plaintiffs' theory that Audible improperly "encouraged" returns because Plaintiffs could not articulate, let alone prove, any means to identify returns that were caused by "encouragement."  Indeed, as the district court noted, Plaintiffs "cite[d] no evidence proving that Audible's purported 'encouragement' led to the return of even a single audiobook."  As such, as a matter of law, Plaintiffs could not establish causation or damages for their implied covenant claim.

Finally, the district court granted Audible's *Daubert* challenge to Plaintiffs' putative damages expert, Joseph Egan.  Egan conducted no expert calculations or analysis of any kind.  He merely took the royalties associated with all of Plaintiffs' returned titles from a spreadsheet Audible had generated for discovery and

proclaimed those totals to be Plaintiffs' damages.  But Plaintiffs never asserted that all returns are illegitimate and should earn a royalty; both Plaintiffs and Egan acknowledged that at least some audiobook returns *are* legitimate and *should* be deducted from their sales.  Thus, the district court found Egan's opinions bore no relation to Plaintiffs' theory of liability and must be excluded.

The district court got it exactly right.  Plaintiffs knew that if listeners returned Plaintiffs' audiobooks, they would not earn a royalty on those returned purchases.  That Plaintiffs disliked Audible's generous return policy cannot override the plain terms of the Agreement, and Plaintiffs cannot renege on the deal they willingly and repeatedly accepted, to their substantial benefit, for years.  Judge Furman's orders and rulings are detailed, thoughtful, and well-reasoned.  The Court should affirm them in full.

## STATEMENT OF THE ISSUES

1.  Whether the district court correctly granted Audible summary judgment on Plaintiffs' breach of contract claim, where the alleged breach—deducting returns from authors' sales when calculating royalties—was expressly and unambiguously permitted by the Agreement.

2.  Whether the district court correctly granted Audible summary judgment on Plaintiffs' claim that Audible breached the implied covenant of good faith and fair dealing by "surreptitiously" deducting returns from royalty statements, when the

Agreement expressly permitted Audible to report net sales information, rather than gross sales, on authors' royalty statements.

3.     Whether the district court correctly granted Audible summary judgment on Plaintiffs' claim that Audible breached the implied covenant of good faith and fair dealing by "encouraging" customers to return audiobooks, where Plaintiffs cited no evidence that Audible's purported "encouragement" led to the return of even a single audiobook, and therefore, Plaintiffs could not establish the required elements of causation or damages.

4.     Whether the district court abused its discretion by excluding Plaintiffs' purported damages expert when his methods and calculations did not fit Plaintiffs' theory of liability and when, at most, he summed numbers using Excel, which required no specialized expertise.

## STATEMENT OF THE CASE

## I.     STATEMENT OF FACTS

### A.     The ACX Service and Agreement

Founded in 1995, Audible is a leading provider of audio content. Dkt.249_¶ 1; Dkt.216-45_¶4.   In 2011, Audible launched ACX, a service that provides independent authors a "one-stop-shop" to produce and publish their works as audiobooks.   Dkt.249_¶2; Dkt.216-45_¶6.   The ACX service enables self-published authors to reach an audience of Audible listeners.  Dkt.216-45_¶10.

These independent authors can post titles on ACX to connect with narrators and studio professionals who can produce the audiobooks. Dkt.216-1_4, 16-17. For authors who want to narrate their own books, ACX provides instructions and guidance. Dkt.216-1_146-149. Once a title is produced, ACX provides for distribution of the audiobook through Audible, Amazon, and iTunes. Dkt.216-1_5. ACX also offers many tools to help authors produce, publish, and market their audiobooks, including personalized support from the ACX team, detailed checklists, and online tutorials. Dkt.249_¶¶3-4; Dkt.216-45_¶¶7-8; Dkt.216-1_26, 71-72.

As Plaintiffs' putative industry expert, Thad McIlroy, acknowledged, "ACX was a breakthrough in audiobook publishing." Dkt.191-2_4. The service "brought self-publishing to audio: the independent authors who had been issuing their ebooks on the Amazon Kindle could now finally produce and distribute audio versions of their work." *Id.* While "[i]n theory this might have been possible … through other smaller distributors," the cost of producing a professional audiobook was "in the thousands of dollars"—an option that "was unrealistic for an author with a modest following." *Id.* In the words of McIlroy, "ACX has enabled its many thousands of authors to earn substantial income beyond the sale of their ebooks and print books," as well as "to present their work professionally, on a par with the top authors from the major publishers." *Id.* At the same time, ACX has offered "royalties

6

significantly higher than can be earned from traditional commercial publishers." Dkt.191-2_14.

Each time they publish an audiobook through ACX, authors must execute the Agreement. Dkt.249_¶7; Dkt.216-45_¶¶11-12. The Agreement provides that Audible will pay royalties to authors based on "net sales" of audiobooks, which the Agreement defines as net of "returns." Dkt.249_¶¶8, 85; Dkt.216-3_2; Dkt.176_5. It is undisputed that, as specified in the Agreement, the royalty statements that Audible provides to ACX authors have always reflected "net sales." Dkt.249_¶21; Dkt.1_¶43; Dkt.132_3-5. Consistent with the Agreement's treatment of "net sales," Audible explained in its online Help Center that "your sale units would decrease each time a unit is returned and refunded." Dkt.249_¶12; Dkt.216-7. A former Audible employee who worked directly with ACX authors for more than seven years testified that authors have "always been aware that there are returns and returns are taken out of the statement. It's always been a part of the contract." Dkt.249_¶¶14-15; Dkt.191-9_84:17-20.

As part of its services to ACX authors, Audible provides an online "dashboard," which gives authors a preview of sales figures by title. Consistent with the Agreement—which provided for royalties on net sales—the dashboard showed only net sales figures. In October 2020, due to a software error, the ACX dashboard temporarily displayed *gross* sales figures. Dkt.1_¶¶3, 54, 71. Plaintiffs allege that,

at that point, the "dam burst" and if not for "this chance occurrence, Authors would still be in the dark." Dkt.1_¶¶3, 71. In fact, as Plaintiffs have consistently acknowledged, the Agreement always provided that Audible would pay authors net of returns, and the ACX royalty statements have always reflected "net sales." Dkt.249_¶¶8, 21.

### B. Audible's Return Policy

The Agreement provides that Audible has "sole discretion over all decisions related to its distribution of the Audiobook." Dkt.1-1_5. In 2012, almost a decade before this lawsuit was filed, Audible launched what was initially called "A Great Listen Every Time" and later came to be called the "Great Listen Guarantee." Dkt.249_¶¶25-26. That policy—which remained substantively unchanged from its inception through the filing of this lawsuit—allowed Audible members in good standing to return, within 365 days of receipt, an audiobook with which they were dissatisfied. Dkt.249_¶¶25-28, 98.[1]

While Plaintiffs have argued that Audible's return policy was anomalous and exceedingly generous, in fact it followed the "satisfaction guaranteed" tradition of many successful retailers. Dkt.249_¶32. Such return policies come with significant

---

[1] When members returned an audiobook, they obtained a refund in their original form of payment—either cash or a membership credit. Dkt.249_¶ 98. Audible members receive one or more "credits" per month that they can use to purchase audiobooks. Dkt.1_¶ 32.

benefits. For example, customers' ability to return a book if dissatisfied gives customers the confidence to try new books and authors, a feature that is particularly relevant and valuable for independent authors. Dkt.249_¶38; Dkt.216-45_¶¶18-20; Dkt.216-16. As one customer wrote to Audible in 2016, with the "'Great Listen Guarantee' I finally felt an ease to buy books using my precious credit. This has actually INCREASED the amount of credits I purchase!" Dkt.216-16; Dkt.216-45_¶19. Plaintiffs also acknowledge that "some customers may experience such confidence." Dkt.249_¶38.

Further, studies introduced by Plaintiffs' putative industry expert, McIlroy, found that generous return policies increase customer willingness to make other purchases and ultimately *increase purchases more than returns*. Dkt.249_¶¶32-37; Dkt.191-2_11-12. And these benefits played out in practice. From 2015 to 2020, both *total* ACX royalty payments and *per-ACX-rights holder payments increased*. Dkt.249_¶39; Dkt.191-17. In other words, during the time that Plaintiffs claim Audible engaged in a "nefarious practice" of netting returns, Plaintiffs-Appellants' Br. ("PB") 1, ACX authors' royalties were *increasing every year*.

Contrary to Plaintiffs' assertions, Audible's return policy was well-known. Audible continuously explained the benefits of the policy on its website and featured it in promotional emails to members, some of whom—*including Plaintiffs*—were ACX authors. Dkt.249_¶¶29-31. Well before October 2020, when the "dam"

supposedly "burst," ACX authors (including Plaintiffs) discussed on social media the Audible return policy and how it operated. Dkt.1_¶71. For example, in 2018, someone described as an "Indie author" wrote on Goodreads, "if you RETURN a book we don't get our 'Sale' …." Dkt.249_¶40; Dkt.216-18_12. Other authors, including an ACX author, discussed returns in a 2018 Reddit thread, where one author commented that returns are "the cost of doing business, unfortunately," and another author replied that "ACX reports show *net* sales from the various sources." Dkt.249_¶41; Dkt.216-18_65-66; *see also, e.g.*, Dkt.216-18_78, 80, 84 (February and July 2020 Twitter posts from authors discussing the return policy).

Plaintiff Big Dog Books' founder and sole owner, Elizabeth Noble, also discussed Audible's generous return policy before supposedly learning about it in October 2020. Although Noble testified that, before that time, she had heard nothing about Audible's return policy "outside of what [she] agreed to in the contract," Dkt.249_¶81, Dkt.191-6_117:4-7, documents Plaintiffs produced after Noble's deposition revealed that to be false. In February 2020, Noble emailed the "Chief of Everything Officer" for Big Dog Books, Lisa Kuhne, that "there's a lot of chatter on the author forums about Audible's return policy where they essentially tell customers that you can return an audio book and get another …. Authors are of course in an uproar over this." Dkt.249_¶82; Dkt.191-31. Noble then asked Kuhne, "I am curious … if we distribute to Audible through Findaway does that take away

Audible's right to do this?" Dkt.249_¶ 82; Dkt.191-31; *see also* Dkt.249_¶83, Dkt.191-32 (February 11, 2020 Facebook message with Noble asking, "can we distribute to audible through findaway and subvert this ability for them to accept returns?").

In short, while Plaintiffs claim that authors were "in the dark," Dkt.1_¶3, Audible's return policy—and its effect on authors' royalties—was always in broad daylight.

### C.  Plaintiffs Golden Unicorn and Big Dog Books

Golden Unicorn and Big Dog Books began publishing through ACX in 2014, two years after Audible began its Great Listen Guarantee return policy. Dkt.249_¶¶42, 44, 65.  Golden Unicorn operates primarily through Jan Bonthu, its founder and president, while Big Dog Books operates primarily through Noble, its founder and sole owner.  Dkt.249_¶¶9, 11.  For Bonthu, joining ACX enabled her to release her first audiobook.  Dkt.249_¶45, Dkt.216-4_46:7-47:4, 53:10-20. Similarly, Noble started releasing audiobooks through ACX because she wanted to "get her foot into audio."  Dkt.249_¶66; Dkt.191-6_32:21-33:2.  Since joining ACX, Bonthu and Noble have each distributed dozens of audiobooks through the service, including several released after they brought this lawsuit.  Dkt.249_¶¶46, 67.  Both Bonthu and Noble have earned hundreds of thousands of dollars through ACX. Dkt.249_¶¶47, 68.  And both authors continue to distribute audiobooks through

ACX. Dkt.249_¶¶48, 67. As Bonthu testified, "I'm earning quite high royalties on some of my books, and I will not get the same royalties on other venues." *Id.*; Dkt.216-4_63:15-64:5. Noble similarly stated, "I would say that I have great benefit in publishing [through ACX]. I make money." Dkt.249_¶69; Dkt.191-6_139:15-16.

Importantly, when they entered the ACX agreements, Bonthu and Noble both knew that royalties were paid net of returns. Dkt.249_¶49; Dkt.216-4_89:9-91:17; Dkt.191-6_104:1-4. Indeed, in 2014, Noble asked ACX Client Support to "define what NET means for me so I make sure I understand." Dkt.249_¶70; Dkt.191-26_GUE_00008241. ACX Client Support responded that "'net sales' are defined as 'the balance of gross sales remaining after deducting trade discounts, *returned sales*, and sales allowances.'" (emphasis added). Dkt.249_¶71; Dkt.191-26_GUE_00008240. Noble never asked that representative, or any other Audible representative, to explain what the term "returns" meant or how returns were treated under the Agreement. Dkt.249_¶¶72-73; Dkt.191-6_73:1-17; Dkt.191-26. And before October 2020, neither Bonthu nor Noble asked Audible for any information about their returns, Audible's return policy, or its impact on their royalty statements. Dkt.249_¶¶23-24, 51, 58-61.

Both Bonthu and Noble testified that they understood a "return" as a customer giving back a product in exchange for money or store credit. Dkt.249_¶¶87-88; Dkt.216-4_90:4-91:11; Dkt.191-6_101:24-102:18. While Bonthu and Noble knew

what returns are and that authors would be paid net of returns, they took divergent positions on what constituted a "legitimate" basis for a return. Bonthu testified that "legitimate" returns included only "defective" audiobooks. Dkt.249_¶50; Dkt.216-4_127:18-129:7. For Noble, however, "legitimate" bases could include mistaken purchases, technical defects, not liking the narrator, or a customer "listen[ing] to the first chapter and it's not their cup of tea." Dkt.249_¶80; Dkt.191-6_104:11-107: 12. This was all notwithstanding that the Agreement makes no such distinctions regarding "returns." Dkt.249_¶ 8.

At times before October 2020, both Golden Unicorn's and Big Dog Books' royalty statements included negative sales units when there were more returns than sales in a given period. Dkt.249_¶¶22, 76. Golden Unicorn Vice President Srikanth Bonthu acknowledged that these negative sales numbers were reflected on the statements, but he did not focus on those figures at the time because he did not review the royalty statements "line by line." Dkt.249_¶¶10, 56; Dkt.216-5_151:10-153:5. Meanwhile, Big Dog Books' "Chief of Everything Officer" Kuhne never asked questions about these figures because she "was not looking at returns; [she] was looking at royalty numbers." Dkt.249_¶77; Dkt.191-27_94:5-98:8. For her part, Noble "assumed [her] work was good enough and nobody was returning it," and she did not ask Audible about her return numbers. Dkt.249_¶77; Dkt.191-6_158:24-25.

13

## II.    PROCEDURAL HISTORY

On August 20, 2021, Plaintiffs filed their complaint, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.  Dkt.1.  Plaintiffs acknowledged that "Audible's Contract with each Author provides that royalty payments are to be calculated after 'returns' and certain other items are netted out."  Dkt.1_¶43.  According to Plaintiffs, "the term 'return' in the context of consumer goods is typically understood to mean that a product is returned for a refund because the product was defective or the buyer was otherwise dissatisfied."  Dkt.1_¶44.  But according to the Complaint, a return "does not encompass an exchange and is especially inappropriate where a customer exchanges a product after receiving any appreciable benefit from it."  *Id.*  The Complaint alleged that Audible "systemically withheld" royalties through a "secret system of accounting for distribution of the Audiobooks."  Dkt.1_¶¶1-2.

### A.    Plaintiffs' Repeated Opportunities To Make Their Case

On November 1, 2021, Audible moved to dismiss Plaintiffs' implied covenant and unjust enrichment claims.  Dkts.16-17.  Before ruling on that motion, the district court stated that Plaintiffs could, if they chose, amend their complaint.  Dkt.18. Plaintiffs opted not to amend and instead opposed Audible's motion to dismiss. Dkt.28.  On December 8, 2021, the district court granted Audible's motion to dismiss the unjust enrichment claim.  SPA-1-2.  The district court allowed Plaintiffs to

pursue an implied covenant claim because it was based on different factual allegations than their breach of contract claim. *Id.*

After the district court's order on Audible's motion to dismiss, the Second Circuit issued a decision clarifying that an implied covenant claim is duplicative of a breach of contract claim and must be dismissed if both claims seek identical damages. *See JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022) (affirming dismissal of implied covenant claim as duplicative because even if plaintiff had "set out a different factual basis for this claim than the factual basis set out in its breach of contract claim, the damages sought for both claims would be the same: compensation for the lost sale."); Dkt.73_2, 5-7. On August 29, 2022, Audible moved for judgment on the pleadings on the basis that the district court had not reached "the question of whether the *damages* sought in relation to the two claims are identical." Dkt.72; Dkt.73_1. Following the *JN* court's reasoning, Audible argued that because Plaintiffs sought the same relief of lost royalties under both their contract and implied covenant theories, the implied covenant claim should be dismissed as duplicative. Dkt.73_6-7. On October 6, 2022, the district court denied Audible's motion without prejudice to renewal on summary judgment, holding that even if *JN* precluded implied covenant claims with duplicative damages, "further factual development is required to determine if Plaintiffs' two claims actually seek the same damages." SPA-4.

When the district court issued that ruling, the parties were conducting fact discovery. Dkt.62_2. In their initial disclosures, served on December 29, 2021, Plaintiffs had not differentiated between damages for their breach of contract and implied covenant claims; they stated only that their damages computation would be based on "the respective number of exchanges" of Plaintiffs' audiobooks. Dkt.249_¶104; Dkt.191-35_4. Later, in their responses to Audible's interrogatories, Plaintiffs similarly described their damages (for both claims) as including their royalties "without netting out these illegitimate exchanges." Dkt.249_¶106; Dkt.191-37_4-5, 6-7; Dkt.191-38_4-5, 6-7. Plaintiffs maintained that they could not complete their damages calculation until Audible provided "responses to Plaintiff's discovery requests," and Plaintiffs represented that they would update their responses after Audible's document production. Dkt.249_¶¶107, 109; Dkt.191-37_5, 7; Dkt.191-38_5, 7; Dkt.191-40_3. But at no point in the litigation did Plaintiffs ever offer different damages calculations for their contract and implied covenant claims.

Fact discovery closed on November 29, 2022. Dkt.62_2. It is undisputed that Audible produced extensive data related to Plaintiffs' claims of damages, including documents and data responsive to Plaintiffs' discovery requests. Dkt.249_¶108. But as of the close of fact discovery, Plaintiffs never updated their discovery responses or initial disclosures regarding damages or their proposed damages calculation.

Dkt.249_¶110.  Plaintiffs also never told Audible that Plaintiffs were missing data needed to make their case for purported damages.  Dkt.249_¶111.  Nor did Plaintiffs ever seek relief from the district court to obtain additional damages-related data.  *Id.*

### B.  Plaintiffs' Putative Damages Expert

On December 15, 2022, Plaintiffs served the report of their putative damages expert, Egan.  Dkt.198-1.  In his report, Egan proposed calculating damages using two "methods," both of which purported to add up damages for *all returns* of Plaintiffs' titles, even though Plaintiffs had never claimed to be injured by *all* returns.  Dkt.198-1_¶26.  For his first "method," Egan added the "royalty amount[s] deducted" for all returns of Plaintiffs' titles.  Dkt.198-1_¶36.  While he unnecessarily sorted these figures by author and year before adding them all back together (*id.*), Egan acknowledged that merely by "using the Excel function to add a bunch of rows together," he "had the Excel add up all the individual rows in this case."  Dkt.222-2_135:11-19; Dkt.222-2_136:4 ("I used Excel to total them").  Egan also admitted that his gratuitous sorting and re-adding exercise yielded exactly the same numbers available from the spreadsheets that Audible generated for discovery and that he was merely (and inexplicably) showing how those figures were derived.  Dkt.222-2_124:11-125:8.  For his second "alternate method," Egan simply used the aggregate

data, again *produced by Audible*, and that method involved no calculation at all.[2] Dkt.198-1_¶¶47-52.

In both of his "methods," Egan proposed including "the royalty amount deducted" for *all returns*, regardless of the reason for, or any other circumstances associated with, the return. Dkt.198-1_¶¶36-57; Dkt.222-2_140:5-7 ("Q. You didn't exclude any returns or exchanges based on the reason for them. A. That's correct."). And although Plaintiffs' complaint distinguished between "returns" and "exchanges"—alleging that a return "does not encompass an exchange," Dkt.1_¶44—Egan used the terms "return" and "exchange" "interchangeably" and did not "provide a distinction between return or exchange" in his opinions. Dkt.222-2_92:2-21, 114:12-17. Notably, Egan's damages opinions also did not distinguish between Plaintiffs' breach of contract and implied covenant claims; in other words, he offered a unified damages theory that purportedly applied to both of Plaintiffs' causes of action. Dkt.222-2_177:31-178:3.

Although Egan's "methods" encompassed all returns, Plaintiffs never claimed that all returns were "illegitimate" and should not have been deducted from net sales.

---

[2] Egan was under the mistaken impression that Plaintiffs' proposed class included only U.S. authors, even though neither Plaintiffs' complaint nor their class certification motion defined it that way. Dkt.198-1_¶50; Dkt.1_¶81; Dkt.130. Egan stated that if Audible produced data limited to U.S. authors, he could calculate damages "by summing the royalty amounts identified as returns at issue for the class period." Dkt.198-1_¶51.

Egan agreed that for at least some returns (what he called a "viable return"), authors would not be due a royalty under the Agreement. Dkt.222-2_82:17-83:17. He acknowledged that "[i]f it's determined that that is a return that is allowed and no royalty should be paid, if that determination is made, then, no, a royalty wouldn't be paid." Dkt.222-2_83:14-17. But Egan provided no method or explanation of how he could exclude such admittedly "viable" returns from his damages opinions. Dkt.198-1_¶¶36-57.

### C. The District Court's Grant Of Summary Judgment For Audible And Exclusion Of Egan

On July 14, 2023, the district court granted Audible summary judgment on Plaintiffs' breach of contract claim and one of Plaintiffs' implied covenant theories and granted Audible's motion to exclude Egan's testimony in its entirety. SPA-6-28.[3] Rejecting the breach of contract claim, the district court held that the ACX "Agreement is unambiguous and that Plaintiffs' breach of contract claim fails as a matter of law." SPA-12. The court explained that the ordinary meaning of "return"—i.e., "to give back a product in exchange for what one used to acquire it"—applied and noted that Plaintiffs' own putative industry expert used the same commonsense meaning. *Id.* Because Audible was entitled to deduct all "returns" from Plaintiffs' royalties, Audible did not breach the contract by doing so. SPA-14.

---

[3] The Special Appendix contains the redacted order, which was issued on July 17, 2023. The Court's decision and initial order was issued on July 14, 2023. Dkt.278.

The district court also held that Plaintiffs' arguments about "industry practice" confused "Audible's return *policy* with the *interpretation* of the contract term 'returns.'" SPA-13-14.

The district court excluded Egan's testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). SPA-17-22. The court found that Egan's proposed calculation "involves relatively simple arithmetic, not expert analysis," and that "Egan simply replicated calculations that Audible had already done." SPA-18. More importantly, the district court held that "Egan's damages calculations, such as they are, do not correspond to Plaintiffs' sole remaining claim (breach of the implied covenant of good faith and fair dealing) and, thus, are irrelevant, unreliable, and will not assist the trier of fact." SPA-20.

For the remaining implied covenant claim, the district court interpreted Plaintiffs' allegations as asserting two theories for how Audible breached the Agreement: (1) by "actively encouraging" returns; and (2) "by 'surreptitiously' deducting royalties." SPA-24. The court granted Audible summary judgment on the second theory, explaining that it was "easily rejected" because "the Agreement expressly permitted Audible to report net sales information, rather than gross sales, on authors' royalty statements." SPA-25. As to the "active encouragement" theory, the district court explained that it "could probably grant summary judgment to Audible" on this theory as well. *Id.* The court nonetheless allowed supplemental

briefing, giving "Plaintiffs an opportunity to marshal the evidence, to the extent it exists, showing that they have a viable theory of damages," an essential element of their claim. SPA-23, 25-26.

After the parties' supplemental briefing, the district court granted Audible summary judgment on Plaintiffs' remaining implied covenant theory. SPA-29-40. The court concluded that "Plaintiffs fail[ed] to identify any means, let alone evidence, to identify 'legitimate' returns from returns that Audible 'encouraged' in breach of the implied covenant. In other words, Plaintiffs cannot prove two essential elements of their remaining claim: causation and damages." SPA-30. Having granted Audible summary judgment on all claims, the court directed the Clerk of Court to enter judgment for Audible. SPA-40.

## SUMMARY OF THE ARGUMENT

The Court should affirm the district court's ruling in its entirety. The district court correctly granted summary judgment for Audible on Plaintiffs' breach of contract and implied covenant claims, and the court did not abuse its discretion by excluding Egan's testimony.

**Breach Of Contract Claim:** There is no dispute that the Agreement provides that authors' royalties are paid net of returns. The district court correctly found that the term "returns" is unambiguous and that "every time an Audible customer gives back an audiobook in exchange for money or store credit, that customer completes

21

a 'return' within the meaning of the Agreement, even if she immediately purchases a new title with the money or store credit." SPA-12-13. Therefore, Audible "was entitled to deduct all 'returns' from Plaintiffs' royalties," SPA-13, and Plaintiffs' breach of contract claim fails as a matter of law.

**Breach Of The Implied Covenant Of Good Faith And Fair Dealing Claims:** The district court correctly found that Audible did not breach the implied covenant of good faith and fair dealing by "surreptitiously" deducting royalties from authors' sales because the Agreement expressly provided that Audible would report net sales, which is what Audible did. Because the conduct Plaintiffs challenge was permitted under the Agreement, Audible could not have breached the implied covenant.

The district court also correctly found that Plaintiffs could not succeed on their "encouragement" theory for breach of the implied covenant because "Plaintiffs fail[ed] to provide a coherent theory, let alone evidence, of the damages attributable to Audible's alleged breach." SPA-36. Despite the district court giving Plaintiffs an additional opportunity to "marshal the evidence, to the extent it exists," of any damages incurred from Audible's alleged "encouragement" of returns, SPA-26, Plaintiffs failed to do so.

Two additional independent bases support affirming the district court's summary judgment for Audible. First, Plaintiffs' implied covenant claim is

duplicative of their breach of covenant claim because Plaintiffs seek the same damages for both claims. Second, Audible's alleged "encouragement" of returns did not violate the implied covenant because, under the Agreement, Audible retained discretion over all decisions related to audiobook distribution, including how it marketed the return benefit.

**Egan Exclusion:** The district court did not abuse its discretion by excluding Egan because his "methods" were completely disconnected from Plaintiffs' theory of liability. Plaintiffs had always maintained that their claims were based on Audible allowing only certain, "illegitimate" returns, but Egan proposed calculating damages by summing *all* returns. In addition, Egan's "methods" (either using Excel to total figures from Audible's spreadsheets or merely adopting a figure on Audible's spreadsheets) required no specialized expertise. The district court did not abuse its discretion by excluding Egan's testimony on that alternative basis.

## STANDARD OF REVIEW

The Court reviews a district court's "grant of summary judgment *de novo*, construing the evidence in the light most favorable to the party against which summary judgment was granted and drawing all reasonable inferences in its favor." *McCutcheon v. Colgate-Palmolive Co.*, 62 F.4th 674, 686 (2d Cir. 2023) (quoting *Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 47 (2d Cir. 2016)). "Summary judgment is appropriate if the record establishes that 'there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). The Court's de novo review includes whether "a contract is ambiguous." *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 94 (2d Cir. 2021).

The Court reviews "a district court's decision to exclude expert testimony for abuse of discretion." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 41 (2d Cir. 2004). "The exclusion of a proposed expert witness will not constitute an abuse of discretion unless it is 'manifestly erroneous.'" *Id.* (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)).

## ARGUMENT

## I. THE DISTRICT COURT PROPERLY GRANTED AUDIBLE SUMMARY JUDGMENT ON PLAINTIFFS' BREACH OF CONTRACT CLAIM.

### A. The Agreement Is Unambiguous.

Summary judgment on a breach of contract claim "is appropriate if the terms of the contract are unambiguous." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). "A contract is unambiguous when the contractual language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 69 (2d Cir. 2014). While "ambiguity exists where a contract's term could objectively suggest more than one meaning to one familiar with the customs and terminology of

the particular trade or business[,] … New York law is well settled that a written agreement that is complete and unambiguous is to be interpreted without the aid of extrinsic evidence and that industry practice may not be used to vary the terms of such a contract." *Id.* "The language of a contract is not made ambiguous simply because the parties urge different interpretations." *Glob. Reinsurance*, 22 F.4th at 94 (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)).

The district court properly concluded that the Agreement is unambiguous, and therefore Plaintiffs' breach of contract claim fails a matter of law. SPA-12. In Plaintiffs' words, it is "[u]ndisputed that the Contract defines net sales of audiobooks as being 'less … returns.'" Dkt.249_¶8. There is no serious argument that the term "return" in that context is ambiguous. As *Plaintiffs' own putative industry expert*, McIlroy, explained, "a digital product return is the process of a customer returning previously purchased digital content back to the retailer, and *in turn receiving a refund in the original form of payment, exchange for another item, or a store credit*." Dkt.191-2_9 (emphasis added);[4] *see also* SPA-12 (district court collecting dictionary

---

[4] In his deposition, McIlroy tried to dance around his definition once he realized that it undermined Plaintiffs' case. Plaintiffs then claimed in summary judgment briefing that McIlroy's statements "cannot be taken out of context." Dkt.249_¶¶89-92, 94-95. But Plaintiffs' string citations to McIlroy's deposition transcript do not in fact provide any "context" and show that the only definition of "return" McIlroy could articulate was the one presented in his report. *See* Dkt.219 (Mem. In Support Mot. Exclude McIlroy Testimony) at 6-8, 17-18, 21-22.

definitions of "return"); *Dish Network Corp. v. Ace Am. Ins.*, 21 F.4th 207, 211 (2d Cir. 2021) ("Courts may refer to the dictionary to determine the 'plain and ordinary meaning' of contract terms." (quoting *Fed. Ins. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011))).  McIlroy (correctly) stated that the term "is neither complex nor nuanced." Dkt.191-2_9.  Unsurprisingly, both Plaintiffs agree with this meaning of "return." Dkt.249_¶¶87, 88.  Indeed, an Audible employee who worked with ACX authors for more than seven years testified that she "had conversations about returns and what does it mean and how it is taken out a lot of times," and that "no one has specifically said, Can you define what a return is for me, because that's -- people know what that is, you know."  Dkt.249_¶¶16, 19; Dkt.191-9_197:3-6; 197:7-10.

Plaintiffs try to avoid the term's unambiguous meaning (which dooms their claims) by suggesting there is some elusive alternative definition of return "in the relevant industry."  PB 17.  As an initial matter, when a party seeks to introduce a term with a certain industry meaning, "the proffered custom or usage must establish that the meaning of the term in question '*was general, uniform and unvarying.*'" *L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (emphasis added) (quoting *Belasco Theatre Corp. v. Jelin Prods., Inc.*, 270 A.D. 202, 206 (N.Y. 1st Dep't 1945)); *see also id.* ("A custom, in order to become a part of a contract, must be so far established and so far known to the

parties, that *it must be* supposed that their contract was made in reference to it." (quoting *Belasco*, 270 A.D. at 206)). Plaintiffs pointed to nothing "uniform and unvarying" that could change the ordinary meaning of "return."

Indeed, even Plaintiffs themselves could not agree on what constitutes a "legitimate" return. Bonthu considered only returns for "defective" audiobooks "legitimate," while for Noble, "legitimate" returns included mistaken purchases, not liking the narrator, or a listener deciding a book is "not their cup of tea" after listening to a chapter. Dkt.249_¶¶50, 80; Dkt.216-4_127:18-129:7; Dkt.191-6_104:11-107:12. Even after litigating this case for years, Plaintiffs could not offer a coherent definition of "allowable" returns under the Agreement. *Compare* PB 26 ("exchanges or other instances where the Audiobook was at least partially consumed or held for any significant time" or "returned or exchanged for reasons other than a technical defect or a mistaken purchase, or more than seven days after purchase"), *with* PB 29 ("books mostly consumed and then swapped well outside the industry standard window for returns").

Moreover, Plaintiffs' assertions about what constitutes a "legitimate" return all address return *policies*—that is, when to *allow* returns—not the *meaning* of "return." *See, e.g.*, PB 26-27 (discussing when retailers allow returns and when Plaintiffs believe a retailer should pay royalties for returned items). In other words, there was no real dispute about what returns *are*, but rather, when a business like

Audible should accept them. In Judge Furman's words, "[a]t bottom, Plaintiffs seek to limit the definition of 'returns' as a matter of policy, not as a matter of contract interpretation." SPA-14.

Additionally, return *policies* vary widely, as (once again) Plaintiffs' own putative industry expert demonstrated. Dkt.249-8_15-18. As the district court noted, Plaintiffs provided no support "for reading the scattered and inconsistent return policies of *other* companies into the Agreement." SPA-14.

Ultimately, none of Plaintiffs' arguments affect the plain meaning of the Agreement, which "defines net sales of audiobooks as being 'less … returns,'" without qualification. Dkt.249_¶¶8, 97, 102. Plaintiffs cannot alter the unambiguous Agreement by invoking their (varying and inconsistent) subjective views on the legitimacy or fairness of when a business should allow a "return." *See L. Debenture*, 595 F.3d at 468 ("[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." (quoting *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569-70, 780 N.E.2d 166, 171 (2002))). And because the Agreement is unambiguous, assessing or "construing ambiguity" is irrelevant here. PB 19, 24; *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins.*, 472 F.3d 33, 43 (2d Cir. 2006) (court may construe ambiguity against drafter *after* concluding contract ambiguous). The district court correctly found that "every time an Audible customer

gives back an audiobook in exchange for money or store credit, that customer completes a 'return' within the meaning of the Agreement, even if she immediately purchases a new title with the money or store credit"; thus, "Audible, which was entitled to deduct all 'returns' from Plaintiffs' royalties, did not breach the Agreement." SPA-12-13.

### B. Plaintiffs Fail To Show That "Returns" Is Ambiguous.

None of Plaintiffs' remaining arguments salvage their case. First, Plaintiffs *admit* that the "general-usage" dictionary definition of return "may apply to traditional sales of physical goods," yet they claim that this definition does not apply to "digital products … and consumable items like Audiobooks." PB 19. But Plaintiffs' own putative industry expert, McIlroy, squarely rejected any suggestion that "digital products" carry a different definition of returns. He explained that "*it's easy to rewrite*" the definition of "'product return' … for an online instance of a digital product." Dkt.191-2_9 (emphasis added) (defining "*digital* return" as "a customer returning previously purchased *digital content* back to the retailer, and in turn receiving a refund in the original form of payment, exchange for another item, or a store credit" (emphases added)).

Plaintiffs' argument exposes the weakness of their position. Plaintiffs claim that the plain meaning of return does not apply to "consumable items like Audiobooks" because audiobooks' "value is imparted at the moment of consumption

and cannot thereafter be truly 'returned.'" PB 19. But this same reasoning applies to physical books. The "value" derived from a book does not differ between whether a customer's "consumption" is through reading or listening. And returning digital content works similarly to returning physical products; as McIlroy explained, with audiobooks, "the buyer no longer has access to the digital file after the return process is complete." Dkt.191-2_9. Given that Plaintiffs offer no principled basis *not* to apply the general-usage definition of "return" to audiobooks, it is unsurprising that their own expert simply applied the Wikipedia definition of "product return" to digital products. *Id.*

Next Plaintiffs point to a definition of "returns" as "unsold publications returned to the publisher for cash or credit," as if this definition somehow supports their argument. PB 20. What book *retailers* return to the *publisher* has nothing to do with this case, which involves consumer returns of digital audiobooks. Indeed, Plaintiffs' own putative expert, McIlroy, also noted this distinction: "[I]t's important to recognize that [returning unsold inventory to the publisher] is a [business to business] practice, and has no bearing on *consumer* [business to consumer] returns practices with respect to books, ebooks or audiobooks." Dkt.191-2_14. And, again, this definition reinforces that the basic concept of a return remains the same: a product is "*returned … for cash or credit.*" PB 20 (emphasis added).

Nor do Plaintiffs' nonprecedential cases help them. *Cox v. Spirit Airlines, Inc.* involved ambiguity over the term "price" for airfare and whether it included carry-on items. 786 F. App'x 283, 285-86 (2d Cir. 2019) (summary order). Plaintiffs assert "the question in the ACX contract is: 'Returns of what, precisely?'" PB 21. But the Agreement here involved royalties on the sale of only one thing: audiobooks. Thus, Plaintiffs' own Complaint resolves this supposed mystery: "returns *of Audiobooks*." Dkt.1_¶ 20 (emphasis added); *see also* SPA-14-15.

*Roberts v. Capital One, N.A.* involved ambiguity over whether "an overdraft occurs when Capital One 'elect[s] to pay' certain costs" or "when Capital One *pays* merchants for transactions." 719 F. App'x 33, 34 (2d Cir. 2017). That ambiguity occurred because the agreement "simply tack[ed] a parenthetical purporting to define the term on to the end of a grammatically complex sentence, without making clear which portions of the sentence are meant to be subsumed within that definition." *Id.* at 36. That reasoning has no application here, as there is no dispute that the Agreement clearly defined "net sales" as net of "returns." Dkt.249_¶¶8, 85.

Finally, Plaintiffs claim that the term "returns" excludes "exchanges." PB 24-25. But, as the district court recognized, every exchange necessarily involves a return. SPA-12-13 ("[E]very time an Audible customer gives back an audiobook in exchange for money or store credit, that customer completes a 'return' within the meaning of the Agreement, even if she immediately purchases a new title with the

31

money or store credit."). When a customer "exchanges" an audiobook, the customer returns the audiobook and purchases a different one, and the author of the second purchased title receives a royalty. Dkt.249_¶99; Dkt.216-47_¶¶ 9-10 (Audible does not distinguish between returns and exchanges, and if a returned credit is used to buy another audiobook, that is a separate transaction, and the second author receives a royalty). And, again, Plaintiffs' putative industry expert conceded that returns include exchanges, stating that "the essential meaning" of returns involves "taking previously purchased merchandise back to a retailer for a refund, *exchange* or credit." Dkt.249_¶93 (emphasis added); *see also* Dkt.261-13_221:14-15 (McIlroy testifying, "I'm saying a return encompasses an exchange"). Consistent with this definition, Plaintiffs' putative damages expert, Egan, also used the terms returns and exchanges "interchangeably." Dkt.222-2_92:2-21, 114:12-17.

Plaintiffs entered a contract that unambiguously provided that their royalties on audiobook sales were paid net of returns. They knew this when they first entered the Agreement, and they have since re-accepted that contractual arrangement dozens of times. Try as they might, Plaintiffs cannot now rewrite the Agreement because they wish it had a different meaning. As the district court concluded, there is "no ambiguity as to what the 'returns' term encompasses; merely a dispute over Audible's business decision to allow a generous return policy." SPA-15.

### C. Plaintiffs' Extrinsic "Evidence" Does Not Change The Meaning Of "Returns."

Because the term "return" is unambiguous, no extrinsic evidence should enter the analysis. *L. Debenture*, 595 F.3d at 467-68. But even the extrinsic "evidence" that Plaintiffs claim the district court should have considered does not help their case. Plaintiffs first assert that "refunds and exchanges," in contexts other than "a technical defect or a mistaken purchase, or more than seven days after purchase," "are simply outside industry norms." PB 26. But, as discussed above, this all goes to the return *policies* of other retailers, which themselves vary, not the definition of "return." *See id.* (discussing the circumstances for "retailers *allowing* returns" (emphasis added)). For example, some retailers do not accept returns at all; one retailer, Kobo, says to "use our online chat to see if your item qualifies for a refund"; and "Audiobooks.com grants refunds at [its] sole discretion." Dkt.249-8_15-18. In no event are those different and widely divergent policies "general, uniform and unvarying," *L. Debenture*, 595 F.3d at 466.

Plaintiffs' incantation of the phrase "'catastrophic' to the Authors' earnings" does not change anything. PB 27. First, the fact that one party to a contract is unhappy with its terms and labels them "catastrophic" does not render the agreement ambiguous or unenforceable. Second, nothing in the record supported that claim. In his report, McIlroy offered only a conclusory statement that "[w]hen readers can return books for up to a year, for any reason, the impact can be catastrophic to an

author's earnings." Dkt.191-2_14. But McIlroy provided no support for that assertion other than his say-so, and the record contradicts it. Studies that *McIlroy himself* introduced found that generous return policies *increase purchases more than returns*. Dkt.249_¶¶32-37; Dkt.191-2_11-12. Plaintiffs each earned hundreds of thousands of dollars through ACX, and across *all ACX rights-holders*, individual royalties *increased* each year from 2015 to 2020. Dkt.249_¶¶39, 47, 68; Dkt.191-17. In short, that Audible paid royalties net of returns (as the Agreement expressly provides) did not in fact have a "catastrophic" impact on authors' earnings in theory or practice.

Plaintiffs also point to a separate 2018 Audible agreement with Noble that provides that net sales receipts were paid net of "exchanges and returns" and claim this shows that Audible recognizes "exchanges" as separate from "returns." PB 27-28. But the fact that Audible used redundant language in an unrelated agreement does not alter the meaning of "returns," which is necessarily part of every exchange, as the district court recognized. Moreover, Plaintiffs cannot use varying phrasing from another, unrelated agreement to change the meaning of an unambiguous contract. *See Olin Corp. v. Ins. Co. of N. Am.*, 221 F.3d 307, 318 (2d Cir. 2000) (definition of term in later policies did not change meaning of earlier policy); *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 394 (S.D.N.Y. 2014) ("use of inconsistent phraseology … alone does not render ambiguous a

34

contractual provision that is otherwise clear")*, aff'd sub nom. APEX Emp. Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc.*, 725 F. App'x 4 (2d Cir. 2018); *see also In re Lehman Bros.*, No. 17 CIV. 6246 (AT), 2018 WL 10454936, at *3 (S.D.N.Y. Sept. 26, 2018) (refusing to consider "earlier, similar agreements" in interpreting contract at issue because a court "may not look to extrinsic evidence to determine the meaning of an otherwise unambiguous agreement"), *aff'd sub nom. In re Lehman Bros. Holdings Inc.*, 792 F. App'x 16 (2d Cir. 2019).

Finally, Plaintiffs argue that the "outcry" following "the glitch" in the ACX dashboard, and subsequent business decisions Audible made, "strongly suggest[] that Audible aimed at conforming, belatedly, to Authors' reasonable expectations of which returns could be accepted such that they would trigger deductions in Authors' royalty payments." PB 28-29.[5] Not so. In January 2021, in response to author feedback, Audible made a generous business decision to pay authors for audiobooks returned more than seven days after purchase, even though the Agreement did not require it. Dkt.216-45_¶25. But neither the fact that certain authors disliked Audible's return policy, nor Audible's business decision to pay authors more than legally required, changes the unambiguous terms of the Agreement. *See Lockheed*

---

[5] Plaintiffs assert that the "outcry … followed Audible's inadvertent disclosure of its actual royalty payment practices," PB 28, but it is undisputed that Audible's royalty statements always reflected "net sales" as provided under the Agreement. Nothing was "undisclosed" to authors. Dkt.249 ¶ 21.

*Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("Ambiguity is determined by looking within the four corners of the document, not to outside sources." (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009))).

Plaintiffs knew that royalties were paid net of returns when they repeatedly executed and operated under the ACX Agreement. Dkt.249_¶49; Dkt.216-4_89:9-91:17; Dkt.191-6_104:1-4. Yet, for years, neither Bonthu nor Noble asked Audible for any information about their returns, Audible's (well-publicized) return policy, or its impact on their royalty statements. Dkt.249_¶¶23-24, 51, 58-61. This is perhaps unsurprising, given Plaintiffs' acknowledgment that they earn "quite high royalties" and "make money" through ACX. Dkt.249_¶¶48, 69; Dkt.216-4_63:15-64:5; Dkt.191-6_139:15-16. As Plaintiffs' putative industry expert, McIlroy, put it, "In my view, authors take -- they don't f[u]ss and fret about returns in the wonderful new world of going online and selling their self-published baby for the first time. They're looking at riches, not at failures." Dkt.261-13_233:11-15.

The plain terms of the Agreement dictate the outcome here. The district court correctly granted Audible summary judgment on Plaintiffs' breach of contract claim.

## II. THE DISTRICT COURT PROPERLY GRANTED AUDIBLE SUMMARY JUDGMENT ON PLAINTIFFS' IMPLIED COVENANT CLAIM.

"Under New York law, 'implicit in every contract is a covenant of good faith and fair dealing … which encompasses any promises that a reasonable promisee

would understand to be included.'" *JN*, 29 F.4th at 128 (quoting *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018)). The implied covenant "includes a promise that 'neither party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations.'" *Id.* (quoting *Spinelli*, 903 F.3d at 205). An implied covenant "will be breached only in a narrow range of cases." *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 97 (2d Cir. 2019) (quoting *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 817 (2d Cir. 2014)).

Plaintiffs claim that Audible breached the implied covenant by (1) "conceal[ing] the numbers of returns and exchanges from Plaintiffs and other Authors, thus preventing them from understanding the clawback policy's impact on their royalty incomes"; and (2) "actively encourag[ing] many of its customers to exchange Audiobooks that had been partially and sometimes even entirely consumed." PB 29-30. The district court correctly granted summary judgment for Audible on both flawed theories.

## A. Audible's Royalties Reporting Complied With The Agreement.

"[T]here can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract."

23 Williston on Contracts § 63:22 (4th ed. May 2024 update); *see JN*, 29 F.4th at 128 (quoting Williston). That is, a party does not breach the implied covenant when it acts consistently with the contract. *See JN*, 29 F.4th at 128. And "[t]he covenant cannot be used … to imply an obligation inconsistent with other terms of a contractual relationship." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013).

The district court correctly found that Plaintiffs' implied covenant claim based on Audible's royalty payments can be "easily rejected." SPA-24. The Agreement expressly states that "Audible will pay Royalties to you *only on Audible Net Sales Receipts* … it receives from sales of the Audiobook." Dkt.1-1_6, 7 (emphasis added). And it also provides that "Audible will provide … a statement of Royalties" (paid on net sales receipts), "together with a check or direct deposit in the amount of any Royalty due." Dkt.1-1_7, 8. That is precisely what Audible did. Plaintiffs do not dispute that their "monthly royalty statements have always reflected 'Net Sales.'" Dkt.249_¶21. They cannot now manufacture an implied covenant claim because they wish that Audible had reported the "volume of actual returns and exchanges," PB 31, when the Agreement contains no such requirement. *See JN*, 29 F.4th at 128 (no breach of implied covenant when defendant acted according to the express terms of the contract).

Recognizing the weakness of their theory, Plaintiffs impermissibly shift their argument on appeal. At the district court, Plaintiffs argued that Audible "surreptitiously" deducted royalty income from "returns and exchanges … from its payments to Plaintiffs and other authors." Dkt.247_13. They asserted that Audible "breached the covenant by providing only net sales numbers, which masked the much larger volume of actual returns and exchange[s]." Dkt.247_14. On appeal, Plaintiffs now argue that "Audible concealed from Authors *its actual method of calculating* the sales numbers on which their royalties were based." PB 31 (emphasis added); *see also* PB 32 (asserting Audible "concealed those methods from Authors"). Because Plaintiffs never presented this argument to the district court, they forfeited it, and the Court should not consider it on appeal. *See Loc. 377, RWDSU, UFCW v. 1864 Tenants Ass'n*, 533 F.3d 98, 99 (2d Cir. 2008).

In any event, this argument fails for the same basic reasons as Plaintiffs' earlier theory. Audible provided exactly what the Agreement said it would: a statement of royalties, paid on net sales receipts. Dkt.249_¶21. Nor is it true that Audible "concealed" what went into net sales. In its online Help Center, Audible explained that "your sale units would decrease each time a unit is returned and refunded." Dkt.249_¶12; Dkt.216-7. If Plaintiffs ever wanted more information on the calculations, they could have asked. Yet despite always receiving statements with "Net Sales Receipts," before October 2020 neither Plaintiff ever asked for

information about how their returns were treated in royalty calculations. Dkt.249_¶¶24, 51, 73-74. That Plaintiffs never bothered to ask does not mean Audible "concealed" that information.

Plaintiffs' remaining (new) arguments also fail. On appeal, they assert for the first time that Audible "reported these numbers to Authors on their ACX dashboards as 'total sales.'" PB 31. If Plaintiffs are now arguing that Audible breached the implied covenant through how it presented sales numbers on the author *dashboard* (as opposed to in royalty statements), that argument is also forfeited. *See Local 377*, 533 F.3d at 99. As the district court noted, this comment appeared only in Plaintiffs' statement of facts, "although, conspicuously, not in their memorandum of law." SPA-25 n.6. But even if Plaintiffs had not forfeited this argument, the author dashboard stated that "Royalty Statements you receive from Audible contain official sales Information" and that "[t]he sales data provided [in the dashboard] is for Informational purposes only" and "preliminary." Dkt.261-27_AUDIBLE_00000460. And in all events, as the district court found, "Plaintiffs point to no evidence that, by reporting net sales numbers under the heading total sales, Audible somehow deprived them of the benefits of the Agreement." SPA-25 n.6.

Finally, Plaintiffs' argument that they "had no reason to suspect that Audible was deducting 'exchanges' and 'swaps,'" PB 33, fails for the same fundamental

reason discussed above: every exchange involves a return. Thus, the district court correctly granted Audible summary judgment on Plaintiffs' implied covenant claim that Audible "surreptitiously" deducted royalties.

### B. Plaintiffs Cannot Prove Damages Under Their "Encouragement" Theory.

Plaintiffs alternatively claimed that Audible breached the implied covenant by "encouraging" returns. The district court correctly rejected that claim, as well, because Plaintiffs did not articulate or prove any connection between such alleged "encouragement" and any damages. SPA-33-38. "Under New York law, proof of damages is an element of both breach of contract and breach of the implied covenant of good faith and fair dealing claims." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 726 F. App'x 17, 20 n.2 (2d Cir. 2018) (summary order) (collecting cases). For a party to prove damages, it must show that the damages are "not merely speculative, possible, and imaginary, but they must be *reasonably certain* and such *only as actually follow or may follow from the breach*." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (second emphasis added) (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 4 N.E. 264, 266 (N.Y. 1886)). Where, as here, Plaintiffs have the burden of proof at trial, "it ordinarily is sufficient for" Audible, the moving party, "to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

As the district court explained, "[p]ut simply, Plaintiffs fail to provide a coherent theory, let alone evidence, of the damages attributable to Audible's alleged breach." SPA-36. Plaintiffs claim that Audible "breached the implied covenant of good faith and fair dealing with both Plaintiffs by encouraging its customers to return Audiobooks." PB 33. Yet although the district court gave Plaintiffs a *second* chance to put forth *any* evidence of damages caused by this alleged breach, they could not. SPA-26, 36-38. That is unsurprising in light of Plaintiffs' admission in their *Daubert* briefing that "*proof* [*of damages*] *has not yet been submitted*." Dkt.246_22 (emphasis added).

Plaintiffs argue that their failure to identify any damages should be excused because their damages "are not speculative" and therefore Plaintiffs need not provide an exact amount. PB 36. But Plaintiffs ignore that they failed to show even the *existence* of damages *resulting from* any alleged "encouragement." *See Tractebel*, 487 F.3d at 110. Importantly, Plaintiffs did not even try to establish that any of their *own* titles were returned because of Audible's supposed "encouragement." In light of that omission, their individual *and* class claims failed. *See Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (a plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties" (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975))).

The district court gave Plaintiffs every opportunity on this point, inviting them to "marshal the evidence, to the extent it exists, showing that they have a viable theory of damages." SPA-26. Their attempts failed. First Plaintiffs cite Audible's "internal research" about some reasons for customer returns. PB 35. But nothing in that research remotely suggests that any of those returns were "encouraged." *Tractebel*, 487 F.3d at 110 (existence of damages cannot be "merely speculative, possible, and imaginary" (quoting *Wakeman*, 4 N.E. at 266)). In the district court's words, "these facts prove neither causation nor damages." SPA-37.

Next, Plaintiffs argue that "when Audible stopped clawing back royalties on titles returned more than seven days after purchase, and stopped encouraging readers to 'swap' their purchases, Authors' royalties increased." PB 36. As an initial matter, the evidence established that authors' royalties *increased* during the time that Audible was purportedly "encouraging" returns. Dkt.249_¶39; Dkt.191-17. But regardless, that argument rested on the false assumption that returns made more than seven days after purchase were attributable to Audible's encouragement. As the district court noted, "that assumption finds no support in the record." SPA-37. A customer might return a title more than a week after purchase for countless reasons, without encouragement by anyone. Additionally, it is unsurprising that royalties increased when Audible started paying authors for these returns. Before that author-friendly change, authors did not receive royalties on any returns, per the

express terms of the Agreement. After the policy change, authors received royalties on all audiobooks returned more than seven days after receipt, even though the Agreement did not require it. Thus, authors were paid royalties regardless of the reason for the return, including for returns that would be "legitimate" even by Plaintiffs' definitions. Plaintiffs pointed to no evidence of a nexus between increased royalties and the cessation of Audible's supposed "encouragement."

Ultimately, nothing Plaintiffs point to suggests that any customer returned a single audiobook *because of Audible's alleged encouragement*, let alone that even one of *Plaintiffs'* audiobooks was returned because of encouragement. Thus, the district court correctly granted summary judgment for Audible on Plaintiffs' implied covenant "encouragement" theory because they failed to "proffer *any* evidence of damages" connected to that theory. SPA-38.

### C. Alternative Bases Exist To Affirm The District Court's Grant of Summary Judgment.

Along with the reasons the district court provided, discussed above, at least two independent bases support the district court's grant of summary judgment, each of which Audible presented to the district court and the Court may adopt on appeal. *See* Dkt.215_11-15, 20-24; *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) ("We may affirm summary judgment on any ground supported by the record, even if it is not one on which the district court relied.").

### 1. Plaintiffs' Implied Covenant Claim Is Duplicative Of Its Breach Of Contract Claim.

"A claim for violation of the covenant survives a motion to dismiss only if it is based on allegations different from those underlying the breach of contract claim, and the relief sought is not intrinsically tied to the damages that flow from the breach of contract." *JN*, 29 F.4th at 128. In *JN*, the Court clarified that identical damages alone were sufficient to dismiss an implied covenant claim as duplicative of a breach of contract claim. *See id.* There, the Court affirmed the district court's dismissal of the plaintiff's implied covenant claim, finding that "[e]ven accepting JN's arguments that it set out a different factual basis for this claim than the factual basis set out in its breach of contract claim, the damages sought for both claims would be the same: compensation for the lost sale." *Id.*; *accord, e.g.*, *Bostany v. Trump Org. LLC*, 73 A.D.3d 479, 481 (N.Y. 1st Dep't 2010) (breach of implied covenant claim redundant when alleged breach "intrinsically tied to the damages allegedly resulting from a breach of the contract" (quoting *Canstar v. J.A. Jones Constr. Co.*, 212 A.D.2d 452, 453 (N.Y. 1st Dep't 1995))).

Here, despite purporting to assert different liability theories, Plaintiffs sought the same damages for their breach of contract and implied covenant claims. *See* Dkt.249_¶¶101-110. Their initial disclosures, which required a "computation of *each category* of damages" (Fed. R. Civ. P. 26(a)(1)(A)(iii) (emphasis added)), identified only one theory of damages, stating that Plaintiffs would compute

damages (for both claims) based on "(1) the respective numbers of exchanges that Audible allowed on [their] various titles pursuant to Audible's 'Great Listen Guarantee,' (2) the price of each such copy, and (3) the 25% or 40% royalty that should have been paid for each such copy or was paid on each such copy before being illegally deducted upon the customer's exchange of that title." Dkt.191-35_4.

Plaintiffs' interrogatory responses similarly did not differentiate between the damages Plaintiffs sought across the breach of contract and implied covenant claims. Dkt.191-37_6-8; Dkt.191-38_6-8. Plaintiffs' putative damages expert confirmed this point. His proposed "methods" did not distinguish between the two claims. Dkt.198-1_¶¶25-57; Dkt.222-2_177:13-178:3 (Egan testifying that his opinions are based on liability for "either count[]," and confirming this meant "liability based on one or both counts"). Nor did Plaintiffs plead their breach of contract and implied covenant claims in the *alternative*, as they did with their now-dismissed unjust enrichment claim. *Cf. Spinelli*, 903 F.3d at 206 ("A party certainly cannot succeed on claims for both breach of an express contract term and breach of the implied covenant based on the same facts, but where, as here, there is a dispute over the meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types of claims *in the alternative*." (emphasis added)).

Because Plaintiffs' implied covenant claim sought damages on the identical theory as their breach of contract claim, and not in the alternative, it was duplicative.

The Court can affirm summary judgment on the implied covenant claim on this basis as well. *See JN*, 29 F.4th at 128.

### 2. "Encouraging" Returns Does Not Violate The Implied Covenant.

Even if Plaintiffs could connect Audible's alleged "encouragement" to any actual returns (or damages), the promotion of the return benefit did not breach the implied covenant. The implied covenant applies only "where an implied promise is so interwoven into the contract 'as to be necessary for effectuation of the purposes of the contract.'" *Thyroff v. Nationwide Mut. Ins.*, 460 F.3d 400, 407 (2d Cir. 2006) (quoting *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990)). It "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *Id.* at 408 (quoting *M/A–COM*, 904 F.2d at 136). Nor can the implied covenant create contractual obligations that are inconsistent with the contract. *See Gaia House*, 720 F.3d at 93.

Plaintiffs cannot genuinely dispute that, under the Agreement, Audible retained discretion over how it marketed its audiobooks program and its return policy. In fact, the Agreement provides that Audible has "sole discretion over all decisions related to its distribution of the Audiobook." Dkt.1-1_4. Further, evidence from Plaintiffs' own industry expert showed that the net effect of generous return policies like Audible's is to increase purchases more than returns—ultimately

putting more money in authors' pockets. Dkt.249_¶¶32-37; Dkt.191-2_11-12. Plaintiffs' disagreement with Audible's business judgment in how it marketed the return benefit does not give rise to an implied covenant claim. *See Schweizer v. Sikorsky Aircraft Corp.*, 634 F. App'x 827, 831 (2d Cir. 2015) (Because defendant "had a genuine and colorable business justification for its decision, … its actions [were not] arbitrary, and thus [it did not] violate[] the implied covenant." (alterations in original) (quoting *Sec. Plans*, 769 F.3d at 820)).

While the Court can and should affirm the district court on the same grounds it relied on, these alternative bases further support affirming the district court's grant of summary judgment.

## III. THE DISTRICT COURT PROPERLY EXCLUDED EGAN'S TESTIMONY.

### A. Egan's Opinions Do Not Fit Plaintiffs' Liability Theory.

Judge Furman's decision to exclude Egan's testimony is reviewed for abuse of discretion and cannot be disturbed unless it was manifestly erroneous. *Wills*, 379 F.3d at 41. It was not.

Federal Rule of Evidence 702 requires that an expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quoting 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02], p. 702-18 (1988)). This

"consideration has been aptly described … as one of 'fit.'" *Id.* (citation omitted).
As the Supreme Court explained, a study of the moon's phases "may provide valid
scientific 'knowledge' about whether a certain night was dark," but absent some
creditable link, "evidence that the moon was full on a certain night will not assist the
trier of fact in determining whether an individual was unusually likely to have
behaved irrationally on that night." *Id.* That is, "Rule 702's 'helpfulness' standard
requires a valid scientific connection to the pertinent inquiry as a precondition to
admissibility." *Id.* at 591-92.

As applied to damages, "a model purporting to serve as evidence of
damages … *must measure only those damages attributable to that theory*." *Comcast
Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (emphasis added). Accordingly, the "first
step in a damages study is the translation of the *legal theory of the harmful event* into
an analysis of the economic impact *of that event*." *Id.* at 38 (quoting Fed. Jud. Ctr.,
Reference Manual on Sci. Evid. 432 (3d ed. 2011)). Simply put, a plaintiff cannot
prove damages through "a methodology that identifies damages that are not the
result of the wrong." *Id.* at 37.

Egan's "methods" are a textbook example of an improper damages model
because they have no connection to Audible's alleged wrongdoing. It is undisputed
that Plaintiffs base their claims on only certain returns: those that Plaintiffs view as
"illegitimate." Dkt.1_¶¶43-44; Dkt.249_¶¶50, 79-80, 106. As Plaintiffs themselves

say, they "do not claim this entire amount [of revenue from all returns] as damages, but only the amounts corresponding to the revenue lost as a result of returns and exchanges outside of industry practices." PB 11 n.5. Plaintiffs acknowledge that "returns" can properly include titles given back because "the buyer was … dissatisfied." Dkt.1_¶44. Bonthu and Noble both agree that returns for "defective" audiobooks are "legitimate" and should not generate a royalty for the author. Dkt.249_¶¶50, 80. Noble also views as legitimate those returns based on mistaken purchases, a customer not liking the narrator, or a customer listening to the first chapter and deciding the book was "not their cup of tea." Dkt.249_¶80. But Egan did not try to calculate damages based on only "illegitimate" returns (as Plaintiffs define that concept); instead, as the district court explained, Egan "tallies up the royalties for *all* returns," legitimate or not. *See* SPA-20; Dkt.222-2_140:5-7 ("Q. You didn't exclude any returns or exchanges based on the reason for them. A. That's correct."). As in *Comcast*, there is "no question" that Egan's "model failed to measure damages resulting from the particular … injury on which … liability in this action is premised." *Comcast*, 569 U.S. at 36. Thus, the district court did not abuse its discretion by excluding Egan's testimony.

### B. Plaintiffs Cannot Excuse Egan's Failures.

Plaintiffs argue that Egan's failure to calculate damages based on Plaintiffs' theory of liability should be excused because (1) the "fact-finder" has not yet

determined which "returns are 'at issue'"; and (2) "Audible has not yet provided data necessary to isolate those returns ... 'at issue.'" PB 40. Neither argument can save Egan's irretrievably flawed opinions.

### 1. Plaintiffs Must Prove A Viable Damages Theory.

Plaintiffs ignore that they bear the burden of proof. They "must prove, by a preponderance of the evidence," not only a breach of the contract but also "damages to the plaintiff[s] caused by [Audible's] breach." *Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). In fact, Federal Rule of Civil Procedure 26 expressly *required* Plaintiffs to perform "a computation of each category of damages claimed." Fed. R. Civ. P. 26(a)(1)(A)(iii). Rule 26 also required Plaintiffs to provide "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). It is not the "fact-finder's" job to articulate Plaintiffs' theory of the case. Plaintiffs claim that they are owed royalties on "illegitimate" audiobook returns, and it was their burden to calculate damages flowing from that theory. But they offered an expert who calculated damages untethered to *any* viable theory.

Plaintiffs respond that Egan only "proposed *methodologies*, not final determinations." PB 39. That argument fails on multiple levels. First, as noted above, Plaintiffs were *required* to compute their damages, and Egan was *required* to state all of his opinions. His job was to calculate damages, not suggest how he *might*

calculate damages. Second, Egan *did* make "final determinations" with respect to Plaintiffs' damages. He opined that Bonthu's damages were $38,701 and Noble's damages were $43,929. Dkt.198-1_¶42. The problem (for Plaintiffs) is that, under Plaintiffs' own theory of liability, *Egan's damages figures are indisputably wrong*. He ignored Plaintiffs' (and his own) acknowledgment that certain returns are legitimate and should not earn a royalty, and he instead calculated damages based on all of Plaintiffs' returned titles. *See* Dkt.198-1_¶¶19-20; Dkt.222-2_70:25-71:20 (Egan stating it was his "understanding" that audiobooks returned because they were defective or the listener was "otherwise dissatisfied" constituted returns that would be "netted out" under the Agreement).

No matter how one labels Egan's work—be it methods, methodologies, determinations, or opinions—Plaintiffs cannot escape their burden "to show that their damages *stemmed from the defendant's actions that created the legal liability*." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (emphasis added) (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)). That is the central flaw that dooms all of Egan's testimony. His damages "methodologies" and calculations bear no relationship to Plaintiffs' theory of liability. As Judge Furman put it, "Plaintiffs have not established that Egan's calculations *could* comport with their theory of damages, let alone that they do so now." SPA-22.

Plaintiffs also protest that opining on "which returns were reasonable under the contract" was "beyond both Egan's expertise and his assignment." PB 40. That might be true, but it is irrelevant. *Plaintiffs* alone bear the burden of proving a viable theory of liability and damages stemming from that theory. If Egan could not opine on which returns were "reasonable" or "legitimate," it was Plaintiffs' burden to establish that in some other way. They each had their own views of what would constitute a legitimate return. Plaintiffs also retained a putative industry expert, McIlroy, who opined on those issues. Egan's job was to align his damages methodologies with those theories, and he failed, completely.

### 2. Plaintiffs Are Not Entitled To More Data.

Plaintiffs argue that "class-wide data … has not yet been produced" and imply that Audible is standing on its objections, which (Plaintiffs say) are "likely to remain until a class is certified." PB 42-43. That is false. Audible *did* produce classwide aggregate sales and returns data. Plaintiffs' opening brief implies without stating that Audible produced only data specific to Plaintiffs and the sales and returns of their audiobooks. Not true. Audible produced aggregate global sales and returns data across ACX rights holders during the full class period. Dkt.191-17; *see also*

Dkt.132-21; Dkt.132-22. It is unclear how any additional data would change Egan's "methods."[6]

Nor are Plaintiffs entitled to any additional data. Discovery closed long ago, and it is too late for Plaintiffs to claim they are still awaiting data from Audible. Audible produced extensive data related to potential damages, including documents and data responsive to Plaintiffs' discovery requests. Dkt.249_¶108. Critically, it is undisputed that Plaintiffs never informed Audible that they were missing any damages-related data and never sought relief from the Court to obtain additional damages-related data or information. Dkt.249_¶111. If Plaintiffs or their expert believed they were missing relevant information, it was incumbent on Plaintiffs to raise that issue during the discovery period (which lasted more than 12 months).

Finally, no amount of data could save Egan's flawed methodology. Had he performed on a classwide basis the same "methods" he used to calculate Plaintiffs' damages, we know for a fact it would yield the wrong result. As addressed above,

---

[6] Egan was surprisingly (and perhaps strategically) ignorant of the details or status of the litigation. He believed that Audible was still producing data when in fact that process had been complete for some time. Dkt.198-1_¶25; Dkt.222-2_47:13-49:17, 105:22-106:15, 107:22-109:18; Dkt.62. He believed that Plaintiffs had requested data they had not received from Audible, which was not true. Dkt.222-2_42:3-10; Dkt.249_¶111. He did not understand the class of authors Plaintiffs were purporting to represent (i.e., the class for which he was supposed to calculate damages). Dkt.198-1_¶24 (stating class includes only "U.S. Authors," when Plaintiffs had not made that limitation, Dkt.1_¶81). And he had never spoken to Plaintiffs or reviewed their deposition transcripts. Dkt.246-2_50:15-52:1, 53:12-54:5.

Egan treated every return as an element of damages, whether it was "legitimate" or not. Not even Plaintiffs stand behind that approach as a proper measure of damages in this case. So whether Plaintiffs are somehow entitled to additional data is academic because Egan's opinions are still inadmissible.

### C. Egan's Opinions Require No Specialized Expertise And Are Unfairly Prejudicial.

Testimony "is properly excludable" under Rule 702 if it is "directed solely to 'lay matters which a jury is capable of understanding and deciding without the expert's help.'" *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (quoting *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)); *id.* at 1233 (holding district court erred by admitting expert testimony when "the jury was entirely capable of understanding the evidence before it and determining the facts in issue without [the expert's] assistance"). Courts, therefore, regularly exclude expert testimony when it involves simple calculations that do not require expert assistance.

For example, in *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, the court excluded the proposed expert's testimony, explaining the expert's "task was a narrow one: add up the numbers Plaintiff's counsel told him to add up, apply the interest rate that Plaintiff's counsel told him to apply, and ignore virtually everything else." No. 3:09-CV-1546 (MRK), 2010 WL 2978289, at *5 (D. Conn. Apr. 9, 2010). The court found "[t]here is nothing that Mr. Koliani was asked to do that a jury of

laypeople could not do equally well. In fact, a jury would probably do a *better* job, as it would at least apply a dose of skepticism to what the attorneys tell it." *Id.*; *see also, e.g.*, *Luck v. McMahon*, No. 3:20-CV-00516 (VAB), 2022 WL 5500934, at *7 (D. Conn. Feb. 11, 2022) (excluding expert opinion that provided only "straight-forward mathematical calculations of [plaintiff's] lost compensation and … salary payments"); *FPP, LLC v. Xaxis US, LLC*, No. 14 CV 6172-LTS-AJP, 2017 WL 11456572, at *2 (S.D.N.Y. Feb. 13, 2017) (excluding expert testimony because expert "does not provide any analysis or opinion, or engage in any calculations that are outside of the capacity of the trier of fact").

The same reasoning applies forcefully here. Egan did effectively nothing, not even simple math. He took an Excel spreadsheet that Audible produced and, for each Plaintiff, used the summation function in Excel to obtain the total of royalties attributable to each Plaintiff's returned titles. He then concluded, for each Plaintiff, that the resulting figures were each Plaintiff's recoverable damages. Even if that were a defensible damages theory—as addressed above, it plainly is not—it would require no human intervention at all beyond summing figures using Excel.

Plaintiffs' handful of out-of-circuit cases do not change the outcome. PB 47-48. Those cases involved some amount of human decision-making or analysis, while at most Egan used Excel's summation function (and otherwise simply adopted numbers on Audible's spreadsheets). *See WWP, Inc. v. Wounded Warriors Fam.*

*Support, Inc.*, 628 F.3d 1032, 1037 (8th Cir. 2011) (expert "compared the amount of donations"); *Mint Solar, LLC v. Sam's W., Inc.*, No. 5:19-CV-05167, 2021 WL 1776144, at *2 (W.D. Ark. May 4, 2021) (expert "organize[d] and add[ed] up the numbers provided to him by Sam's Club"); *United States ex rel. Banigan v. Organon USA Inc.*, No. CV 07-12153-RWZ, 2016 WL 6571269, at *2-3 (D. Mass. Jan. 20, 2016) (expert added claims data); *Total Control, Inc. v. Danaher Corp.*, 338 F. Supp. 2d 566, 569 (E.D. Pa. 2004) (finding expert's "ability to present a vast quantity of calculations derived from disparate sources in an understandable format will assist the jury").

Further, to the extent these cases suggest that using Excel's summation function meets Rule 702's standard, they are inconsistent with the decisions from the district courts in this Circuit discussed above. And the single Second Circuit case Plaintiffs cite is plainly inapposite. *See United States v. Onumonu*, 967 F.2d 782, 788 (2d Cir. 1992) (holding "proffered expert testimony regarding diamond smuggling from Nigeria into the United States and the feasibility and profitability of smuggling diamonds in the alimentary canal was relevant and would have assisted the jury in resolving the only contested issue in the case"). Moreover, the issue here is not only the lack of complexity of Egan's calculations but whether it was "manifestly erroneous" for the district court to exclude calculations that would be entirely unhelpful to the jury. *Castillo*, 924 F.2d at 1232. It was not.

Even if Egan's "work" could fairly be characterized as math, it would be confusing and unfairly prejudicial to admit his testimony. *See* Fed. R. Evid. 403.[7] "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (citation omitted). And "given the unique weight such [expert] evidence may have in a jury's deliberations," Federal Rule of Evidence 403 plays a "uniquely important role … in a district court's scrutiny of expert testimony." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). Rule 403 is particularly important where, as here, "the potential unfair prejudice flowing from the admission of [the] testimony is substantial given the grave concerns with [Egan's] methodology and the imprimatur of science that accompanies an expert witness." *United States v. Tuzman*, No. 15 CR. 536 (PGG), 2017 WL 6527261, at *19 (S.D.N.Y. Dec. 18, 2017) (excluding expert testimony); *see also Tchatat v. City of New York*, 315 F.R.D. 441, 447 (S.D.N.Y. 2016) (excluding expert report when "[w]hat little value [the conclusions]

---

[7] The district court did not expressly rely on Rule 403 when excluding Egan, but the Court of Appeals can "affirm a decision on any grounds supported in the record, even if it is not one on which the trial court relied." *Abrahams v. MTA Long Island Bus*, 644 F.3d 110, 115 (2d Cir. 2011) (quoting *10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 125 (2d Cir. 2011)). Audible raised this argument in its *Daubert* motion. Dkt.222_17-18.

have is far outweighed by the danger that the jury would accord too much weight to such opinions because they come from the mouth of a … professional").  The district court could have excluded Egan's testimony under Rule 403 as well.

Plaintiffs respond that "it is reasonable, appropriate, and perhaps even mandatory that an expert (or party) independently perform calculations that a defendant has performed" and that they might have a duty "at least to double-check … those calculations."  PB 44.  That argument strains the limits of candor to the tribunal.  Egan did not "independently perform calculations" or "double-check" anything; he took a summed number from one column in an Audible spreadsheet.  And there was nothing to "double-check"; the column comprised royalty figures associated with returned titles, and Excel did the math.  Again, if that royalty sum was somehow a relevant or proper measure of Plaintiffs' damages, at trial Plaintiffs could simply point to the Audible spreadsheet.  If there were any question about its admissibility, the spreadsheet could come in as a summary under Federal Rule of Evidence 1006.  *See, e.g.*, *SEC v. Terraform Labs Pte. Ltd.*, No. 23-CV-1346 (JSR), 2023 WL 8944860, at *14 (S.D.N.Y. Dec. 28, 2023) ("a witness providing 'a summary of the relevant financial records' is not supplying expert testimony under Federal Rule of Evidence 702" (citation omitted)).

Plaintiffs' strategy is transparent.  They want their purported damages to come not from an Audible spreadsheet but from an expert's mouth.  And they hope a jury

will be confused and swayed to accept those damages based on Egan's *ipse dixit*. That is precisely what Rule 403 forbids. *Tchatat*, 315 F.R.D. at 447. Indeed, before the district court, Plaintiffs more candidly suggested that, rather than Audible's spreadsheet, *Egan's testimony* could properly come in through Rule 1006. Dkt.246_26 n.9. The district court rejected that argument as "borderline frivolous." SPA-19 n.5 ("Rule 1006 permits parties to use summaries, charts, or calculations to present voluminous records to a factfinder. It is not a backdoor for expert testimony, and Plaintiffs provide no case to the contrary." (collecting cases)).

Finally, Plaintiffs lament that Egan has over 35 years of experience, and this is "the first time ever" that his testimony was excluded. PB 36-37. But courts have long recognized that "qualifications alone do not suffice. A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999); *see also Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997) (it is "vital … that judges not be deceived by the assertions of experts who offer credentials rather than analysis"). Audible does not dispute Egan's credentials. But his experience cannot save his irrelevant, unhelpful, and meaningless opinions; indeed, his resume is the very thing that makes his testimony unfairly prejudicial.

In sum, the district court did not abuse its discretion in excluding Egan's testimony. They were neither relevant to Plaintiffs' claims nor did they constitute proper expert analysis.

## IV. CONCLUSION

For all these reasons, the Court should affirm the district court's grant of summary judgment and exclusion of Egan's testimony.

Dated: June 11, 2024       FENWICK & WEST LLP


By: */s/ Brian D. Buckley*
       Brian D. Buckley

Attorneys for Defendant-Appellee
AUDIBLE, INC.

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Circuit Rule 32(a).  This brief contains 13,989 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.      The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Civil Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word, Version 23H2, in 14-point font Times New Roman.

Dated:  June 11, 2024          FENWICK & WEST LLP


By: */s/ Brian D. Buckley*
       Brian D. Buckley

Attorneys for Defendant-Appellee
AUDIBLE, INC.